# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CR417-219 |
| | ) | |
| JUAN RANGEL-RUBIO, | ) | |
| | ) | |
| Defendant. | ) | |

FILED
Scott L. Poff, Clerk
United States District Court

*By James Burrell at 3:05 pm, Jan 18, 2018*

## REPORT AND RECOMMENDATION

This case involves a challenge to the validity of a search warrant issued by a state magistrate to officers conducting a murder investigation in Effingham County, Georgia.  Defendant Juan Rangel-Rubio, an illegal alien charged with the unlawful possession of a rifle seized during the execution of that warrant, contends that the warrant violated the Fourth Amendment by failing to particularize his residence as a place to be searched and by failing to set forth a probable-cause basis for the search. Docs. 37 & 51.  Because the warrant specifically and clearly described each of the multiple dwellings that the magistrate authorized to be searched, including the camper where Rangel-Rubio had a bedroom, his particularity challenge is utterly without merit.  Defendant's attack on the probable cause underpinnings of the warrant fails to acknowledge

1

the deferential standard of review that this Court must utilize when assessing the warrant's validity. Under the appropriate "great deference" standard, *Illinois v. Gates*, 462 U.S. 213, 236 (1983), the warrant affidavit provided a "substantial basis" for the state magistrate's finding of probable cause to search the property described in the warrant. Even if the state magistrate erred, however, the officers had an objective, good faith belief that the warrant was valid both when it was issued and when it was executed. Accordingly, this case does not call for an application of the exclusionary rule, and thus defendant's motion to suppress should be denied.

## I.   FACTS

The essential facts are not in dispute.[1] On August 19, 2017, Garden City police officers discovered the lifeless body of Eliud Montoya, who had been shot in the back of his head and in his back by a small-caliber weapon. Detective Roberto Rodriguez, a Chatham County Officer and the lead homicide investigator, soon identified Pablo Rangel and his nephew, Refugio Ramirez, as the chief suspects. Det. Rodriguez then

---

[1] The Court's discussion of the facts is drawn from the search warrant affidavit (the veracity of which is unchallenged by defendant), the unrebutted suppression hearing testimony of the police detective who presented that affidavit and oversaw the execution of that warrant, and the various exhibits offered by the parties at the suppression hearing.

prepared a warrant affidavit seeking authorization to search certain property owned by Rangel in Effingham County, Georgia. The detective had a police sergeant and a police captain "proofread" the affidavit, and he conferred with an assistant district attorney, who opined that there was sufficient probable cause to seek a warrant. Later that same evening, Det. Rodriguez called an Effingham County Magistrate and arranged to meet with her the next morning, a Saturday. During their brief meeting, the detective supplemented his written affidavit with certain sworn, but unrecorded, oral testimony, which is permissible under Georgia law. *King v. State*, 263 Ga. 741, 743, 438 S.E.2d 620 (1994).

### A. Warrant Affidavit

Detective Rodriguez sought leave to search Pablo Rangel's rural, 26-acre property for guns, ammunition, shell casings, and other items believed to be pertinent to the murder investigation. Aff. at 1.[2] He described the property to be searched as follows:

---

[2] The warrant affidavit appears at various locations in the record, as it was attached to the Government's pre-hearing brief (doc. 46, ex. A) and defendant's post-hearing supplemental brief (doc. 51, ex. A), and introduced as an exhibit during the suppression hearing. For convenience, the Court will simply cite to the affidavit as "Aff." and to the search warrant as "Warrant," using the handwritten numbering scheme that appears at the bottom of each document (*e.g.*, "1 of 4").

275 Milton Rahn Road, Rincon Georgia, 31326.  The residence and property can be reached by traveling on Rahn Station Road from Highway 21 for 2 miles making a left onto Milton Rahn Road and traveling 1.2 miles and the residence (tan in color) will be located on the left following [sic] by the mobile home (gray in color).  See Exhibit A and B.

Property is owned by Pablo Rangel.  Property is listed with having 26.65 acres.  Land has multiple dwellings that can not be accessed without driving on a private drive that dead ends on this land.  Residence has a newer structure identified as a modular home, as well as multiple trailers as follows.  Gray in color mobile home with white trim located at the far end the driveway.  Light colored pull behind camper located in the rear of the gray mobile home, tan in color residence with wooden porch on the back located before reaching the gray mobile home. There are currently 8-10 vehicles on the property.

Aff. at 1.[3]

On the next two pages, Det. Rodriguez set out the facts offered in support of a probable cause finding.  In brief, those facts were these:

- The previous day, August 19, 2017, someone had murdered Eliud Montoya by shooting him once in the back of the head and twice in the back.  Aff. at 2, 3.

- The gunshot wounds appeared to have been inflicted by a small caliber (possibly a .22 caliber) weapon.  *Id.* at 3.  Montoya, whose nose had also been broken, did not exhibit any wounds suggesting that he had fought with his assailant.  *Id.* at 3.

---

[3]  Detective Rodriguez set out the property description passage in both his affidavit and the proposed search warrant using bold, uppercase lettering.  He used similar emphasis in other sections of his warrant application.  Unless otherwise noted, the Court will use standard, unemphasized capitalization when quoting from the affidavit and search warrant.

- Montoya appeared to have been working on a large tree-service work truck at the time of the murder. *Id.* at 2. The investigators saw no evidence that Montoya had been robbed, for his personal vehicle was parked next to the work truck and no items appeared to be missing. *Id.* at 3.

- Montoya's mother arrived at the scene and informed Det. Rodriguez that Montoya's boss, Pablo Rangel, had killed him. *Id.* at 2. She reported that the two men had had a falling out at work on August 17, 2017. She stated that Montoya had filed a complaint against Rangel with the Equal Employment Opportunity Commission (EEOC), and that there were documents that would support her statement. *Id.*

- When Det. Rodriguez interviewed Montoya's wife at their nearby residence, she independently confirmed the information furnished by his mother. *Id.* She also furnished documentation reflecting his employment by Wolf Tree Experts, as well as a manila envelope from the EEOC containing four legal statements from that company's employees, including one by Montoya. *Id.* Those statements advised the EEOC that the employees were in the United States illegally and that they had been mistreated and taken advantage of by their supervisor, Pablo Rangel, who withheld some of their pay. *Id.* Inside Montoya's vehicle the investigators found further documentation reflecting a work conflict between Montoya and Rangel. *Id.* at 3.

- Joel Reyes, one of the EEOC complainants accusing Pablo Rangel of mistreatment, confirmed the truthfulness of his notarized statement to the EEOC. *Id.* at 3. He advised that Rangel would provide the employees with a Social Security Number and phony personal identifiers so that they could be added to the company payroll. *Id.* Rangel did not want Montoya to share this information with anyone. Reyes had warned Montoya to leave Rangel alone, for he was going to have him killed. *Id.* Reyes did not believe that Pablo Rangel would kill Montoya but that he had family members who were willing to do so. *Id.*

- The investigators learned that Refugio Ramirez, one of Pablo Rangel's nephews, lived in a trailer on Rangel's property. *Id.* at 3. A 2014 police report revealed that Ramirez had been arrested for possession of a concealed weapon, a .22 magnum SuperX pistol. *Id.* Ramirez, who worked with the same tree service company as the murder victim, currently had an outstanding arrest warrant from Chatham County.[4]

The search warrant that Det. Rodriguez prepared reflected the same property description as the warrant affidavit. Warrant at 1. Again, that property description stated that Pablo Rangel's 26.65-acre tract could "not be accessed without driving on a private drive that dead ends on this land." *Id.* When the detective appeared before the magistrate, he testified under oath that he had been unable to view Rangel's property himself, because he had been assured by local officers that anyone driving down the secluded private drive would certainly be spotted, thus tipping the investigators' hand. Instead, he relied upon information furnished by Effingham County deputies who had previously been on the property. The detective further explained to the magistrate that he was seeking authorization to search each of the structures and vehicles mentioned in the property description, for he believed that the items to

---

[4] The final sentence of the paragraph discussing "Refugo [sic] Ramirez" actually says that "Eilud" had warrants out for his arrest. *Id.* at 3. Det. Rodriguez testified at the suppression hearing, however, that he "verbalized" to the state magistrate that it was Refugio who was wanted by the police.

be seized (weapons, ammunition, etc.) could be concealed in any of those places.  The magistrate issued the requested warrant at 11:23 a.m. on August 20.

### B. Execution of the Search Warrant

Immediately after obtaining the warrant, Det. Rodriguez met with the assembled search team of around twenty officers and explained the purpose of the search.  He showed them photographs of both Refugio Ramirez and another individual who were believed to be on the property and who both had outstanding arrest warrants.  Each member of the entry team was assigned to search one of the multiple structures located on the property.

The agents arrived at the property between 12:00 and 1:00 p.m., on a day when the temperature approached 100 degrees.  During the next three to four hours, the agents searched all the structures and vehicles on the property.  During the course of that search, they seized numerous firearms, a variety of ammunition and shell casings, and other evidence. Gov't Ex. 14.  While the agents encountered and arrested Pablo Rangel, neither Refugio Ramirez nor the other person wanted by the authorities was on the property at the time of the search.

## II.   ANALYSIS

### A. Particularity Challenge

Defendant's particularity argument rests upon a fallacy -- that Det. Rodriguez sought permission to search, and the warrant allowed him to search, only the "tan in color" modular home where Pablo Rangel resided.  Doc. 22 at 17.  But such a limited search of that single residence was neither requested by the detective nor authorized by the state magistrate.  In his affidavit, Det. Rodriguez stated that he had reason to believe that evidence pertinent to the murder of Montoya was located at "275 Milton Rahn Road," which was the address of the 26.6 acre tract owned by one of the chief suspects, Pablo Rangel.  Aff. at 1.  The affidavit carefully described the "multiple dwellings" on that property, *id.*, and it revealed that another key suspect lived in a trailer on the property.  *Id.* at 3.  Those dwellings consisted of a newer "modular home" as well as a "gray in color mobile home with white trim" located past the modular home, and a "light colored pull behind camper" located behind the mobile home.  Aff. at 1.

Only a strained reading of the warrant's lengthy description of the places to be searched will support defendants' argument that "275

8

Milton Rahn Road" could only mean Pablo Rangel's personal residence "and not the 26 acres surrounding it."  Doc. 51 at 2.  First, neither the warrant affidavit nor the warrant itself ever identifies the tan-colored modular home as Rangel's personal residence, and Det. Rodriguez testified that he did not confirm (though he suspected) that Rangel resided there until after the search.  Second, Rangel was not the only suspect believed to reside at the Rangel compound, for Refugio Ramirez reportedly lived in one of the "trailers" on that property and he was thought to be in possession of a .22 caliber pistol that possibly served as the murder weapon.  Clearly, law enforcement wished to search that trailer.  Finally, the warrant's property description contains this sentence: "*Residence* has a newer structure identified as a modular home, as well as multiple trailers as follows," and what "follows" is a detailed description of each of those structures.  Warrant at 1 (emphasis added).  This definitional passage makes clear that the use of the word "residence" was meant to encompass not just the modular home but the gray trailer and light-colored pull behind camper as well.

Furthermore, when he presented his warrant affidavit to the magistrate, the detective specifically informed her that he was seeking

authorization to search *all the dwellings and vehicles* referenced in the affidavit's property description, for he emphasized that evidence of the murder might be concealed in any of those places.  The magistrate then issued a warrant that contained the exact same property description as the warrant affidavit.  The command clause of that warrant directs the police to search the "property described above."  Warrant at 1.  Any reasonable officer (or judge) would have interpreted that warrant as allowing a search of each of the specifically-described structures, including the camper where Rangel-Rubio resided.

Defendant notes that the detective set forth his firm belief that the "fruits of the crime linking Pablo Rangle to Eliud[ ] Montoya's murder" would be found in "his residence."  Doc. 51 at 3 (referring to Aff. at 2).  When read in isolation, that passage does suggest that there was but one residence at 275 Milton Rahn Road where evidence of the homicide might be concealed.  But when the affidavit is considered in its entirety, whether as originally drafted or as supplemented by the detective's sworn oral testimony before the magistrate, it becomes clear that the detective painstakingly described each of the multiple structures believed to be located at 275 Milton Rahn Road for a very good reason -- he was

seeking to search them all.  And that is precisely what the state magistrate authorized him to do.  Any argument to the contrary depends upon a mischaracterization of both what the detective sought and what the magistrate allowed.[5]

As it turns out, one of the dwellings on Pablo Rangel's property -- the gray mobile home -- had the separate mailing address of 135 Milton Rahn Road.  The camper itself -- where defendant had a bedroom -- had no address at all.  Because the warrant only mention "275" Milton Rahn Road, defendant contends that the officers had no license to enter his unnumbered camper.  This argument is simply wrong.

The Fourth Amendment particularity requirement is satisfied "if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925).  While it is common practice to

---

[5] Defendant refers to *Maryland v. Garrison*, 480 U.S. 79 (1987), where police officers armed with an overbroad but facially valid warrant entered the wrong apartment and, before recognizing their mistake, discovered drugs.  Doc. 51 at 2-3 (while that warrant contemplated only a single apartment on the third floor of a building when there were actually two, both the warrant itself and its execution were valid, as the officers' failure to recognize the warrant's overbreadth was understandable and reasonable).  Here, the police not only recognized that there were multiple dwellings on Rangel's property, they so informed the magistrate of that fact, and they then acted pursuant to a warrant that particularly described and granted permission to search each dwelling.  Thus, this case does not involve the overbreadth problem presented in *Garrison*.

identify the premises by street address (particularly in urban areas), there is no constitutional requirement that this be done. 2 WAYNE R. LAFAVE, SEARCH & SEIZURE § 4.5(a) at 711-12 (5th ed. 2012).[6]  All the Fourth Amendment requires is that the warrant's property description be sufficiently detailed as "to minimize the risk that officers executing [the warrant] will by mistake search a place other than the place intended by the magistrate." *Id.* at 711.  The warrant in this case clearly met that objective.  The warrant gave precise directions to Pablo Rangel's 26-acre tract and, specifically, to the multiple dwellings located on that property.  Warrant at 1 (noting that the property could be reached by "traveling on Rahn Station Road from Highway 21 for 2 miles making a left onto Milton Rahn Road and traveling 1.2 miles," where the "tan in color" residence would be located on the left followed by the "gray in color" mobile home and then the "pull behind camper").  The affidavit then referenced as exhibits two aerial photomaps showing the Rangel property's precise location.  *Id.*, exs. A and B.  The warrant's

---

[6]  As the LaFave treatise notes, the particularity requirement has a greater degree of flexibility in rural settings, both because such property "often does not lend itself to precise description" and "because the chances of error are somewhat less in a rural setting." *Id.* at 712-13.

property description was so precise as to eliminate any possibility that the executing officers would search the wrong premises.

Not only was there no requirement that the camper be further identified by any numeric address, it is unclear how defendant believes the camper could have been more clearly identified.  Based on information gained from local Effingham County officers, Det. Rodriguez believed that the 275 Milton Rahn Road address applied to all of the structures on Rangel's property.  The detective, who was conducting a rapidly unfolding murder investigation, had been unable to examine the property himself prior to the execution of the warrant for fear of alerting the suspects that they had become the focus of that investigation.  He reasonably relied upon local officers familiar with Rangel's property for both its proper address and for the description of the various structures on that property.

When the detective arrived at the property he secured the modular home and the gray mobile home, and proceeded on to the pull-behind camper, which was attached to a homemade, covered wooden entryway resembling a shed.  Gov't Exs. 7-9.  At this point of entry, there was no identifying address or number of any kind to distinguish it as anything

except the structure identified in the affidavit and warrant.  *Id*.  Det. Rodriguez, armed with a warrant that particularly described, and specifically authorized the search of, the pull-behind camper, did not violate defendant's Fourth Amendment rights by entering that dwelling.

The Fourth Amendment states that no warrants shall issue except those "particularly describing the place to be searched."  The search warrant in this case did exactly that.  Defendant's particularly challenge is without merit and must be rejected.

### B. Probable Cause

Defendant next argues that the warrant affidavit failed to establish probable cause to search the camper, doc. 51 at 2, though he appears to concede that the affidavit provided probable cause to search Pablo Rangel's home.  *Id*. at 2, 4.  Nothing in the warrant affidavit's probable cause statement, however, gave greater evidentiary emphasis to Rangel's personal residence than to any of the other dwellings (or vehicles) located inside the Rangel compound.  Indeed, the affidavit set forth information suggesting that it was Rangel's nephew, not Rangel himself, who was the likely triggerman.  There was a greater probability that the murder weapon, or ammunition associated with it, would be found in the

"trailer" where Refugio Ramirez resided than in Rangel's own home.  By again asserting that Rangel's home is the only "residence" at 275 Milton Rahn Road, doc. 51 at 2, defendant is simply resurrecting a particularity challenge that the Court has already found lacking rather than making a direct attack on the affidavit's probable cause foundation.

Defendant's probable cause challenge also fails to discuss the exceedingly deferential standard this Court must employ when reviewing the state magistrate's probable cause determination.  A reviewing court's task is not to make a *de novo* finding of probable cause but rather to decide whether the issuing magistrate -- whose assessment of the affidavit's factual presentation is entitled to "great deference" -- had a "substantial basis" for finding probable cause.  *Gates*, 462 U.S. at 236, 238-39.  Given the strong preference for warrant-based searches, a magistrate's "finding of probable cause should be sustained in doubtful or marginal cases."  *United States v. Scott*, 555 F.2d 522, 527 (5th Cir. 1977).

The state magistrate's probable cause determination clearly survives under this highly deferential standard.  Almost immediately after the police discovered a Hispanic male who had been subjected to an

execution-style slaying, suspicion focused on Pablo Rangel, whom multiple witnesses identified as having a strong motive for committing the murder.  Rangel was a businessman who dominated and abused his illegal-alien workforce, and he had amassed sufficient wealth to acquire a large tract of real estate.  Aff. at 1-3.  It was not unreasonable to infer that this powerful figure -- who had "family" willing to commit murder at his behest -- exercised full control over that secluded 26-acre property. Rangel's nephew, who worked with the victim, lived in one of the trailers on Rangel's property and was known to have been arrested several years earlier while in possession of a small-caliber pistol that matched the murder weapon.   There was then an outstanding warrant for the nephew's arrest.  Defendant does not contest a finding that those facts yielded probable cause to search *some part* of Rangel's 26-acre rural tract, but for reasons that are not precisely explained (other than a bogus particularity claim), he insists that probable case was limited to Rangel's personal residence.   But probable cause may exist to believe that a particular item of evidence is concealed in more than one location, *Gov't of the Virgin Islands v. Gereau*, 502 F.2d 914, 929 (3d Cir. 1974), and here the state magistrate had a substantial basis for her inference that

evidence of the murder might be concealed within any dwelling or vehicle at the Rangel compound.

"Reasonable minds frequently may differ on the question of whether a particular affidavit established probable cause." *United States v. Leon*, 468 U.S. 897, 914 (1984).  Certainly, reasonable jurists might disagree on whether Det. Rodriguez' affidavit established probable cause to search all (or, for that matter, any) dwellings and vehicles on Rangel's property.  But when the state magistrate's probable cause assessment is viewed charitably, as the "great deference" standard requires, it cannot be said that the facts presented were so insubstantial as to preclude any possible finding of probable cause to search the entirety of the Rangel estate.  This warrant, therefore, survives a probable cause challenge.[7]

### C. Good Faith

The judicially-crafted exclusionary rule does not apply where an

---

[7]  Defendant's odd conclusion that because, at the time of the search, he "was outside and not in any structure and was not aware of the presence of firearms or other items of contraband," he "should not be charged with items he was not aware of or physically in possession of at the time of the arrest" (doc. 37 at 1) is unbriefed, unsupported by any citation to legal authority, and unsupported by citation to any declaration, affidavit, or other discovery material in violation of L. Crim. R. 12.1.  It was also ultimately abandoned in his supplemental brief (*see* doc. 51).  In any event, defendant's conclusion raises a jury argument, not a ground for suppression of evidence seized under the warrant.

officer acts in objective, good faith reliance upon a search warrant that is only later determined to be invalid. *Leon*, 468 U.S. 897 (declining to apply the exclusionary rule where officers had acted in reasonable reliance on a search warrant that was ultimately found to be unsupported by probable cause); *Massachusetts v. Sheppard*, 468 U.S. 981 (1984) (applying the good faith doctrine to a warrant that misstated the items to be seized). After *Leon* and *Sheppard*, "searches conducted pursuant to warrants rarely require suppression," *United States v. Taxacher*, 902 F.2d867, 871 (11th Cir. 1990), for "[i]n the ordinary case an officer cannot be expected to question the magistrate's probable cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921.

Even in with-warrant cases, however, the exclusionary rule continues to apply in circumstances where the officer has "no reasonable grounds for believing that that warrant was properly issued." *Id*. at 922-23. *Leon* identified four such situations: (1) where the officer misled the magistrate by intentionally or recklessly including false information in his affidavit, (2) "where the issuing magistrate wholly abandoned his judicial role" by failing to act in a neutral and detached manner,

(3) where the warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," and (4) where the warrant is "so facially deficient . . . in failing to particularize the place to be searched . . . that the executing officers cannot reasonably presume it to be valid." *Id.* at 923.

Nowhere in his briefs has defendant remotely suggested that the affidavit contained any falsehood or that the issuing magistrate served as a partisan for the police.  And despite his particularity challenge (which depends upon evidence not reflected in the warrant itself), he concedes that the warrant is facially invalid.  Doc. 51 at 4.  Rangel-Rubio relies instead upon the third *Leon* exception -- *i.e.,* that the detective's reliance upon the warrant was objectively unreasonable.  *See* doc. 51 at 3 (because Det. Rodriguez "had never been to the property [and] had only looked at it through various websites, including Google maps," "[w]hile the officer[s] could rely on the warrant to search the residence of Pablo Rangel at 275 Milton Rahn Road, it was not good faith to go search every vehicle, trailer and shed on the property . . . without more particularity on the warrant (*sic*).").

The appropriate question here is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. This Court's earlier finding that the magistrate had a "substantial basis" for finding probable cause would certainly suffice to establish that the detective had a good faith belief in the warrant's validity, for if the magistrate acted reasonably (even if erroneously) then so did the officer. But, the circumstances under which an officer might have good faith are not limited to situations where "the affidavit presents enough evidence to create disagreement among reasonable jurists as to the existence of probable cause." *Taxacher*, 902 F.2d at 871. "*Leon* did not establish a 'reasonable jurist' test as the threshold" for evaluating an officer's good faith, "because a reasonable jurist has more legal training than a reasonably well-trained officer." *Id.* at 872. Thus the detective may have had a good faith belief that the warrant was valid even if there was no substantial basis for the magistrate's probable cause finding.

The Court has no difficulty in concluding that Det. Rodriguez had such a reasonable good faith belief that the magistrate had issued a valid warrant to search all of the dwellings and vehicles on Pablo Rangel's

property.  The detective had acquired evidence from multiple witnesses that Rangel had orchestrated the murder of Montoya, and he had been furnished documentation showing that Rangel had a powerful motive to do so.  Rangel had a nephew who worked with the murder victim.  That nephew not only lived in an unspecified trailer[8] on Rangel's 26-acre property but had a criminal record reflecting the prior possession of a pistol that might have served as the murder weapon.  The detective had been assured by local deputies that 275 Milton Rahn Road served as the address for all of the dwellings on Rangel's property.  Once he accumulated this evidence Det. Rodriguez conferred with both his superiors and an assistant district attorney, who agreed that the probable cause threshold was met.  "These steps are indicative of objective good faith."  *Id.* at 872.  A well-trained officer could reasonably have assumed that this warrant met Fourth Amendment standards.

## III.  CONCLUSION

Defendant has shown neither that the warrant insufficiently particularized the places to be searched or that the issuing magistrate

---

[8]  Det. Rodriguez testified at the suppression hearing that, during his interview, Joel Reyes had revealed only that Refugio Ramirez lived in "a trailer" on Rangel's land. Reyes had been able to furnish a more precise description of that dwelling, however.

lacked a substantial basis for her probable cause determination.  But even assuming such deficiencies, this warrant stands, for the executing officer had an objective, good faith belief that the magistrate had properly found that the warrant was both technically sufficient and adequately supported by probable cause.  Hence, defendant's suppression motion fails.

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge.  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to timely file objections will result in the waiver of

rights on appeal.  11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this   18th   day of January, 2018.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA