1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                      SAVANNAH DIVISION


 3
    UNITED STATES OF AMERICA,   )
 4                              )
            Plaintiff,          )
 5                              )
       vs.                      )      CASE NO. 4:17-CR-217
 6                              )
    HIPOLITO MARTINEZ-MARTINEZ, )
 7                              )
            Defendant.          )
 8  ---------------------------
    UNITED STATES OF AMERICA,   )
 9                              )
            Plaintiff,          )
10                              )
       vs.                      )      CASE NO. 4:17-CR-218
11                              )
    JHONATAN RANGLE,            )
12                              )
            Defendant.          )
13  ---------------------------
    UNITED STATES OF AMERICA,   )
14                              )
            Plaintiff,          )
15                              )
       vs.                      )      CASE NO. 4:17-CR-219
16                              )
    JUAN RANGEL-RUBIO,          )
17                              )
            Defendant.          )
18  ---------------------------

19

                 TRANSCRIPT OF EVIDENTIARY HEARING
20             BEFORE THE HONORABLE G. R. SMITH
                  United States Courthouse
21                    125 Bull Street
                      Savannah, GA
22                  December 13, 2017

23  COURT REPORTER:  Kelly McKee Dorsey, CCR, RMR, CCP
                     United States Court Reporter
24                   P. O. Box 8552
                     Savannah, GA  31412
25                   912-650-4065
```

2

```
 1                        APPEARANCES OF COUNSEL

 2     FOR THE UNITED STATES OF AMERICA:

 3         TANIA D. GROOVER, Esq.
           U. S. ATTORNEY'S OFFICE - SAVANNAH DIVISION
 4         P. O. Box 8970
           Savannah, GA 31412
 5         912-201-2552
           Email:  Tania.groover@usdoj.gov
 6
       FOR THE DEFENDANT MARTINEZ-MARTINEZ:
 7
           AMY LEE COPELAND, Esq.
 8         AMY LEE COPELAND, LLC
           P. O. Box 23358
 9         Savannah, GA 31403
           912-544-0910
10         Email:  Alc@roco.pro

11     FOR THE DEFENDANT JHONATAN RANGEL:

12         TINA M. HESSE, Esq.
           P.O. Box 1002
13         Savannah, GA 31402
           912-656-2377
14         Email: Tinahesse06@yahoo.com

15     FOR THE DEFENDANT JUAN RANGEL-RUBIO:

16         JAMES B. BLACKBURN, JR., Esq.
           WISEMAN, Blackburn & Futrell
17         P.O. Box 8996
           Savannah, GA 31412-8996
18         912-232-2136
           Fax: 912-238-9810
19         Email: Jbbjratty@aol.com

20

21

22

23

24

25
```

3

1                          I N D E X

2                                              PAGE
  WITNESSES
3      Roberto Rodriguez
           Direct Examination by Ms. Groover        12
4          Cross-Examination by Ms. Copeland        67
           Cross-Examination by Ms. Hesse          103
5          Cross-Examination by Mr. Blackburn       110
           Redirect Examination by Ms. Groover      116
6          Recross-Examination by Ms. Copeland      118

7      Anthony Miranda
           Direct Examination by Ms. Groover       121
8          Cross-Examination by Ms. Copeland       138

9  Certificate of Reporter                         161

10

11

12  (Proceedings recorded by FTR, transcript subsequently produced
  by mechanical stenography and computer-aided transcription.)
13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    **P R O C E E D I N G S**

2                       **(10:04 a.m.)**

3           THE CLERK:  Court calls the case of the *United States of*

4   *America vs. Hipolito Martinez*, Criminal Case Number CR 4:17-217;

5   Jhonatan Rangel, Criminal Case Number CR 4:17-218; Juan Rangel-

6   Rubio, Criminal Case Number 4:17-219.

7           MS. GROOVER:  Tania Groover on behalf of the government.

8   We are ready to proceed, Your Honor.

9           MS. COPELAND:  Good morning, Judge.  Amy Lee Copeland

10  for Mr. Martinez.  We are also ready this morning.

11          THE COURT:  All right.  We need the services of an

12  interpreter, I'm told.  So if you would administer the oath.

13          THE CLERK:  Please raise your right hand, Mr. Maldonado.

14                  (Interpreter sworn)

15          THE CLERK:  Please state your name for the record.

16          THE INTERPRETER:  Jorge Maldonado.

17          MS. HESSE:  Your Honor, good morning.  Tina Hesse.  I

18  represent Jhonatan Rangel.

19          THE COURT:  All right.  Good morning to each of you.

20          Now, there is a third defendant that we've brought here,

21  Mr. Juan Rangel-Rubio, who is represented by attorney James

22  Blackburn.  I'm told he's not present.  His client is.  He had

23  filed a preliminary motion to suppress, he called it.  And in

24  there he said he was filing it in general form.  But he did not

25  return the standard notice that we have developed for use in

1    criminal cases for a defendant's attorney to give specific

2    notice to the Court about which of the many motions they

3    typically file really need a hearing; in other words, what is

4    still unresolved.  He did not file it.

5            MS. GROOVER:  No.  That is correct, Your Honor.

6            THE COURT:  Have you heard from him?

7            MS. GROOVER:  I have not, Your Honor.

8            MS. COPELAND:  He called me yesterday afternoon.  He

9    needed to know what length of time one had to file a notice of

10   appeal following a judgment in a federal criminal case.  And we

11   had this discussion yesterday afternoon about 4 or 4:15.  And at

12   the end of it I said, "I will see you in the morning, Jay."  And

13   he said, "oh."  That was the only discussion that I have had

14   with him, but I have spoken with him and mentioned this

15   morning's hearing to him specifically.

16           THE COURT:  Well, I don't know what all this means,

17   whether -- he's not formally withdrawn the motion.  But it is in

18   general form.  It doesn't meet the rules.  We're certainly not

19   going to proceed with a hearing today as to his client when he's

20   not here with his client.  So it's very strange.  He doesn't

21   usually fail to appear for noticed proceedings, particularly

22   after a reminder by co-counsel the day before.  So I'll just

23   have to put that case aside.  And we'll address the other two

24   defendants who are here and who are represented.

25           MS. COPELAND:  Judge, as a housekeeping matter, will we

6

1    be cross-examining the officer *ad seriatim* or do you want us to

2    keep this separately or how do you want us to proceed?

3              THE COURT:  Well, the Court is flexible in that.

4    Economy, both of my time and yours, is always of paramount

5    consideration.  I think the government may have some witnesses

6    here.  Is that right?

7              MS. GROOVER:  We do, Your Honor.  The government intends

8    to call two witnesses to establish how the search warrant was

9    obtained and how it was executed, Your Honor, if Your Honor

10   would permit.

11             THE COURT:  All right.  I would guess after the

12   witnesses for the government testify, the defense counsel will

13   each get a shot at cross-examining; and then if you need to

14   introduce your own evidence -- and Amy Lee, I see you have

15   some -- then you may proceed to do it.

16             Counsel may be seated a minute.  You know, this case

17   arose because, everybody knows, officers investigating a murder

18   in Effingham County obtained a warrant to search for the murder

19   weapon.

20             Mr. Blackburn, you're late.

21             MR. BLACKBURN:  Yes, sir.  I brought my checkbook.

22             THE COURT:  Well, I mean we're into this proceeding now.

23   Why are you sitting in the back of the courtroom?  If you're a

24   lawyer appearing for a client here, come up.  You know how it

25   works.

7

1          Let's begin by asking you, do you still -- this

2     preliminary motion to suppress that you said that was filed in

3     general form --

4          MR. BLACKBURN:  I have supplemented it.

5          THE COURT:  Oh, I haven't seen any supplement.

6          MR. BLACKBURN:  And it will be entered into the record

7     today.

8          THE COURT:  Today?  That's a little untimely, sir.  What

9     is your supplement?

10          MR. BLACKBURN:  It further outlines our contentions and

11     the law we claim that applies.

12          THE COURT:  And what is your contention?

13          MR. BLACKBURN:  That basically the warrant was not

14     specific enough as to where they were searching and that it was

15     specific as to one residence, not to a 26-acre parcel of land

16     and not to every building, outhouse and shed --

17          THE COURT:  That's the same argument raised in the other

18     briefs, that there was a violation of the Fourth Amendment

19     particularity requirement.

20          MR. BLACKBURN:  Yes, sir.

21          THE COURT:  That's it?

22          MR. BLACKBURN:  That's basically it.

23          THE COURT:  All right.  As I was saying, we have -- the

24     warrant that was issued by a state magistrate in Effingham

25     County to search for the murder weapon led to the discovery -- I

8

don't know if it led to the discovery of the murder weapon or
not, but it led to the discovery of various firearms, including
the firearms that each of these defendants has been charged with
possessing as an illegal alien.  Each defendant has contested
the validity of the warrant and to some extent the manner in
which the warrant was executed.

Having read the briefs thoroughly, and I have certainly
studied the warrant affidavit and the application; and Amy Lee,
you gave me the police report that talks about the execution.
I've read that very carefully.  And it seems to me from my
survey of all that material that we have four questions to
consider today.

First, what is the proper interpretation of this
warrant?  What did it authorize?  Did it -- and there's a
dispute about it.  Did it authorize a search of the tan-colored
modular home where the chief suspect, Pablo Rangel, resided as
is contended by some of the defendants, or all of them?  Or did
it also authorize a search of each of the multiple dwellings and
vehicles that were set forth, listed in the property description
paragraph of the warrant; and of course, what was listed there
is a gray mobile home with white trim and a pull-behind camper,
and eight to ten vehicles are listed or mentioned there.  So
that's the first question.

The second -- and that may require the taking of
evidence, and I think the parties think it will.  If the warrant

9

is determined to have authorized this broader search of all
dwellings and vehicles on this Pablo Rangel's property, did the
state magistrate err in finding probable cause for such a
broader search?  And assuming the state magistrate did err, did
these officers, nevertheless, have an objective, good-faith
belief in the warrant's validity?  That is, the question in the
*Leon* case, would a reasonable officer have known that despite
the issuance of the warrant, that the probable cause was so
lacking that any search under that warrant would be illegal?

And finally, the question about the execution.  Did the
officers act reasonably in the manner in which they executed
this warrant?  So the particularity argument that has been
raised would merit the taking of evidence about what these
officers knew or should have known about the property
description and how you would tell the judge and how the warrant
would be framed and what it would authorize, the search of what
specific property.  So were they -- did they make a reasonable
effort to identify the place with the particularity the Fourth
Amendment requires?  And also, we may need evidence on the facts
relating to the execution of the warrant.

Now, as to the question of probable cause, in assessing
probable cause, the Court is limited to the facts that were
presented to the state magistrate.  So far I've been assuming
that all of the facts presented to the state magistrate are set
forth within the four corners of this affidavit that I've read

1    that the parties have furnished me.  Was any other information

2    presented to that state magistrate?

3        MS. GROOVER:  It's my understanding there was with

4    respect to the description of the property, Your Honor.

5        THE COURT:  And do you have evidence you intend to

6    introduce regarding that?

7        MS. GROOVER:  I have a witness, Your Honor, the witness

8    that was present and provided the testimony to the magistrate.

9        THE COURT:  Well, Georgia Law, unlike federal law, does

10   allow for information that was presented to the magistrate to be

11   in oral form.  That wouldn't work here.  So I was afraid of

12   that, we might be getting into that kind of testimony.  But

13   we'll address it as it arises.

14       All right.  How many witnesses do you have?

15       MS. GROOVER:  The government has two witnesses, Your

16   Honor.

17       THE COURT:  Do you have any?

18       MS. COPELAND:  Your Honor, I think a lot depends on what

19   the government's witnesses have to say as to whether or not we

20   will be calling anyone.  I also have my client's affidavit in

21   the record establishing that's where he resided and that was

22   where he received his mail.

23       THE COURT:  You know, somehow I missed the affidavit,

24   but I assumed it was there.  You said you would be forthcoming

25   with it.

1    MS. COPELAND:  It's Document 27, and the attachment is

2    27.  Your Honor, if I may approach, I --

3    THE COURT:  You can give it to the clerk.  I'm sure it

4    says -- Tina, I've got your affidavit where you say --

5    MS. HESSE:  Yes, Your Honor.

6    THE COURT:  I'm sorry we're having to put up with this.

7    If I knew how to put a piece of paper in there to stop this from

8    vibrating, I'd do it.

9    All right.  Let's have your witnesses stand.  Let's

10   place them under oath.

11   THE CLERK:  Would the witnesses please stand and raise

12   your right hand.

13   MS. HESSE:  Would the defense --

14                    (Witnesses sworn)

15   THE COURT:  Any requests to exclude any witness?

16   MS. GROOVER:  The government would request to exclude

17   any witness that's not a defendant, Your Honor.

18   THE COURT:  Well, I didn't see anybody on the defense

19   side.

20   MS. COPELAND:  Your Honor, the government is limited to

21   one case agent at the table, I believe, and so I would ask for

22   the non case agent to step out.

23   MS. GROOVER:  The case agent is Special Agent Harley

24   Snipes, who's not -- at this time will not be called, and the

25   two witnesses I will ask that they step out then.

Case 4:17-cr-00219-LGW-GRS    Document 61    Filed 03/02/18    Page 12 of 161
ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

12

1          THE COURT:  Well, you need one of them right now, don't

2  you?

3          MS. GROOVER:  I do.

4          THE COURT:  All right.  Well, call that witness.  Let me

5  have the other witness step out of the courtroom.

6          MS. GROOVER:  Yes, Your Honor.  The government calls

7  Detective Robert Rodriguez.

8          THE CLERK:  Sir, you have just been sworn.  If you

9  would, please be seated.  State your name and your occupation

10  for the record, please.

11          THE WITNESS:  Roberto Rodriguez, I'm a detective with

12  the Garden City Police Department.

13                ROBERTO RODRIGUEZ, having been previously

14  sworn, testified as follows:

15                          DIRECT EXAMINATION

16  BY MS. GROOVER:

17  Q.    What are your duties as a detective, sir?

18  A.    I do forensics as well as investigate all type of crimes,

19  from petty larceny to homicide.

20  Q.    And as part of a detective, does that include obtaining

21  search warrants?

22  A.    Yes, ma'am, it does.

23  Q.    And generally, can you describe the process for the Court

24  that you go through when you obtain a state search warrant?

25  A.    First thing we have to have is we have to try to build

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

13

1   some kind of probable cause to obtain the item to be searched,

2   whether it be an electronic device, residence or vehicle.  With

3   that being said, we type up the search warrant --

4         MS. COPELAND:  Your Honor, may I ask the witness to

5   speak a little bit more slowly?  It is very rapid fire.  I'm

6   having trouble following.

7         THE COURT:  Well, people can only do so much about their

8   rhythms of speech.  But Detective Rodriguez, to the extent that

9   you can slow down a little bit, if you will do that, please.

10        THE WITNESS:  Yes, sir.  Will do.  We gotta build the

11  probable cause first.  First off, we have to have a crime.  We

12  build the probable cause.  We annotate the probable cause, and

13  we go to the jurisdiction where the search warrant is to be

14  filled out and have it signed by either a magistrate or superior

15  court judge in that jurisdiction.

16  BY MS. GROOVER:

17  Q.   Do you -- and for that process do you prepare your own

18  search warrant?  Do you actually type it up or does someone else

19  type it up?

20  A.   I type it up myself.

21  Q.   And do you submit it to a prosecutor or attorney to review

22  it before you go in to touch base with the magistrate or the

23  superior court judge?

24  A.   On some occasions we do.  On this particular occasion,

25  this was proofread by a sergeant as well as a captain in the

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

14

1   criminal investigations division.

2   Q.    In this particular case was this presented to a

3   prosecuting attorney?

4   A.    As far as the search warrant goes, no.  As far as the

5   information reference to the search warrant to obtain a search

6   warrant, that was with Assistant District Attorney Frank

7   Pennington from the Chatham County DA's office.

8          THE COURT:  So the answer is you did -- the warrant was

9   reviewed by --

10         THE WITNESS:  It was -- I verbally annotated what the

11  context of the search warrant was to see if I had enough

12  probable cause to obtain a search warrant.

13         THE COURT:  So you called --

14         THE WITNESS:  Yes, sir.

15         THE COURT:  -- the assistant district attorney --

16         THE WITNESS:  Yes, sir.

17         THE COURT:  -- and told him what you were up to and what

18  the warrant affidavit said?

19         THE WITNESS:  Yes, sir.

20  BY MS. GROOVER:

21  Q.    Did he personally review the four corners of the document?

22  A.    Not the verbiage, no, ma'am.

23  Q.    Okay.  And do you speak Spanish?

24  A.    Yes, ma'am, I'm bilingual.

25  Q.    Fluent Spanish?

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

15

1   A.    Yes, ma'am.

2   Q.    And were you assigned to the homicide investigation that

3   occurred on August the 19th of 2017?

4   A.    Yes, ma'am, I was.

5   Q.    And could you describe for the Court how the events took

6   place?

7   A.    On this particular day I was actually investigating a

8   separate homicide that occurred the night prior.  I was in the

9   area when the call came out for an unresponsive male lying on

10  the ground next to a work truck on Old Dean Forest Road.  I was

11  one of the first responding officers.  I saw the first officer

12  trying to obtain vitals or see if there was a pulse on the

13  victim.  She advised no.

14      EMS arrived a short time later, put some leads on him,

15  which was to see if he had any heart rhythm or if he was

16  breathing.  They advised no.

17      At that time when they turned him over, they advised that

18  he had what appeared to be a gunshot wound to the back of his

19  head.

20  Q.    Did the investigation determine that he appeared to be

21  shot multiple times with a possible .22-caliber weapon?

22  A.    Yes, ma'am.  That was -- we found that out two days later.

23  Q.    On or about the 19th of August at the time when you found

24  Mr. Montoya, did you determine at that time that it was a

25  small-caliber weapon that had shot him?

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

16

1   A.   The hole that entered his body was smaller.  So we ruled

2   that it was possibly going to be a smaller caliber ammunition.

3   Q.   Did you speak with members of Mr. Montoya's family and as

4   well as --

5        THE COURT:  Well, I know he did.  I've read the warrant

6   affidavit.  And nothing he says here can expand the warrant

7   affidavit, unless he's telling me, I told the judge this and

8   that wasn't in the affidavit.

9        MS. GROOVER:  Yes, sir.

10        THE COURT:  So why go through everything that's in the

11   affidavit?  I mean I've read it carefully.  I know -- I don't

12   want to interrupt the flow of the presentation.  In other words,

13   the officer is probably -- you told him, I'll be asking you

14   these questions.  And I don't want to disrupt the government's

15   presentation.  That's not my intent.  But I know what's in the

16   affidavit.

17        MS. GROOVER:  Yes, sir.

18   BY MS. GROOVER:

19   Q.   Based on your investigation, did you prepare a search

20   warrant in this case?

21   A.   Yes, ma'am, I did.

22   Q.   And the search warrant that we just discussed that you

23   discussed verbally with the prosecutor's office, but they did

24   not review.

25   A.   Correct.

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

17

1        MS. GROOVER:  Your Honor, may I approach the witness?

2        THE COURT:  You may.

3   BY MS. GROOVER:

4   Q.   Sir, I'm handing you what's been marked for identification

5   purposes as Government Exhibit 1.  Can you take a look at that

6   and tell me if you recognize that, sir?

7   A.   Yes, ma'am, I do.

8   Q.   And what is that?

9   A.   It is a copy of my affidavit and search warrant as well as

10  two exhibits in the back.

11  Q.   And is this a copy of what you prepared to present to the

12  judge?

13  A.   Yes, ma'am, it is.

14  Q.   And let's start with the property description.

15  A.   Okay.

16  Q.   How did you -- first, have you ever been to 235 Milton

17  Rahn Road before?

18  A.   Prior to this investigation, no, ma'am.

19  Q.   Okay.  How did you determine the description of 275 Milton

20  Rahn Road?

21  A.   Investigative leads led us to a potential suspect living

22  at 275 Milton Rahn Road in Rincon, Georgia.  I'm not a resident

23  of Rincon, so I relied a lot of the information as to Sergeant

24  Don White of the Effingham County Sheriff's Department.  He

25  composed reports as well as got patrol officers' information in

Case 4:17-cr-00219-LGW-GRS    Document 61    Filed 03/02/18    Page 18 of 161
ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

18

1    reference to this residence.  He advised me that it's a very

2    secluded area.  It's over 20 acres of land.  He stated that if

3    any vehicle or any police car drives on the property, it will be

4    easily identified, and if there was a potential suspect, murder

5    suspect on the property, they'll get spooked or they'll get

6    scared, and any evidence that could possibly be there would

7    be -- they would get rid of it.

8    Q.    Based on that information, did you determine it was in the

9    best interest of the investigation to not attempt to go into the

10   property?

11   A.    Yes, ma'am.  Based on that reason only.

12   Q.    Did you do independent research about the property in

13   determining the description of the suspect's residence?

14   A.    Yes, ma'am, I did.

15   Q.    Describe that process for the Court.

16   A.    I did a background on Mr. Pablo Rangel on the website

17   called TLO.  It's an investigative tool we use to obtain

18   telephone numbers and addresses.  That address came back to

19   Mr. Pablo Rangel.  I asked Effingham for their property records

20   website to annotate any kind of property records that had been

21   filed in their county.  They provided me a website, which I was

22   able to get on, and I believe it's qPublic.net, which is run by

23   Effingham County.  And it showed that the residence was owned by

24   Pablo Rangel, and it was 26.65 acres.

25          THE COURT:  When you say the residence was 26.65 --

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

19

1          THE WITNESS:  The property.

2          THE COURT:  -- acres, you're using residence to mean

3    what?

4          THE WITNESS:  Just the property itself.  The land.

5          THE COURT:  Okay.

6    BY MS. GROOVER:

7    Q.    And did you print a document from that qpublic.net website

8    regarding the property owned by Pablo Rangel?

9    A.    Yes, ma'am.  I attached that as well as a Google Earth

10   image with highlighted images of the property to be searched,

11   and that was presented to the magistrate court judge, Ms. Rhonda

12   Sexton.

13   Q.    And specifically, is Exhibit A the printout from

14   qPublic.net describing the property owned by your murder

15   suspect, Pablo Rangel?

16   A.    Yes, ma'am.

17   Q.    And is Exhibit B to the affidavit an overview map from

18   Google Maps of the property owned by the murder suspect?

19   A.    Yes, ma'am.

20   Q.    Now --

21          THE COURT:  That zoomed-in shot of Exhibit B appears to

22   show a road coming out of the bottom right-hand corner that then

23   turns and curves.  That road, what is that road we're looking at

24   there?

25          THE WITNESS:  That is a dirt road that leads from

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

20

1   multiple other dwellings.  You've got to drive on the dirt road

2   to get to this actual property.

3          THE COURT:  I understand -- you concede --

4          THE WITNESS:  Yes, sir.

5          THE COURT:  -- this Exhibit B, all right, it's the same

6   picture.  This road coming out, if you keep going down into the

7   white part of the page, where do you go?

8          THE WITNESS:  It'll take you -- after you travel for

9   several hundred acres of woods, it'll take you back to the main

10  road.

11         THE COURT:  And what is the name of that main road?

12         THE WITNESS:  I believe it's actually either Milton Rahn

13  or Rahn Road.

14         THE COURT:  Is there a Rahn Station Road?

15         THE WITNESS:  I believe that's it, yes, sir.  Rahn

16  Station Road.

17         THE COURT:  The reason I'm saying that is because

18  Ms. Copeland representing Mr. Martinez took some photographs of

19  some mailboxes at that intersection.  So you agree this Milton

20  Rahn Road -- is this Milton Rahn Road in this Exhibit B or is

21  that a private drive?

22         THE WITNESS:  Like I said, it's not an actual road, a

23  paved road.  It's in the woods.  It's a dirt road that looks

24  like it was created, and it leads all the way to the back of

25  this property.

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

21

1      THE COURT:  Is that publicly maintained what we're

2   seeing here in this picture?

3      THE WITNESS:  From what I saw, Judge, no.  I would not

4   say it was publicly maintained property.

5      THE COURT:  So you think that's a private drive?

6      THE WITNESS:  Yes, sir.  Yes, sir.

7   BY MS. GROOVER:

8   Q.   And that was your understanding when you prepared the

9   warrant?

10  A.   Yes, ma'am.

11  Q.   That you needed permission to get on it?

12  A.   Correct.  Yes, ma'am.

13     THE COURT:  You haven't mentioned yet -- he's talked

14  about he was seeking -- earlier, he'd never been before to 275

15  Milton Rahn Road in Rincon, and yet there's a reference in the

16  affidavit to Springfield.  Were you initially under the

17  impression that this road was in Springfield, Georgia?

18     THE WITNESS:  No.  We interviewed a witness in reference

19  to we had a signed affidavit that led us to this actual

20  residence.  And it was that witness who provided us Springfield,

21  Georgia.  It was unknown at the time.  So at the time two search

22  warrants were actually compiled, one with the actual Springfield

23  address and one with Rincon address.  And when the Rincon

24  Sergeant Don White proofread the report, he's the one that told

25  me at that time that it was an actual Rincon address.

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

22

1   BY MS. GROOVER:

2   Q.    In your affidavit you reference an individual that

3   indicated Pablo Rangel had family members that lived with him.

4   A.    Yes, ma'am.

5   Q.    Did that individual specifically say he lived in

6   Springfield?

7   A.    Yes.

8   Q.    And is that why your affidavit references Springfield?

9   A.    Correct.

10  Q.    But the overall property description references Rincon,

11  Georgia.

12  A.    Yes, ma'am.

13          THE COURT:  Go ahead and identify the witness.  I've

14  read the affidavit enough, I know all the names.

15          MS. GROOVER:  Yes, sir.

16  BY MS. GROOVER:

17  Q.    Joel Reyes.

18  A.    Joel Reyes, yes, ma'am.

19  Q.    You interviewed him prior to obtaining the search warrant;

20  is that correct?

21  A.    Yes, ma'am.

22  Q.    And what specifically did he tell about the murder

23  suspect?

24  A.    He said that the murder suspect had problems with the

25  victim.  Specifically, he said that if he didn't back off of

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

23

1  pressuring the fact that the suspect was an illegal alien, I

2  guess picking on the actual -- the illegal aliens as well and

3  pressuring them for money, he was actually going to have him

4  killed.  Those were his exact words.

5  Q.   And --

6       THE COURT:  Go ahead.

7  Q.   Did you learn also that Pablo Rangel had a family member

8  that lived with him on a trailer on his property?

9  A.   Yes, ma'am.  He provided a name of Refugio.  That

10 information was brought forward to him.  It was Refugio and I

11 believe Carlos Perez.

12 Q.   And the witness, Joel Reyes, told you this information?

13 A.   Yes.

14 Q.   Were you able to identify that in 2014 Refugio was in fact

15 arrested with a .22-caliber firearm?

16 A.   Yes, ma'am.

17 Q.   And did your investigation also determine that that was

18 possibly --

19 A.   At that time we suspected a .22 caliber was used for the

20 murder.

21 Q.   And you placed all of this in your affidavit?

22 A.   Yes, ma'am.

23 Q.   And --

24      THE COURT:  Well -- go ahead.  Go ahead.

25      MS. GROOVER:  I'm sorry, sir.  I don't mean to interrupt

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

24

1    you.

2            THE COURT:  Well, no.  I mean what's in the affidavit --

3    there's a reference in there to Springfield, which you've

4    explained, or tried to.  But you say Refugio lives in a trailer

5    located on his uncle's property located at 275 Milton Rahn Road.

6    That information came from your witness you were interviewing?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  He knew the 275 Milton Rahn Road address?

9            THE WITNESS:  No, he did not.  No.  He said the uncle --

10   he identified the property as a large area that they call --

11   he's an employee of the company.  He's been there before, and

12   they call it Farm because they have animals on the property.

13           THE COURT:  All right.  So the victim -- I mean this

14   Refugio lived in a trailer on -- he couldn't be more specific

15   than that?

16           THE WITNESS:  No.  No.

17           THE COURT:  All right.

18   BY MS. GROOVER:

19   Q.   Did you discuss with Effingham County deputies and law

20   enforcement who had actually been to this property about whether

21   or not there were other trailers on this property?

22   A.   Yes.  They're the ones that actually told me there was

23   multiple other trailers on there, multiple vehicles, multiple

24   people.  They also told me as well that they've had numerous

25   shots-fired complaints coming from that residence as well.

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

25

1    Q.    And the description --

2            THE COURT:  When you say residence, again, you're

3    talking about this property?

4            THE WITNESS:  In this instance they described it as

5    multiple trailers, campers.

6            THE COURT:  But I mean the gunshots, were they specific

7    as to any particular dwelling on the property or people --

8    neighbors could hear gunfire from someplace on the property?

9            THE WITNESS:  Yeah, the neighbors were calling on the

10   actual 275 Milton Rahn Road.  They were not specific on an

11   actual trailer and area it was coming from.  They were just

12   coming from that area.

13           THE COURT:  All right.

14   BY MS. GROOVER:

15   Q.    And your understanding of 275 Milton Rahn Road was this

16   26-acre property that -- land owned by Pablo Rangel?

17   A.    Yes, ma'am.

18   Q.    And it's your further understanding, based on discussions

19   with other law enforcement officers who had actually been to the

20   property, that there were multiple trailers or campers or places

21   to live on the property?

22   A.    Yes, ma'am.

23   Q.    It's further your understanding from speaking with the

24   witness, Mr. Reyes, that family members of Pablo Rangel lived in

25   these trailers or campers on his property?

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

26

1    A.    Yes, ma'am.

2    Q.    And it's further your understanding based on your

3    investigation that one of these family members was arrested with

4    a caliber firearm that matched -- possibly matched the caliber

5    firearm shot that Mr. Montoya was shot with?

6    A.    Yes, ma'am.

7          THE COURT:  This was the Refugio character?

8          THE WITNESS:  Yes, sir.

9    BY MS. GROOVER:

10   Q.    The description that you placed in the search warrant, at

11   the time you used dwelling, residence, trailer, camper.

12         THE COURT:  Land.  Don't leave out land.

13   BY MS. GROOVER:

14   Q.    And land.  Can you describe for the Court why you switched

15   from using the terms?

16   A.    From dwelling to --

17   Q.    To camper to land throughout the affidavit.  Is there a

18   particular reason?

19   A.    No, ma'am.  Just the verbiage changed.

20   Q.    And why did you change the verbiage?

21   A.    There's no apparent reason.  It's just -- I guess

22   originally when I started typing the search warrant, it was

23   for -- I thought it was just going to be one residence on there.

24   But then the more I read into the interview with Joel and then

25   the interview I did with Effingham County, it changed from an

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

27

1    actual residence to multiple trailers and multiple campers.  In

2    the property there was actually campers and trailers.

3            THE COURT:  Did you know whether or not any of these

4    other dwellings or any of the dwellings had listed addresses

5    separate from number 275?

6            THE WITNESS:  No, sir.

7            THE COURT:  Go ahead.

8    BY MS. GROOVER:

9    Q.    What magistrate did you meet with when you presented this

10   warrant?

11   A.    It was Judge Rhonda Sexton from the Effingham County.

12           THE COURT:  What's the first name?

13           THE WITNESS:  Rhonda.

14           THE COURT:  Rhonda Sexton.

15           THE WITNESS:  Yes, sir.

16   BY MS. GROOVER:

17   Q.    Attachment Exhibit A and B describe the property that your

18   intention was to search.  And was it your intention that you

19   were seeking a search warrant to search all of the campers and

20   trailers and homes on this property?

21   A.    Yes, ma'am.  And the sole reason was that .22-caliber

22   rounds could be small, as small as a hand pistol to as large as

23   a rifle.  Guns are easily -- you can put them anywhere:

24   Vehicles, campers, residence.  So that was the main reason I

25   wanted to search the property.

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

28

1    Q.    And was it also your intention to search all of the

2    trailers and campers and homes and dwellings -- I use the term

3    broadly because they were referred to broadly throughout the

4    warrant -- because it was your understanding that you had

5    probable cause that family members may live at these other --

6    A.    Yes, ma'am.

7          THE COURT:  Did you know whether the victim was shot --

8    you thought it was a small-caliber weapon?

9          THE WITNESS:  Yes, sir.  I presumed -- I'm not a gun

10   expert.  Originally -- I've shot .22-caliber bullets, and I know

11   the size hole that the .22 makes, but then my captain, is former

12   military, advised that the same hole could be made by a .223; an

13   assault rifle will leave about the same size hole on it.  So at

14   that point we went from a .22 to it could possibly be a larger

15   semiautomatic rifle.

16         THE COURT:  Well, I was going to ask if you had -- in

17   looking for a weapon if you knew whether it was a pistol or a

18   rifle.

19         THE WITNESS:  It was unknown.

20         THE COURT:  All right.

21         THE WITNESS:  There was no shell casings recovered on

22   scene, so --

23         THE COURT:  So you're looking for a small-caliber

24   weapon?

25         THE WITNESS:  What we suspect, yes, sir.

Case 4:17-cr-00219-LGW-GRS    Document 61    Filed 03/02/18    Page 29 of 161
ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

29

1          THE COURT:  All right.

2    BY MS. GROOVER:

3    Q.    When you met with the Magistrate Sexton, describe that

4    process for the Court.

5    A.    I called her the evening of the 18th.  I advised her that

6    we had some deputies provide information in reference to the

7    address of coming back to Rincon.

8    Q.    You mean the evening of the 19th.

9    A.    The evening of the 19th.  Yes, ma'am.  We made an agreement

10   that we would meet on the 20th and would have the search warrant

11   executed on that day.  I met with her.  She drove to the

12   Effingham County Sheriff's Department, and I provided her with

13   the affidavit and application for search warrant.

14   Q.    Did you -- at the time when you provided her the search

15   warrant, did you explain to her that you had never been on this

16   property before?

17   A.    Yes, ma'am.  I advised her that the search warrant was

18   based on information provided by her deputies, the Effingham

19   County deputies.

20   Q.    And did you further explain that it was your intention and

21   understanding that you were seeking a warrant to search all of

22   the campers and trailers and homes and residences on the

23   property owned by Pablo Rangel, that is, the 26 acres?

24   A.    Yes, ma'am.

25          THE COURT:  Say that again.  You advised her what?

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

30

1          THE WITNESS:  That I was going to be searching the

2    26.65-acre land with all the dwellings, trailers and mobile

3    homes on the property to include the vehicles.

4    BY MS. GROOVER:

5    Q.    And you list eight to ten vehicles on the property?

6    A.    Yes, ma'am.

7    Q.    And why did you have a general range of number of

8    vehicles?

9    A.    That's what Effingham County provided there's usually

10   between nowhere -- when they've been on the property, there's

11   been an array of vehicles ranging between eight to ten vehicles.

12   Q.    And you provided the number of vehicles and the number of

13   trailers and campers and homes that it is your understanding

14   from other officers who were on this property, provided that

15   information to the magistrate?

16   A.    Yes, ma'am.

17   Q.    And did you explain you were seeking a warrant to search

18   all of that?

19   A.    Yes, ma'am.

20   Q.    And did the magistrate have any questions about that?

21   A.    No, ma'am.

22   Q.    And did you provide all this information under oath when

23   you obtained your search warrant?

24   A.    Yes, ma'am.

25   Q.    Was it recorded?

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

31

1   A.   It was not, no, ma'am.

2   Q.   Was anyone else --

3        THE COURT:  And how were you placed under oath?

4        THE WITNESS:  She had me raise my right hand, and she

5   swore me in.

6        THE COURT:  Was that before or after she read the

7   affidavit?

8        THE WITNESS:  It was before she read the affidavit.

9        THE COURT:  And in the course of that reading of the

10  affidavit, she asked you questions or you started volunteering

11  information?

12       THE WITNESS:  She asked me -- before she swore me in,

13  she asked if I had any oral testimony, and at that point she

14  said she had to swear me in.  That's when I advised her that the

15  search warrant -- I gave her the circumstances surrounding the

16  search warrant as well as the verbiage in the search warrant

17  prior to her reading it, as well as she asked me -- I informed

18  her that it's not common practice for me to obtain pictures from

19  Google Earth as well as the property records; however, I've

20  never been on the property, and that was the sole reason of

21  providing that, because I was basing my information on the

22  Effingham County deputies.

23  BY MS. GROOVER:

24  Q.   And have you presented other warrants to Magistrate Sexton

25  before?

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

32

1   A.    No, ma'am, this is my first warrant.

2   Q.    Okay.  So you explained why those maps and aerials were

3   submitted?

4   A.    Yes, ma'am.

5         THE COURT:  What exactly -- and you may have already

6   brought this out.  What was exactly told to the magistrate

7   that's not in the affidavit?

8   BY MS. GROOVER:

9   Q.    Did you explain to the magistrate that you had never been

10  on the property?

11  A.    Yes, ma'am.

12  Q.    And that this description that was in the warrant came

13  from other law enforcement officers?

14  A.    Yes, ma'am.

15  Q.    And that it was your intention to search every single

16  trailer, camper, home, dwelling on the property?

17  A.    Yes, ma'am.

18  Q.    Which is why the description says multiple dwellings?

19  A.    Yes, ma'am.

20  Q.    And then you further explained that you described these

21  trailers, campers, dwellings to the best you could from other

22  officers' observations?

23  A.    Yes, ma'am.

24  Q.    But notwithstanding the limited description, it was your

25  intention, and this was told to the magistrate under oath, that

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

33

1   you were seeking a warrant to search all of the dwellings?

2   A.    Yes, ma'am.  Yes, ma'am.

3         THE COURT:  Did the term 275 Milton Rahn Road come up

4   about any issue, about, well, are there any other addresses

5   there?  Did that come up during your discussion with the judge?

6         THE WITNESS:  I don't recall, no, sir.

7         THE COURT:  All right.

8   BY MS. GROOVER:

9   Q.    Was there any other additional testimony that you provided

10  to the magistrate that is not in the warrant?

11  A.    No, ma'am.

12  Q.    After you obtained your search warrant, did you meet with

13  other law enforcement officers who assisted you in the execution

14  of the warrant?

15  A.    Yes, ma'am.  We met at the -- we were all stationed at the

16  Effingham County Sheriff's Department.

17  Q.    And who all was that?

18  A.    It was -- HSI was there.  FBI was there.  Effingham County

19  sheriff's officers and detectives as well as Garden City Unit K9

20  Units as well as our detectives.

21  Q.    And did you have -- why did you have Effingham County

22  present?

23  A.    It's their jurisdiction.

24  Q.    Were they also familiar with the property?

25  A.    Yes, ma'am.

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

34

1    Q.    Did you brief everyone involved?

2    A.    Yes, ma'am.

3    Q.    Did you explain that there was a .22-caliber weapon that

4    was possibly the murder suspect -- it was possibly the murder

5    weapon and that the murder suspect lived on a trailer on the

6    property?

7    A.    Yes, ma'am.  And I also informed -- I showed them a

8    picture of Mr. Carlos Perez and Mr. Refugio who were supposed to

9    be on the property from the information we received.  I believe

10   they both had active warrants out for their arrests as well.

11   That was brought as well -- I informed them as well, because at

12   this point I needed to talk to both of them, not only for the

13   warrant, as well as the fact that he was in possession of a .22-

14   caliber pistol.

15        THE COURT:  I note -- I don't see anywhere the reference

16   to Carlos Perez in the affidavit or the police report.

17        THE WITNESS:  It was brought up before in my interview

18   with Joel.  I did associates of Pablo Rangel with that address,

19   and their names popped up.  And those pictures were shown to

20   Joel during the interview.

21   BY MS. GROOVER:

22   Q.    But this was not information --

23   A.    No, no, no.

24   Q.    -- (simultaneously speaking) nor information presented to

25   the magistrate?

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

35

1   A.   No, ma'am.

2   Q.   This was just your investigation that you were debriefing

3   the officers?

4   A.   Yes, ma'am.

5   Q.   Prior to executing the search warrant?

6   A.   Correct.

7   Q.   So the officers knew that they were searching for family

8   members or friends who had guns that lived on a trailer on this

9   property; is that correct?

10  A.   Yes, ma'am.

11  Q.   Can you describe for the Court in general how -- general

12  terms, how did you go about executing this search warrant?  Who

13  was in charge and what took place?

14  A.   I had the search warrant, however, I let Effingham captain

15  as well as Sergeant Don White, who was my liaison in the case, I

16  let him create the operational plan because he was more familiar

17  with that property than I was.  I can tell you the area was very

18  dense.  We had to take mostly SUVs and pickup trucks in the area

19  as well as all-terrain vehicles, ATVs.  Everybody had a

20  residence that they were to go secure.  My job was to secure the

21  main residence where the target Pablo Rangel was to be residing

22  at.

23       THE COURT:  And how many structures, dwelling places did

24  you think were on the property?

25       THE WITNESS:  From what they told me --

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

36

1      THE COURT:  If you had already identified, well, each

2  officer will go to a different place, you must have had some

3  idea about how many places were there.

4      THE WITNESS:  Three to five.

5      THE COURT:  Three to five.

6      THE WITNESS:  Yes, sir.  Because they said that there's

7  campers -- pull-behind campers that are occasionally on the

8  property.

9  BY MS. GROOVER:

10  Q.    What was your job?

11  A.    My job was to go to the main house, secure anybody inside

12  of that residence and then was to take operational control as

13  far as now the search warrant aspect goes.  So my job was to

14  photograph the scene and collect and secure all the evidence

15  obtained from the residence.

16  Q.    And when you say photograph the scene and collect all the

17  evidence, are you talking about just the main residence that you

18  went to or --

19  A.    No, ma'am.  Every -- every residence, every camper, every

20  house, every vehicle.

21  Q.    So you then were in charge of the whole search --

22  A.    Yes, ma'am.

23  Q.    -- that went from location to location?

24  A.    Yes, ma'am.

25      THE COURT:  From reading your police report that

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

37

1  references -- let's see.  Let me pull that up.  It was in your

2  second supplement, Amy Lee, Document 39.

3       MS. COPELAND:  Yes, sir.

4       THE COURT:  All right.  I tried to go through and count

5  the number of places that were actually entered, and you give

6  designations to those places as house number one, house number

7  two, with various bedrooms, camper number three.

8       THE WITNESS:  Yes, sir.

9       THE COURT:  And Mr. Rangel's personal residence.  It

10  looks like from the best I could determine that four different

11  dwelling places were entered?

12       THE WITNESS:  It was a total of one, two, three -- yes,

13  sir.  It was a total of four.

14       THE COURT:  All right.  I was just trying to get

15  clarification about the police report and get it straight in my

16  mind.  All right.  Proceed.

17  BY MS. GROOVER:

18  Q.   Did you take photographs of every home or camper or

19  dwelling that you entered?

20  A.   Yes, ma'am.

21  Q.   And did you -- at the time you entered them, did you know

22  often if you were entering the front door or the backdoor?

23  A.   It was -- no, ma'am.

24  Q.   And were some of these homes connected to a camper?

25  A.   Yes, ma'am.  There was a camper butted up into a trailer,

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

38

1    and then there was a -- I guess a homemade porch you would call

2    it hooked -- connected to a camper.

3    Q.    And while you were going through this warrant, did you

4    notice any house numbers?

5    A.    No, ma'am.

6    Q.    Did you later learn that there were different house

7    numbers associated with some of these trailers?

8    A.    Yes, ma'am.

9    Q.    But at the time you were executing the search warrant, did

10   you see --

11   A.    No, ma'am.

12   Q.    And you began by -- you took photographs of all the

13   locations you searched?

14   A.    Yes, ma'am.

15         MS. GROOVER:  Your Honor, may I approach the witness?

16         THE COURT:  You may.

17   BY MS. GROOVER:

18   Q.    Detective, I'm handing you what's been marked as Exhibits

19   3 through 14 --

20   A.    Yes, ma'am.

21   Q.    -- for identification purposes.  Can you take a look at

22   those --

23   A.    Yes, ma'am.

24   Q.    -- and tell me if you recognize Exhibits 3 through 14?

25   A.    Yes, ma'am.

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

39

1    Q.    And are these photographs that you took during the

2    execution of the search warrant?

3    A.    Yes, ma'am, they were.

4    Q.    And do they fairly and accurately represent the photos

5    that you took?

6    A.    Yes, ma'am.

7          MS. GROOVER:  Government would move for the admission of

8    Exhibits 3 through 14.

9          MS. COPELAND:  No objection.

10          THE COURT:  Admitted.

11          MS. HESSE:  No objection.

12          MR. BLACKBURN:  No objection.

13   BY MS. GROOVER:

14   Q.    Starting with Government Exhibit 3, can you identify what

15   we're looking at in Exhibit 3, or what you're looking at?

16   A.    It turned out to be the large trailer was Hipolito's and

17   Jonathan's residence.

18   Q.    Do you identify this as house number one in your --

19   A.    That is -- yes, ma'am.  That is house number one.  It is

20   the first house that I searched.

21   Q.    And you also identify it as house number one when you

22   saved your photographs?

23   A.    Yes, ma'am.

24   Q.    Okay.

25          THE COURT:  What color is it?

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

40

1        THE WITNESS:  I believe it was either white or grayish.

2   It was definitely a light in color.

3   BY MS. GROOVER:

4   Q.   Was it a light-in-color gray trailer with white trim?

5   A.   Yes, ma'am.

6   Q.   Is it the same trailer that is described in the affidavit

7   of the search warrant as the gray trailer with the white trim?

8   A.   Yes, ma'am.

9   Q.   Now, in photograph number three, I see there are two

10  structures.  There is what appears to be a camper on the left

11  and a trailer on the right.

12       THE COURT:  I thought -- photograph number three or

13  Exhibit 3?

14       MS. GROOVER:  Exhibit 3 is a photograph.

15       THE COURT:  Well, I thought Exhibit 3 was the large

16  trailer, gray with white trim.  Did I get that down wrong?

17  House number one, large trailer, gray with white trim.  Let me

18  see the pictures.

19       MS. COPELAND:  Sherri, I can give the judge my copy and

20  look on co-counsel's, if you'd like.

21       THE COURT:  Is this what you describe, Amy Lee, as 135?

22       MS. COPELAND:  That is 135, and that's the back side of

23  the house.

24       THE COURT:  That's the back -- so your picture that you

25  furnished was on the front side.

Case 4:17-cr-00219-LGW-GRS    Document 61    Filed 03/02/18    Page 41 of 161
ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

41

1      MS. COPELAND:  Right.

2      THE COURT:  Back and front being relative terms.  All

3  right.

4      THE WITNESS:  Thank you, sir.

5      MS. GROOVER:  Your Honor, I do believe now you have a

6  copy -- thank you for that -- of the photograph.

7  BY MS. GROOVER:

8  Q.   Now, in Exhibit 3 --

9      THE COURT:  Oh, I do?  As you talk about them, I can

10 look at them, too?  All right.

11 BY MS. GROOVER:

12 Q.   In Exhibit 3, the trailer on the right side of this

13 photograph, this is the gray trailer with the white trim?

14 A.   Yes, ma'am.

15 Q.   And did this -- did you enter the trailer, begin searching

16 it on this side --

17 A.   Yes, ma'am.

18 Q.   -- as you look at this photograph?

19 A.   Yes, ma'am.

20 Q.   And did you later determine that it's the back side of the

21 trailer?

22 A.   Yes, ma'am.

23 Q.   At the time did you believe it was the front side of the

24 trailer?

25 A.   Yes, ma'am.

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

42

1    Q.    And looking at Exhibit 4, what is Exhibit 4?

2    A.    That is me now approaching the residence as I entered it.

3    Q.    As you compare it to Exhibit 3, is this your opinion that

4    little --

5    A.    The little -- what I -- yes, ma'am.  Yes, ma'am.

6    Q.    And you see a stove.

7    A.    Yes, ma'am.

8    Q.    And at the time you believed that you were entering the

9    premises of --

10   A.    Correct.  Yes, ma'am.  Yes, ma'am.

11   Q.    And Exhibit 5, what are we looking at in Exhibit 5?

12   A.    That's the door in which I entered into the residence.

13   Q.    And do you see any markings on this door about an address

14   at all?

15   A.    No, ma'am.

16   Q.    Did you later determine or learn from defense counsel's

17   motion that there's a marking of 135 on the other side of the

18   street?

19   A.    Yes, ma'am.

20   Q.    And you conducted your search beginning from the back side

21   of this?

22   A.    Correct, which I assumed to be the front.

23   Q.    But this is the gray trailer with the white trim --

24   A.    Yes, ma'am.

25   Q.    -- described in the affidavit?

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

43

1   A.    Yes, ma'am.

2   Q.    Exhibit 6, is this a piece of mail that you found inside

3   the gray trailer with the white trim?

4   A.    Yes, ma'am.

5   Q.    And is this addressed to an individual at 275 Milton Rahn

6   Road?

7   A.    Yes, ma'am.

8   Q.    And did you find various ammunition and firearms and items

9   of interest in that gray trailer with the white trim?

10  A.    Yes, ma'am.

11  Q.    After you searched that gray trailer with the white trim,

12  did you then move on to another location?

13  A.    Yes, ma'am, I did.

14  Q.    And where did you go next?

15  A.    I went directly behind that trailer.

16  Q.    And what type of structure was directly behind that

17  trailer?

18  A.    It looked like it was -- as I approached it, I thought it

19  was going to be a shed, but it turns out to be inside the shed,

20  right behind it, the shed was built around a camper.  So it is

21  a -- I guess a pull-behind camper.

22  Q.    Government's Exhibit 7, can you describe what we're

23  looking at in Government's Exhibit 7?

24  A.    You're looking at the -- what I originally thought was

25  going to be a shed.  As I saw it, I was informed that it was not

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

44

1    a shed, that it was an actual residence.

2    Q.   And do you see any address or numbers listed on that?

3    A.   No, ma'am.

4    Q.   Did you later determine who lived at this dwelling?

5    A.   Yes, ma'am.

6    Q.   Who lived there?

7    A.   Mr. Juan Rangel.

8    Q.   Exhibit 8, what are we looking at in Exhibit 8?

9    A.   You're now looking at a closer-up image of the front as I

10   entered.

11   Q.   And through Exhibit 8 there's an entryway.  You have some

12   orange coloring in there.

13   A.   That's the actual -- that's the camper, yes, ma'am.

14   Q.   Is that a camper that's actually, then, attached to the

15   shed?

16   A.   It was built and attached to the shed, yes, ma'am.

17            THE COURT:  What is orange?

18            THE WITNESS:  It's the pull-behind camper.  It's like

19   orange and white.

20            THE COURT:  Hold your picture up and point to it.

21            THE WITNESS:  (Witness complied).

22            THE COURT:  Oh, okay.  Looks yellow in my picture.  But

23   go ahead.  All right.

24   BY MS. GROOVER:

25   Q.   Exhibit 9, what are we looking at in Exhibit 9?

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

45

1   A.    That is the shed as I'm looking at it showing the camper

2   to the left-hand side.

3   Q.    So you actually walked inside the structure that's

4   identified in Exhibit 8?

5   A.    Yes, ma'am.

6   Q.    And this is what it looks like if you turn --

7   A.    Turn towards the right, yes, ma'am, showing the camper.

8   Q.    And do you see this blue towel hanging down?

9   A.    Yes, ma'am.

10  Q.    What's behind the blue towel hanging down?

11  A.    Looks like some homemade lights as well as some trash.

12  Q.    And describe the wall on the left side of this photograph

13  of this shed.

14  A.    It's the actual shed.  I mean it's the trailer.  Talking

15  about this?

16  Q.    Yes.

17  A.    That's the trailer itself.

18  Q.    And did you previously testify, refer to it as a camper?

19  A.    A camper, yes, ma'am.  That's the pull-behind camper.

20        THE COURT:  You say this structure is not a shed but a

21  residence.

22        THE WITNESS:  The --

23        THE COURT:  Or a dwelling.

24        THE WITNESS:  It's a homemade shed that I guess was made

25  for the camper.

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

46

1          THE COURT:  Right.

2          THE WITNESS:  I mean you can see it goes above the

3   camper as well.

4          THE COURT:  So you're saying it's sort of an addition to

5   the camper.

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Is there a bed in there?

8          THE WITNESS:  No, sir.

9          THE COURT:  Okay.

10         THE WITNESS:  Just tables, chairs.

11   BY MS. GROOVER:

12   Q.    In the shed portion.

13   A.    In the shed portion.

14   Q.    But you did continue walking into the actual camper

15   itself?

16   A.    Yes, ma'am.  I make entry into the front door of the

17   actual camper itself.

18   Q.    And Exhibit 10, what are we looking at in Exhibit 10?

19   A.    You're looking at the front door entry into the camper.

20   Q.    And so comparing Exhibit 10 back to Exhibit 8, if you were

21   to walk into that shed and just keep walking straight, would you

22   get to the --

23   A.    You'd run right into this -- if you're coming straight

24   inside the shed, you'd run right into the residence.

25         THE COURT:  And just for purposes of my clarity, what

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

47

1    did you refer to this initial structure, the what you thought

2    was a shed?  What did you call that in your police report?

3            THE WITNESS:  I believe we called it a camper.  It was

4    referred to as a camper.

5            THE COURT:  The shed was called a camper?

6            THE WITNESS:  It was attached -- I believe we called it

7    a shed leading to the camper.

8            THE COURT:  If I may, Your Honor --

9    BY MS. GROOVER:

10   Q.   Did you in fact refer to it as a small homemade shack, no

11   doors, in the report?

12   A.   Okay.  Yes, ma'am.

13   Q.   And did you document it in the photograph as house number

14   two?

15   A.   Yes, ma'am.

16           THE COURT:  All right.

17   BY MS. GROOVER:

18   Q.   So reading the report, the home that you will later

19   identify that Juan Rangel lived at you've documented as a small

20   homemade shack with no doors and photographed it as house number

21   two?

22   A.   Yes, ma'am.

23   Q.   And that's what we're looking at in Exhibit Number 10?

24   A.   Yes, ma'am.

25   Q.   The entrance?

Case 4:17-cr-00219-LGW-GRS    Document 61    Filed 03/02/18    Page 48 of 161
ROBERTO RODRIGUEZ – DIRECT EXAMINATION BY MS. GROOVER

48

1    A.    Yes, ma'am.

2         THE COURT:  So it's described in the police report as

3    entryway to a detached small camper.  And that entryway itself

4    is designated as house number two.

5         THE WITNESS:  Yes, sir.  It's --

6         THE COURT:  Okay.

7         THE WITNESS:  Yes, sir.

8         THE COURT:  All right.  That's what I thought after

9    multiple readings, but I just wanted to make sure of that.  All

10   right.

11   BY MS. GROOVER:

12   Q.    Exhibit 11, describe for the Court what are we looking at

13   in Exhibit 11?

14   A.    When you come inside the camper and you look to the right,

15   that's the first thing you see inside the camper.

16   Q.    And now you can see a TV, a bed and even an oven?

17   A.    Yes, ma'am.

18        THE COURT:  Well, what you call the camper in your

19   police report --

20        THE WITNESS:  Yes, sir.

21        THE COURT:  -- I mean it's not designated as house

22   number three or anything.

23        THE WITNESS:  No.  It's all under house number two.

24        THE COURT:  But you call it at the top of Page 7 of Amy

25   Lee's Documents 39-1, "I then searched camper number three."

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

49

1         THE WITNESS:  After the conclusion of this search, we

2    searched camper number three.  There's another camper on the

3    property.

4         THE COURT:  So camper number three is not the camper --

5         THE WITNESS:  That we're looking at, no, sir.

6         THE COURT:  -- designated as house number two.

7         THE WITNESS:  No, sir.

8         THE COURT:  Okay.

9         THE WITNESS:  No, sir.

10        THE COURT:  So the shed portion and on into this camper

11   that is shown in Exhibits 8, 9, 10, all of that is house number

12   two?

13        THE WITNESS:  Yes, sir.

14        THE COURT:  Okay.

15        THE WITNESS:  Yes, sir.

16        THE COURT:  All right.

17   BY MS. GROOVER:

18   Q.   And then according to your report and then pursuant to the

19   search, did you go search another item?

20   A.   Yes, ma'am.

21   Q.   Location?

22   A.   Yes, ma'am.

23   Q.   And you refer to that in your report as number three?

24   A.   Camper number three, yes, ma'am.

25   Q.   And is that what we're looking at in Government's Exhibit

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

50

1    12?

2    A.    Yes, ma'am.

3    Q.    And then Exhibit 13 --

4         THE COURT:  Well, what's behind -- in Exhibit 12, what

5    is behind this what you call camper number three?

6         THE WITNESS:  That is house number one.

7    BY MS. GROOVER:

8    Q.    And if you compare Exhibit 12 to Government's Exhibit 3,

9    the camper that's in Exhibit 12, is this the same camper that's

10   on the left side of the gray trailer with the white trim that's

11   on the right side of Exhibit 3?

12   A.    Yes, ma'am.

13   Q.    And Exhibit 13, describe for the Court what are we looking

14   at in Exhibit 13?

15   A.    This is Pablo's residence.

16   Q.    And this is the tan house or the main house?

17   A.    Yes, ma'am.

18   Q.    And Exhibit 14, what are we looking at in Exhibit 14?

19   A.    It's just an array of all the items collected inside the

20   residence.

21   Q.    These are the various firearms and ammunition that were

22   seized in the different locations that you searched on the

23   property?

24   A.    Yes, ma'am.

25        THE COURT:  Could you come retrieve these, please?

ROBERTO RODRIGUEZ – DIRECT EXAMINATION BY MS. GROOVER

51

1    BY MS. GROOVER:

2    Q.    After you were done searching the residence and

3    documenting your findings photographed in your notes, what did

4    you do next?

5    A.    I spoke to Mr. Rangel's wife, and I advised her on the

6    dining room table I was leaving a copy of the search warrant

7    return, which was a copy of every one of the items that were

8    seized property control form wise.  That was left on the dining

9    room table.  I then had our patrol officers transport the males

10   inside the residence back to the Garden City Police Department

11   to be interviewed.

12   Q.    Approximately how long did this search take place?

13   A.    Several hours.

14   Q.    And was this during the day?

15   A.    It was during the day, yes, ma'am.

16   Q.    And this was on August the 20th of 2017?

17   A.    Yes, ma'am.

18   Q.    Was it a particularly hot day?

19   A.    It was a little warm, yes, ma'am.

20   Q.    Almost 100 degrees?

21   A.    Yes, ma'am.

22        THE COURT:  What time did the search begin?

23        THE WITNESS:  I believe it was roughly around between 12

24   and 1, Judge.  I don't have the exact time in front of me.

25                         (Nothing omitted)

Case 4:17-cr-00219-LGW-GRS   Document 61   Filed 03/02/18   Page 52 of 161
ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

52

1   BY MS. GROOVER:

2   Q.   And lasted multiple hours?

3   A.   At least three to four hours.

4   Q.   When law enforcement first arrived on scene to begin

5   execution of the search warrant, was anyone attempting to leave

6   the location?

7   A.   Yes, ma'am.

8   Q.   Who was that?

9   A.   It was Juan Rangel.

10  Q.   And how was he attempting to leave?

11  A.   He was leaving in a brown pickup truck, I believe with a

12  trailer.  As he was -- he was on that main road --

13       THE COURT:  And when was this that he was stopped?

14       THE WITNESS:  As we were going to execute the search

15  warrant.

16       THE COURT:  As you were coming in to the property.

17       THE WITNESS:  As we were coming in, yes, sir, we were

18  caravanning into the residence.  The vehicle was leaving.

19  Effingham County initiated a traffic stop for us and I believe

20  had Mr. Rangel drive back to the residence.

21  BY MS. GROOVER:

22  Q.   When law enforcement arrived on scene to begin the

23  execution, approximately how many people did law enforcement

24  initially locate?

25  A.   A lot.  It was a bunch -- a lot of children.  I believe

Case 4:17-cr-00219-LGW-GRS   Document 61   Filed 03/02/18   Page 53 of 161
ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

53

1    there was four males, three adult females and probably five to

2    six children.

3    Q.    And what did law enforcement -- how did -- what did you do

4    with all those people during the execution of the search

5    warrant?

6    A.    The children and the ladies were allowed, after a quick

7    canvas of the living area of Pablo's residence, they were all

8    allowed to sit inside there.

9    Q.    Was it air-conditioned inside?

10   A.    Yes, ma'am, it was.

11   Q.    Was one female pregnant?

12   A.    Yes, ma'am.

13   Q.    All the children and the females were inside?

14   A.    Yes, ma'am.

15   Q.    And what about the men?

16   A.    The men were -- they were secured in handcuffs.  They were

17   put underneath a -- I guess a -- God, I don't know how to -- a

18   carport, a large open carport with a canopy on top.  They were

19   there for maybe an hour, hour and a half.  And then they were

20   removed -- they were moved to another location which is in the

21   front of Pablo's residence.  That as well has got a covered

22   porch on it as well as rotating ceiling fans.

23   Q.    And is that -- can you just see that in Exhibit 13?

24   A.    Yes, ma'am.  You can see the -- you can see the males

25   where they were standing at.

Case 4:17-cr-00219-LGW-GRS    Document 61    Filed 03/02/18    Page 54 of 161
ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

54

1   Q.   And there were fans above them?

2   A.   Yes, ma'am.

3   Q.   Why were they moved from the shed to the --

4   A.   One of our officers saw one of the individuals detained as

5   showing signs of maybe fatigue or some kind of heat exhaustion.

6   At that time he was provided water, and an ambulance was called

7   to the scene to examine the male.

8   Q.   Was that Mr. Martinez-Martinez?

9   A.   Yes, ma'am.

10  Q.   Hipolito Martinez?

11  A.   Yes, ma'am.  So at that time we decided to move from that

12  location to a cooler area, which would have been with the

13  ceiling fans above them.

14  Q.   Were all of the individuals offered or provided water if

15  they needed it?

16  A.   Yes, ma'am.  Every individual was provided water as well

17  as numerous bathroom breaks.

18  Q.   Did you speak with any individuals on scene about the

19  items you seized or --

20  A.   Not on scene in reference to any one of the suspects, no,

21  ma'am.

22  Q.   Did you have another agent or law enforcement speak with

23  any individuals?

24  A.   Detective Reyes was standing next to the suspect.  He was

25  there for his -- he's fluent in Spanish, so any questions or

Case 4:17-cr-00219-LGW-GRS   Document 61   Filed 03/02/18   Page 55 of 161
ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

55

1    anything that they required, it was his job to oblige their

2    requests.

3         THE COURT:  But there were no interviews conducted

4    during the search?

5         THE WITNESS:  As far as Garden City Police goes, no,

6    sir, or Effingham County.

7         THE COURT:  What -- since you mentioned Garden City,

8    you're a detective with Garden City.  What jurisdiction do you

9    have -- this would be in Effingham outside the boundaries of

10   Garden City.  What's your jurisdiction in that area?

11        THE WITNESS:  I'm deputized through Chatham County.  I

12   strictly stick to the Chatham County area.

13        THE COURT:  Okay.  But how did you come -- they

14   recognized that you were the chief -- the victim was found in

15   what county?

16        THE WITNESS:  Garden City, in Chatham County.

17        THE COURT:  In Chatham.  And so you were just allowed by

18   the Effingham authorities to lead the investigation?

19        THE WITNESS:  As far as to lead?

20        THE COURT:  To lead, yes.

21        THE WITNESS:  Because it was my investigation.  They

22   handled the tactical operation plan as far as the execution of

23   the -- I guess -- they had the guns, as I'm going to call it.

24   So they're the ones that executed the search warrant.  We stood

25   back -- once the residence were cleared of any potential

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

56

 1    suspects, Garden City took over in that aspect as well as

 2    obtaining all property and --

 3              THE COURT:  But you were really the lead investigator.

 4    You were the person calling the shots about --

 5              THE WITNESS:  Yes, sir, it was me.

 6              THE COURT:  -- this is the place where we're going to

 7    search.

 8              THE WITNESS:  Yes, sir.

 9              THE COURT:  And you got the warrant from an Effingham

10    County judge?

11              THE WITNESS:  Yes, sir.

12              THE COURT:  And your authority as a police detective

13    allowed her to swear you in and accept a warrant from you?

14              THE WITNESS:  Correct, yes, sir.

15              THE COURT:  All right.

16    BY MS. GROOVER:

17    Q.   Is it your understanding were individuals possibly

18    interviewed by Homeland Security agents?

19    A.   I was advised, yes, ma'am.

20    Q.   On scene?

21    A.   On scene.

22    Q.   Was Homeland Security agents part of this search due to

23    the nature of possibly the illegal aliens and not citizens of

24    the United States?

25    A.   Yes, ma'am.

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

57

1    Q.    So HSI's role there were also immigration enforcement?

2    A.    Correct, yes, ma'am.

3    Q.    And was Special Agent Tony Miranda part of that?

4    A.    Yes, ma'am.

5    Q.    Okay.  In addition to searching the homes, dwellings,

6    campers identified in the photographs, did you search any

7    vehicles on the property?

8    A.    Yes, ma'am.

9    Q.    What other vehicles did you search?

10   A.    We searched an array of vehicles.  We saw some sedans.

11   Specifically, we saw a Chevrolet Tahoe that was, I believe,

12   owned by Mr. Jhonatan Rangel.

13   Q.    Was that a gold Tahoe?

14   A.    Yes, ma'am, it was.

15   Q.    Texas plates?

16   A.    Yes, ma'am, it was.  It did have.

17   Q.    Was Mr. Jhonatan Rangel present during the execution of

18   that search?

19   A.    No, ma'am, he was not.

20   Q.    Did law enforcement seize a passport with his name on it

21   during the search?

22   A.    Yes, ma'am.

23   Q.    Was that seized from the vehicle --

24   A.    Yes, ma'am, the gold Tahoe.

25   Q.    And that passport was a United States passport?

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

58

1   A.   I don't believe so.  I believe it was a Mexican passport.

2        THE COURT:  In whose name?

3        THE WITNESS:  Jhonatan Rangel.  We also searched a

4   black-in-color Chevrolet Silverado pickup truck.  That vehicle

5   was owned by Mr. Hipolito Martinez-Martinez, and I believe it

6   was driven by his girlfriend.  We recovered a firearm inside

7   that vehicle as well.

8   BY MS. GROOVER:

9   Q.   Specifically with respect to Mr. Juan Rangel --

10  A.   Okay.

11  Q.   -- did you identify that he lived in the light-colored

12  pull-behind camper located at the rear of the (indiscernible)?

13  A.   Yes, ma'am.

14  Q.   And you referred to that in your report as the homemade

15  shack with no doors and also as house number two in your photos?

16  A.   Yes, ma'am.

17  Q.   And did law enforcement seize a Ruger Model 1022 .22-

18  caliber rifle?

19  A.   Yes, ma'am, we did.

20  Q.   From the home?

21  A.   Yes, ma'am, from the residence.

22  Q.   With respect to Mr. Jhonatan Rangel -- and Mr. Juan Rangel

23  was present --

24  A.   He was present, yes, ma'am.

25  Q.   He was brought back to where the search took place and

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

59

1   detained?

2   A.   Yes, ma'am.

3   Q.   Mr. Jhonatan Rangel, he was not present during the search?

4   A.   He was not, no, ma'am.

5   Q.   Did your investigation determine that he lived in the gray

6   trailer with the white trim, referred to as house number one in

7   the report as well as the photographs?

8   A.   Yes, ma'am.

9   Q.   And did you seize from an oven at Juan Rangel's house a

10  firearm, Rock Island Armory Model 1911 .45-caliber pistol?

11  A.   Yes, ma'am.

12  Q.   Did your investigation later determine in your interview

13  that that firearm belonged to Jhonatan Rangel?

14  A.   Yes, ma'am.

15  Q.   And with respect to Mr. Hipolito Martinez-Martinez, did

16  you determine that he lived in the gray trailer with the white

17  trim, also referred to as house number one in the report and

18  photos?

19  A.   Yes, ma'am.

20  Q.   And did you seize from his room a Mossberg Model 500A

21  12-gauge shotgun?

22  A.   Yes, ma'am.

23  Q.   And additionally, there was a passport that was seized

24  from the Tahoe from Mr. Jhonatan Rangel?

25  A.   Yes, ma'am.

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

60

1    Q.    After the execution of the search, when it was all

2    completed, what happened next?

3    A.    After everything was done at the residence, myself and

4    another Effingham County deputy were the last to leave.  There

5    was, I believe, four males transported back to the Garden City

6    Police Department to be interviewed.  It was Juan Rangel, Pablo

7    Rangel, Hipolito Martinez-Martinez and a fourth individual, who

8    was subsequently released, no involvement whatsoever in this

9    case.

10   Q.    During the execution of the search warrant, did anyone

11   complain about how you were going about searching?

12   A.    No, ma'am, not a single person.

13   Q.    Not even with the heat?

14   A.    Correct, nobody.

15   Q.    Did Mr. Hipolito Martinez-Martinez accept the medical

16   treatment that was offered to him?

17   A.    I believe he was -- they checked vitals.  They provided

18   him water; and when asked for transport to the hospital, he

19   declined.

20   Q.    And were these -- and then Mr. Juan Rangel, Pablo Rangel

21   and Hipolito Martinez, they were brought back to the department

22   to be interviewed?

23   A.    Yes, ma'am.

24   Q.    And were these interviews recorded?

25   A.    Audio and video recorded, yes, ma'am.

ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

61

1    Q.    And how many people interviewed these individuals?

2    A.    It was myself and Detective Reyes.  I believe we began

3    every interview.  We were questioning in reference to the

4    homicide and then --

5            THE COURT:  Where are these being conducted at?

6            THE WITNESS:  In Garden City, at my office.

7            THE COURT:  Okay.

8            THE WITNESS:  And then Special Agent Miranda came in and

9    interviewed these individuals as well.

10   BY MS. GROOVER:

11   Q.    Prior to interviewing these individuals, were they given

12   an opportunity for water and a restroom break?

13   A.    Everybody was provided either water or soda and were

14   allowed to use the restroom while at the Garden City Police

15   Department.

16   Q.    With respect to Mr. -- beginning with Mr. Juan Rangel, was

17   his interview conducted in English or Spanish?

18   A.    It was in Spanish.

19           MS. COPELAND:  Your Honor, at this point I would like to

20   object to this line of inquiry.  It seems like we're getting far

21   afield from the execution of the search warrant issue in this

22   motion to suppress.

23           THE COURT:  Well, I thought only one defendant was

24   challenging the -- an interview.

25           MS. COPELAND:  And I am sorry.  I'm not familiar with

Case 4:17-cr-00219-LGW-GRS   Document 61   Filed 03/02/18   Page 62 of 161
ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

62

1   what the other defendants are challenging.  I was just going to

2   say that we recently were provided English translations,

3   transcripts of the in-Spanish interviews.  In that it was a

4   36-page transcript that I got of my client.  It starts out that

5   he does not really understand his Miranda rights.  And I think

6   that I might be filing another motion to suppress in this case

7   based upon the recent provision of that interview, because it

8   is -- it's a little troubling to me, coupled with the fact that

9   he is having heat exhaustion in 100-degree weather by being made

10  to stand outside for four hours before this interview.  So I

11  would just ask that we not plow this ground with Mr. Martinez

12  today, and if I file that motion to suppress, it will be done

13  fairly quickly.  But this was just provided to me in discovery.

14          THE COURT:  Well, I didn't even know there were

15  statements taken from anybody but I think, Tina, your client.

16          MS. HESSE:  Yes.  I listened to the recorded interview.

17  It was all done in English.

18          THE COURT:  It was done in English?

19          MS. HESSE:  Yes.  And he was -- he seemed to understand.

20          THE COURT:  I thought it was conducted three days later.

21          MS. HESSE:  Yes.

22          THE COURT:  The 23rd.

23          MS. HESSE:  My client was.  My client was not present.

24          THE COURT:  And you are challenging that.  You raise

25  that issue.

Case 4:17-cr-00219-LGW-GRS    Document 61    Filed 03/02/18    Page 63 of 161
ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

63

1          MS. HESSE:  I was raising issue with it being basically

2     a product of the --

3          THE COURT:  Exactly.

4          MS. HESSE:  -- search.  Yes, Your Honor.

5          MS. GROOVER:  In response to with respect to the

6     discovery, I will say that law enforcement did provide the

7     recorded interview at the time when we produced all the digital

8     discovery months ago.  I will say Mr. Hipolito's is in Spanish

9     as well as Mr. Juan Rangel.  I do not speak Spanish, and

10    requested transcripts.  Several weeks ago we got the transcripts

11    and did produce them.

12         THE COURT:  There is no pending motion on the part of

13    Defendant Martinez to suppress any statements at this point.

14    And then we'll have to get into a motion and a government

15    response to the motion before -- I see doing a sort of a

16    peremptory strike on a motion with respect to Mr. Martinez.  And

17    let me get the defendant's name again.  And Jhonatan Rangel's

18    statement is being challenged as the unlawful fruit of the

19    search, not on the basis of any Miranda violation or anything of

20    that kind.

21         MS. GROOVER:  That's correct.

22         THE COURT:  And I'm not sure about Juan Rangel-Rubio.  I

23    can't tell if there's any statement being challenged or not in

24    this pro forma, preliminary, unsupported, inadequate-under-

25    the-rules motion to suppress.  Are you challenging any

64

1    statements?

2         MR. BLACKBURN:  We are not at this point, but --

3         THE COURT:  Well, today is the day to announce it.

4         MR. BLACKBURN:  I believe that after reviewing the

5    statement just recently that we got on a hard drive full of

6    information, that the statement may have been the result of the

7    illegal detention.

8         THE COURT:  All right.  Same thing as Ms. Hesse has just

9    said.  That's the basis.

10        MR. BLACKBURN:  Right.

11        THE COURT:  Was Mr. Juan Rangel-Rubio's interview

12   conducted in English or Spanish?

13        THE WITNESS:  Spanish.

14        THE COURT:  And you made those -- that was part of your

15   initial discovery disclosure?

16        MS. GROOVER:  That is correct.  The audio.

17        MR. BLACKBURN:  It's Spanish audio.

18        MS. GROOVER:  It's in Spanish.

19        THE COURT:  Yeah, but we have interpreters, you know?

20   And defense counsel are entitled to use them.  So when was this

21   initial discovery disclosure made?

22        MS. GROOVER:  It was either on the day of arraignment or

23   directly the day --

24        THE COURT:  Which was?

25        MS. GROOVER:  I do not have the docket sheet in front of

Case 4:17-cr-00219-LGW-GRS    Document 61    Filed 03/02/18    Page 65 of 161
ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

65

1    me, but I can get that information.

2         THE COURT:  Sherri, I'm asking.

3         THE CLERK:  I'm looking.

4         MS. HESSE:  Your Honor, I believe it was September 27th

5    was arraignment.

6         MS. GROOVER:  And I will say Ms. Copeland called me

7    yesterday and said she was unable to open the audio file, and I

8    said that perhaps it was copied in another way, but we can

9    provide that if she wanted, and she said she would contact me

10   (indiscernible).

11        THE CLERK:  It was indeed September 27th.

12        THE COURT:  It's a little late in the day to be

13   expanding the motions to suppress in this case.  I understand

14   the complications associated with language.  I'll let them --

15   you can file your motion.  I can't stop you from filing it.  But

16   regarding its timeliness, the government will get a chance to

17   respond.  We'll address that when I see the motions.

18        But I don't think we need to get into this witness

19   talking about the specifics of the interviews or whether Miranda

20   rights were read or all of those things when it's not even

21   presented before the Court in a live motion.

22        MS. GROOVER:  Yes, sir.

23   BY MS. GROOVER:

24   Q.   Just generally, several days after the execution of this

25   search warrant, did law enforcement locate Jhonatan Rangel?

Case 4:17-cr-00219-LGW-GRS   Document 61   Filed 03/02/18   Page 66 of 161
ROBERTO RODRIGUEZ - DIRECT EXAMINATION BY MS. GROOVER

66

1    A.    Yes, ma'am, we did.

2    Q.    And was he located at a trailer park at 9902 Ferguson

3    Avenue?

4    A.    Yes, ma'am, we did.

5    Q.    And were law enforcement were you searching for him?

6    A.    We were actually not searching for him.  We were searching

7    for two other individuals who were supposedly living in the

8    area.  He just happened to -- as we were leaving, he drove past

9    both of the agents, our agents that were there in that same

10   Chevrolet Tahoe we recovered on scene with the same Texas

11   plates.  Special Agent Miranda and Special Agent Harley advised

12   that they saw him driving through, so contact was made with him.

13   Q.    And at that time he was arrested and detained at that

14   point?

15   A.    Yes, ma'am, he was.

16         THE COURT:  Arrested, detained and interviewed.

17         THE WITNESS:  Yes, sir.  They were brought back to the

18   Garden City Police Department to be interviewed.

19         MS. GROOVER:  Your Honor, may I approach the witness?

20         THE COURT:  You may.

21   BY MS. GROOVER:

22   Q.    Sir, I'm handing you what's been marked for identification

23   purposes as Government's Exhibit 2.  Can you tell us what we're

24   looking at in Exhibit 2?

25   A.    It's the actual search warrant to the residence of 275

ROBERTO RODRIGUEZ – CROSS-EXAMINATION BY MS. COPELAND

67

1   Milton Rahn Road as well as the return, the search warrant

2   return.

3   Q.    And did you make the return to a judge after you had

4   completed your search?

5   A.    Yes, ma'am.

6   Q.    And is this a true and correct copy of the return that you

7   made?

8   A.    Yes, ma'am.

9         MS. GROOVER:  Government would move for the formal

10  admission of Exhibit 1 and 2.

11        MS. COPELAND:  No objection.

12        MS. HESSE:  No objection.

13        THE COURT:  Those are admitted.

14        MS. GROOVER:  May I have just a moment, please, Your

15  Honor?

16        THE COURT:  Yes.

17        MS. GROOVER:  I have no further questions for this

18  witness, Your Honor.

19        THE COURT:  All right.  Before we launch into any

20  cross-examination, let's take a ten-minute recess.

21   (Proceedings stood in recess from 11:18 a.m. until 11:37 a.m.)

22        THE COURT:  You're going first, are you?

23                    CROSS-EXAMINATION

24   BY MS. COPELAND:

25  Q.    Good morning, Mr. Rodriguez.

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

68

1    A.    Good morning.

2    Q.    My name is Amy Lee Copeland, and I represent the defendant

3    Hipolito Martinez-Martinez.

4         Just to recap, the need for the search warrant came about

5    because of the August 19th, 2017, suspected murder of Eliud

6    Montoya; is that right?

7    A.    Yes, ma'am.

8    Q.    And you believe that Pablo Rangel was connected to it.  Am

9    I also correct?

10   A.    Yes, ma'am.

11   Q.    And looking at Page 3 of your affidavit and application

12   for search warrant, which I believe that you have as

13   Government's Exhibit 1 up there, you told Judge Sexton that you

14   firmly believed that there was enough probable cause that had

15   arisen to show Pablo -- and that would be Pablo Rangel; correct?

16   A.    Yes, ma'am.

17   Q.    -- is involved in the murder of Eliud Montoya, and you

18   believe that the fruits of the crime due to this inside the

19   residence located at 275 Milton Rahn Road.

20   A.    Yes, ma'am.

21   Q.    So that paragraph refers only to probable cause as to

22   Pablo Rangel.

23   A.    Correct.

24   Q.    And the only other -- by my count the only other relative

25   of Pablo Rangel mentioned in the search warrant affidavit is

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

69

1   Refugio Ramirez; is that correct?

2   A.    Yes, ma'am.

3   Q.    And you identified him as living in the trailer in

4   Springfield, Georgia.

5   A.    Correct, yes, ma'am.

6   Q.    And in fact, you didn't even tell the magistrate judge in

7   this search warrant affidavit and application that there was an

8   arrest warrant out for Refugio Ramirez, did you?

9   A.    I did, yes, ma'am.

10  Q.    No, if you would, sir, please look with me at the

11  next-to-the-last paragraph of Page 3 in your search warrant

12  affidavit that's Government's Exhibit 1.  I'm going to read the

13  last sentence of that paragraph, the next-to-the-last paragraph.

14  "Eliud further has warrants out for his arrest in Chatham County

15  Recorder's Court."  So it says Eliud; correct?

16  A.    It was, I guess, a typo.

17  Q.    But the judge wouldn't know that.  You didn't explain that

18  to her when you were explaining the search warrant, did you?

19  A.    I verbalized it, yes, sir.  Yes, ma'am.

20  Q.    But the search warrant itself it says that Eliud has

21  warrants out for his arrest.  It doesn't say that Refugio

22  Ramirez has a warrant out for his arrest?

23  A.    Yes, ma'am.

24  Q.    Okay.  So as in this affidavit and as in your

25  investigative report, you repeatedly tell the judge this

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

70

1    property is in Springfield?

2         THE COURT:  And can we agree that there's an I and

3    Refugio?

4         MS. COPELAND:  We can agree to that, Judge.  Thank you.

5    That's been bothering me also.

6         THE COURT:  All right.  I saw it somewhere.  Maybe in

7    one of the briefs.  I don't know.  All right.  Go ahead.

8    BY MS. COPELAND:

9    Q.   All right.  So those repeated references that the property

10   is actually in Springfield, that's incorrect.  Am I right?

11   A.   That was information we originally received, yes, ma'am.

12   Q.   Okay.  And you've never been to this property.  We've

13   already established that before; is that correct?

14   A.   Prior to the search warrant, no, ma'am.

15   Q.   And the only evidence you have about any criminal history

16   of anybody in Mr. Rangel's family is about Refugio Ramirez; is

17   that correct?

18   A.   Yes, ma'am.

19   Q.   And that's his 2014 arrest; is that right?

20   A.   I believe, yes, ma'am.

21   Q.   Okay.  And if my math is correct, that's about three years

22   before you obtained this warrant.

23   A.   Correct.

24   Q.   And did I hear you say earlier, too, that on this murder

25   of August 19th you didn't know exactly what caliber weapon was

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

71

1  used in the murder until two days later?

2  A.    Yeah, when the GBI did the autopsy, yes, ma'am.

3  Q.    And two days later was the day after the search warrant

4  was issued; right?

5  A.    Yes, ma'am.

6         THE COURT:  How did they determine caliber three days

7  later?

8         THE WITNESS:  They suspected it was a .22-caliber

9  because they -- from the -- they recovered some bullet fragments

10 as well as bullets, and they were able to retrieve and tell it

11 was a small caliber, possibly a .22 caliber.

12 BY MS. COPELAND:

13 Q.    So when you say in this affidavit at Page 3 and also in

14 Government's Exhibit 1, "The caliber of said handgun matched the

15 one Refugio Ramirez allegedly had in 2014; however, said handgun

16 matches that which was suspected to be used to murder Eliud,"

17 you had no information that that was in fact a .22-caliber

18 handgun used to murder Mr. Montoya?

19 A.    Not 100 percent.  Just by training and experience, yes,

20 ma'am.

21 Q.    But that's not recited in there.

22 A.    Okay.

23 Q.    And in any event a .22-caliber gun is a pretty common

24 weapon; right?

25 A.    Very common.

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

72

1   Q.   Yeah, it's a Saturday Night Special basically.

2   A.   Yes, ma'am.

3   Q.   All right.  I want to talk a little bit more about the

4   August 20th, 2017 day of the report -- day of the search, I'm

5   sorry.  And I'm going to show you what I have marked as

6   Government's Exhibit -- I mean as Martinez Exhibit Number 3.

7   I'm sorry.  The investigator report.

8           THE COURT:  Old habits.  Old habits.  Go ahead.  Tell me

9   what it is when you hand it to him.

10          MS. COPELAND:  Sure.  Judge, it is the investigative

11  report of November the 13th, 2017.  Do you recognize that?

12          THE COURT:  Detective Rodriguez's report?

13          MS. COPELAND:  Yes, sir.

14          THE COURT:  I've read it.

15  BY MS. COPELAND:

16  Q.   Okay.  And that is your report; is that correct?

17  A.   Yes, ma'am.

18  Q.   Okay.  So --

19          THE COURT:  Defense exhibit what?

20          MS. COPELAND:  Defense Exhibit Number 3.

21          THE COURT:  All right.

22          MS. COPELAND:  Let me get my copy up.

23  BY MS. COPELAND:

24  Q.   So just to get my idea of the times down correctly, on

25  Page 4 of this, you say at 900 hours, at 9 a.m., accompanied by

Case 4:17-cr-00219-LGW-GRS    Document 61    Filed 03/02/18    Page 73 of 161
ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

73

1   multiple Garden City Police Officers, you met with Sergeant Don

2   White.  He was with Effingham County; right?

3   A.   Yes, ma'am.

4   Q.   You met with the FBI.  Yes?

5   A.   Yes, ma'am.

6   Q.   And Homeland Security; correct?

7   A.   Yes, ma'am.

8   Q.   And you briefed them on an operational plan; is that

9   right?

10  A.   Yes, ma'am.  Yes, ma'am.

11  Q.   And how many officers would you say were briefed on this

12  operational plan at 9 that morning?

13  A.   Maybe 20.

14  Q.   20.  Is that about how many accompanied you to the house?

15  A.   Yes, ma'am.

16  Q.   And I gather from your report that you were in the sixth

17  car it appears.  How many cars were there?

18  A.   I cannot recall.  Over six.

19  Q.   More than six?

20  A.   Yes, ma'am.

21  Q.   All right.  And then if you'll look at the last paragraph

22  on Page 4, at 11:23, or 11:23 a.m. you met with Judge Sexton; is

23  that correct?

24  A.   Yes, ma'am.

25  Q.   And that's when she, quote, thoroughly reviewed the search

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

74

1   warrant and you gave her additional information that you

2   recounted for the first time today?

3   A.    Yes, ma'am.

4   Q.    Is that your recollection?

5   A.    Yes, ma'am.

6   Q.    And that statement is correct?

7   A.    Yes, ma'am.

8   Q.    And the time of 11:23 is when you met with her; is that

9   correct?

10  A.    I believe, yes, ma'am.

11  Q.    Okay.  Can you look at Government's Exhibit 1, please?

12        THE COURT:  That's the affidavit I take it.

13        MS. COPELAND:  It's the search warrant itself, Judge.

14        THE COURT:  The warrant itself.  Okay.

15  BY MS. COPELAND:

16  Q.    Is that what Government's Exhibit 1 is marked to you?

17  Does it have the actual one up there?

18  A.    Yes, ma'am.  I've got it, yes, ma'am.

19  Q.    So the judge actually enters the search warrant in at

20  11:23 a.m.  Is that your recollection?  That's what the search

21  warrant shows.

22  A.    I don't see where the time is on the search warrant.

23        MS. COPELAND:  Judge, if I may approach, I'm going to

24  show him what I have marked as Martinez Exhibit Number 2, which

25  is just the entire package of the search warrant application and

1    affidavit.

2          So at the -- is there an objection to either one of two

3    or three that I've produced?  Judge, I would tender the

4    admission of Martinez Exhibits 2 and 3.

5          THE COURT:  And what is 2 again?

6          MS. COPELAND:  2 is the composite search warrant

7    application and affidavit.

8          THE COURT:  All right.

9          MS. COPELAND:  And 3 is the incident -- the investigator

10   report.

11   BY MS. COPELAND:

12   Q.   So at the bottom of the first page of Martinez Exhibit 2

13   it shows that the judge actually entered the search warrant at

14   11:23.  Is that correct?

15   A.   Yes, ma'am.

16   Q.   So it's fair to say that this is not a lengthy meeting

17   that you had with Judge Sexton to discuss this search warrant.

18   A.   Three to five minutes.

19   Q.   Okay.  Well, it says in your report that you arrived to

20   see her at 11:23.  Is that right?  Bottom of Page 4.

21   A.   Rough estimate, I based that based on the time that she

22   signed the search warrant to get a timeline or time guide.

23   Q.   And that's your testimony today, even though that's not

24   what your report reflects; is that right?

25   A.   Correct, ma'am.  I wasn't -- I didn't have a watch on me

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

76

1    at the time.  I just based it on what she wrote on the actual

2    search warrant.

3    Q.    Okay.  And so then after she signs the search warrant, you

4    go over the operational plan again with the agents.  Is this the

5    new operational plan or is this the same operational plan?

6    A.    It is a new one.

7    Q.    What is different about this operational plan?

8    A.    Officers, I guess, were in -- had been there -- I didn't

9    know there were some officers in all-terrain vehicles with

10   binoculars and snipers in the area observing the movements going

11   on on the property.

12   Q.    Okay.  So to get this straight, you got 20 agents;

13   correct?

14   A.    Yes, ma'am.

15   Q.    You had at least six vehicles and possibly many more; is

16   that correct?

17   A.    Yes, ma'am.

18   Q.    You had snipers?

19   A.    I don't know if it was -- it could have been binoculars.

20   I didn't see those guys.  They were in all-terrain vehicles.

21   Q.    But you testified earlier you thought they were snipers.

22   A.    Could have been snipers, yes, ma'am.

23   Q.    There were K9 units?

24   A.    We had Garden City came out with us.

25   Q.    Okay.  And so with this operational briefing, with these

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

77

1  multiple officers, you say in your investigative report you were

2  to travel to the large house where the suspect was suspected to

3  possibly be living.  Do you see that on your report?

4  A.   Yes, ma'am.

5  Q.   And by that person you mean Pablo Rangel.  Is that

6  correct?

7  A.   Yes, ma'am.

8  Q.   Because he's the one that you suspected of murdering Eliud

9  Montoya.  Is that correct?

10 A.   No, ma'am.  I think he is associated with the murder.

11 Q.   So but he is the one in your search warrant affidavit that

12 you said you thought you would find fruits of the crime at this

13 residence?

14 A.   To associate him with the murder, yes, ma'am.

15 Q.   Okay.  And you believe that he was associated with that?

16 A.   Yes, ma'am.

17 Q.   Can you point out on that search warrant affidavit and

18 application where Mr. Martinez's name is?

19 A.   It's nowhere.

20 Q.   It is not in there.

21 A.   Yes, ma'am.

22 Q.   The address 135 Milton Rahn Road was nowhere in there?

23 A.   No, ma'am.

24 Q.   Okay.  You testified earlier, if I heard right -- and if I

25 didn't, please correct me -- that when you wrote the search

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

78

1    warrant affidavit and the warrant itself, you used the term

2    residence to mean the land.  Is that what you testified to

3    earlier?

4    A.    And I elaborated to the residence being Pablo's residence

5    and the campers and then the -- as well as the trailers.

6    Q.    Well, look with me at the first page of Martinez Exhibit

7    Number 2.  In the first full paragraph, you talk about 275

8    Milton Rahn Road, and you distinguish there, the residence and

9    property can be reached.  So that distinguishes between the

10   residence and the property.

11   A.    Okay.

12   Q.    Do you agree with me?

13   A.    In that statement, yes, ma'am.

14   Q.    Okay.  And then you describe the residence as a newer

15   structure identified as a modular home.  And that refers to the

16   residence of Pablo Rangel; is that correct?

17   A.    As far as the 275 Milton Rahn Road.  I believe that's the

18   description that was provided, yes, ma'am.

19   Q.    Okay.  So the only way to get to 275 Milton Rahn Road is

20   to go on Rahn Station Road.  Is that your recollection?

21   A.    Yes, ma'am.

22   Q.    Okay.  And Rahn Station is a paved road?

23   A.    It is a paved road, yes, ma'am.

24   Q.    Milton Rahn Road is an Effingham County dirt road; is that

25   correct?

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

79

1   A.    Yes, ma'am.

2   Q.    And it just kind of snakes off Milton Rahn Road?

3   A.    Correct, yes, ma'am.

4         MS. COPELAND:  May I approach, Your Honor?

5         THE COURT:  You may.

6   BY MS. COPELAND:

7   Q.    I'm going to show you Composite Exhibit Martinez 1, which

8   are eight photographs that I have taken, and see if you can tell

9   me that that is a true and accurate representation of your

10  travel down to 275 Milton Rahn Road.  First of all, do you

11  remember seeing these mailboxes at the intersection of Milton

12  Rahn Road and Rahn Station Road?

13  A.    Yes, ma'am.

14  Q.    Okay.  Do you see -- if you'll turn to the second

15  photograph.  Would you agree with me that those mailboxes are

16  the same mailboxes shown on the prior page?

17  A.    Yes, ma'am.

18        THE COURT:  You took these pictures?

19        MS. COPELAND:  I did, Your Honor.  I drove by.  I've

20  actually been to this property.

21        THE COURT:  All right.  Now, I don't know the -- what's

22  this composite exhibit you're talking about?

23        MS. COPELAND:  Composite Exhibit Number 1.

24        THE COURT:  All right.  This shot that you took with

25  your high-quality camera --

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

80

1      MS. COPELAND:  Yeah, sorry about that.

2      THE COURT:  What was it?

3      MS. COPELAND:  I'm sorry?

4      THE COURT:  What did you use?

5      MS. COPELAND:  I used my cellphone.

6      THE COURT:  Oh, okay.  You have --

7      MS. COPELAND:  I'm sorry.

8      THE COURT:  No.  I compliment the photography.

9      MS. COPELAND:  Okay.

10     THE COURT:  Did that capture all the mailboxes at that

11  location?

12     MS. COPELAND:  Your Honor, there may have been a few on

13  the other side, and there were garbage cans also.  I got as many

14  as I could while parked on Rahn Station Road without getting

15  hit.

16     THE COURT:  All right.  I'm familiar with that type of

17  lineup of mailboxes out in the country.

18     MS. COPELAND:  Sure.

19  BY MS. COPELAND:

20  Q.   And so in the second photograph you would agree with me

21  that there is a mailbox that is labeled 275; correct?

22  A.   Yes, ma'am.

23  Q.   And there's a mailbox that's labeled 135; is that correct?

24  A.   Yes, ma'am.

25  Q.   And flipping on to the next page, is this -- does this

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

81

1    appear to be as you are driving down the dirt road on to the

2    Rangel complex, let's call it?

3    A.    From one area, yes, ma'am.  This is from the -- I guess

4    what you would call the side view.

5    Q.    Right.  And this is the only way to get onto the property?

6    A.    It is the only way on the property, yes, ma'am.

7    Q.    To your knowledge?

8    A.    As far as I know, yes, ma'am.

9    Q.    Okay.  And on the left there, you see that there is a

10   structure that appears to be a residence?

11   A.    Yes, ma'am.

12   Q.    And you would agree with me that that's Pablo Rangel's

13   residence?

14   A.    We found out afterwards it was Pablo Rangel's residence.

15   Q.    Well, that's the first place you stopped, wasn't it?

16   A.    Yes, ma'am.

17   Q.    Okay.  And you talked to his wife, did you not?

18   A.    Yes, ma'am, we did.

19   Q.    Did you ever say, is this Pablo's residence?

20   A.    Not at that time, no, ma'am.

21   Q.    Okay.  So you go to the residence.  You suspected that

22   this is his residence; is that correct?

23   A.    Yeah, it was -- yes, ma'am.

24   Q.    That's what you told the magistrate judge?

25   A.    Yes, ma'am.  We suspected that to be his residence.

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

82

1   Q.   That's what you put in this incident report; is that

2   correct?

3   A.   Yes, ma'am.

4   Q.   And that's the first place you stopped?

5   A.   Yes, ma'am.

6   Q.   It is by far the nicest living structure out there; is

7   that correct?

8   A.   Yes, ma'am.

9   Q.   You talked to somebody who lives there.

10  A.   Post search warrant, yes, ma'am.  Or during the search

11  warrant.

12  Q.   No, but --

13  A.   During the execution, yes, ma'am.

14  Q.   Yeah, during the execution you actually stopped at that

15  house.

16  A.   Yes, ma'am.

17  Q.   And you talked to his wife.  This is the first thing you

18  did according to this report that you've given me.

19  A.   Yes, ma'am.

20  Q.   Okay.  But you don't ask is this Pablo's house?

21  A.   No, ma'am.

22  Q.   Because Pablo was the person you believed was associated

23  with the murder of Eliud Montoya?

24  A.   Yes, ma'am.

25  Q.   And he is the reason why you got this search warrant in

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

83

1    the first place?

2    A.    Yes, ma'am.

3    Q.    Okay.  So you don't ask?

4    A.    No, ma'am.

5    Q.    All right.  So you -- and would you agree with me that

6    there is a pretty marked like main-drag road that goes in front

7    of all of this stuff?  There's a dirt road in front of Pablo's

8    trailer that extends down to the little shed that I think you

9    described as house number two.

10   A.    Yes, ma'am.

11   Q.    Okay.  So -- will you turn the page with me?

12   A.    Yes, ma'am.

13   Q.    Okay.  On your left would you agree with me that that's

14   Pablo Rangel's house with the trampoline in front?

15   A.    Yes, ma'am.

16   Q.    Next to that would you agree that there is a shed?

17   A.    Yes, ma'am.

18   Q.    And that's where all of the people were gathered, the men

19   were gathered?

20   A.    Yes, ma'am.

21   Q.    Okay.  Do you see on the right-hand side of this picture

22   there's a red what appears to be a tractor-trailer --

23   A.    It's a --

24   Q.    -- cargo?

25   A.    It's a cargo container, yes, ma'am.

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

84

1          THE COURT:  Wait a minute.  You're looking at this

2    picture?

3          MS. COPELAND:  I am, Your Honor.  This is Pablo's --

4    this is the shed where the men were gathered, and then this is a

5    red container in the far distance.  (Multiple parties speaking)

6          THE COURT:  I'm still not seeing the red container.

7          MS. COPELAND:  Sorry, Judge.  I should have given you

8    color photographs.

9          THE WITNESS:  I've got the color photos.

10          THE COURT:  Let me see.  Ah, shows up clear as a bell.

11          MS. COPELAND:  Yeah, it's not black and white.  Sorry

12    about that.

13    BY MS. COPELAND:

14    Q.   Okay.  So you're traveling --

15          THE COURT:  Is that a fence?

16          MS. COPELAND:  Judge, that is like a cargo --

17          THE COURT:  Oh, I see what it is, yes.

18          MS. COPELAND:  -- container.  Yeah, it's like a cargo.

19          THE COURT:  Yeah.  I'm familiar with those, too.  Go

20    ahead.

21          THE WITNESS:  Thank you, sir.

22    BY MS. COPELAND:

23    Q.   And the dirt road that's on to the right of the cargo

24    container.  And it's only past this cargo container that you

25    come into Mr. Hipolito's gray trailer; is that correct?

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

85

1    A.    Yes, ma'am.

2    Q.    If you'll flip the page, this will show the size of the

3    shed where the camper is parked.  Would you agree with me?

4    A.    Yes, ma'am.

5          THE COURT:  That turned out to be tall camper number

6    three?

7          MS. COPELAND:  Judge, I don't believe that this is the

8    camper that they actually searched.

9          THE COURT:  Okay.  All right.

10         THE WITNESS:  No, no.  We didn't.

11         MS. COPELAND:  We'll get into that.

12   BY MS. COPELAND:

13   Q.    And then the next page, that is -- would you agree with me

14   that that appears to be the side of the gray mobile home looking

15   back at Pablo Rangel's house through the --

16   A.    I don't know how close -- I don't know where this picture

17   was taken from.

18         THE COURT:  Let me see it, the color picture.  South

19   Georgia sand.  I'm guessing a swamp chestnut oak.  All right.

20   BY MS. COPELAND:

21   Q.    So the two are separated by some distance.  Would you

22   agree with me?

23   A.    Yes, ma'am.  Good bit of --

24   Q.    It's not like the gray trailer is in the backyard of the

25   brown one?

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

86

1   A.    No, ma'am.  It's a good bit of a walk.

2   Q.    All right.  And would you turn the page with me, then, to

3   the seventh picture.

4   A.    Yes, ma'am.

5   Q.    And that is the gray trailer, is it not?

6   A.    That is what is -- yes, ma'am, it is.

7   Q.    And what does the house number show on the gray trailer?

8   A.    135.

9   Q.    And finally, the last picture, the eighth picture is what

10  you referred to as house number two; is that correct?

11  A.    Yes, ma'am.

12  Q.    And this house number two, this little shed is not

13  identified anywhere in the search warrant, is it?

14  A.    No.  That is not identified, no, ma'am.

15       MS. COPELAND:  Your Honor, I'd move for the admission of

16  Exhibit Number 1.

17       MS. GROOVER:  No objection.

18       THE COURT:  Admitted.

19  BY MS. COPELAND:

20  Q.    So let's go back.  You drive down this dirt road and you

21  stop at what you think is Pablo's trailer.  Am I right?

22  A.    Yes, ma'am.

23  Q.    And you talk to a woman that you later find out to be

24  Mrs. Rangel?

25  A.    Actually, the first thing I did was, like I say, it was an

1    execution of a search warrant for a homicide.  Nobody was talked

2    to based on that reason alone.  My job was to go in there,

3    secure the residence and make sure that Pablo Rangel or any

4    other potential harmful suspect for us to be inside the

5    residence.  That's why she was never spoken to.  I was told via

6    radio that Mr. Pablo Rangel was arrested near the rear of the

7    complex next to this white-and-gray trailer.  That is the sole

8    reason that is labeled as house number one.

9    Q.   So was he arrested in the front or the back of the gray

10   trailer?

11   A.   It was next to it.  It was like, I don't know, underneath

12   a tree.  He was sitting down next to the trailer.

13           THE COURT:  Amy Lee, I hate to interrupt.

14           MS. COPELAND:  Sure.

15           THE COURT:  But for purposes of clarity of the record,

16   you just said Pablo Rangel's trailer.

17           MS. COPELAND:  Yes, I'm sorry --

18           THE COURT:  Is that the modular home?

19           MS. COPELAND:  That is a tan-in-color modular structure.

20           THE COURT:  All right.

21           MS. COPELAND:  Thank you, Judge.  I will be mindful of

22   that.

23   BY MS. COPELAND:

24   Q.   So you had noticed that Mr. Rangel was secured.  Is that

25   correct?

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

88

1    A.    Yes, ma'am, him as well as three other males.

2    Q.    And at that time you had 20 other agents with you?

3    A.    I don't think it was but about four or five at that time.

4    Q.    About four or five?

5    A.    Yeah, because the rest of them were still securing their

6    residence.

7    Q.    Okay.  But there were a total of about 20?

8    A.    It was, yeah, it was give or take 20, yes, ma'am.

9    Q.    And so in the first place that you went, the tan-in-color

10   modular home that you believed belonged to Mr. Rangel --

11   A.    Yes, ma'am.

12   Q.    -- you had four colleagues with you?

13   A.    Give or take, yes, ma'am.

14   Q.    And you found women and children there?

15   A.    Yes, ma'am.

16   Q.    And also during the time you were securing this residence,

17   you received a radio call that Pablo Rangel had been

18   apprehended, if you will.

19   A.    Yes, ma'am.

20   Q.    Okay.  And so --

21            THE COURT:  There were no males inside that initial --

22            THE WITNESS:  There was none, no, sir.

23            THE COURT:  As you entered it.

24            THE WITNESS:  It was only women and children.

25            THE COURT:  Okay.

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

89

1    BY MS. COPELAND:

2    Q.    And so despite the fact that you believed the tan-in-color

3    home belonged to Pablo Rangel and you had knowledge that

4    Mr. Rangel was secured, you did not ask anyone in that residence

5    if that's where Mr. Rangel resided?

6    A.    No.  Not at that time.

7    Q.    Instead you decided to search every other trailer on the

8    property.

9    A.    I went to the area where he was arrested.  Where he was

10   detained, yes, ma'am.

11   Q.    Did you talk to Mr. Rangel?

12   A.    At the Garden City Police Department.

13   Q.    Did anybody talk to Mr. Rangel that day?

14   A.    I cannot answer for H.S.I.  I did not as far as

15   investigations go, no.  I'm sure Garden City Police asked him if

16   he required something to drink, bathroom breaks, was he hungry,

17   et cetera.

18        THE COURT:  When you approached Mr. Rangel, Pablo

19   Rangel's tan-in-color modular home, did you see any numbers on

20   the house?

21        THE WITNESS:  No, sir.

22   BY MS. COPELAND:

23   Q.    But from your estimation, the gray trailer looked to be a

24   completely separate residence from the tan-in-color mobile home.

25   Isn't that true?

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

90

1    A.    As far as -- not attached, yes.  They were not attached.

2    Q.    Right.  And is it your experience as let's say a human

3    being that people typically live in one residence within a

4    half-mile radius?

5    A.    Occasionally, yes, ma'am.

6    Q.    Occasionally.

7    A.    Yes, ma'am.

8    Q.    So you have two residences in the same neighborhood?

9    A.    Yes, ma'am, I do.

10   Q.    You do?

11   A.    I have two houses on the same property that I live in.

12   Q.    And you live in both houses?

13   A.    I have one for storage and one for where I actually live

14   at, yes, ma'am.

15   Q.    But you would consider the place where you actually live

16   your home?

17   A.    Yes, ma'am.

18   Q.    And the other would be your storage area?

19   A.    Yes, ma'am.

20   Q.    So also, would you agree that people live in trailers?

21   A.    Yes, ma'am.

22   Q.    Okay.  So trailers could be his residence, too.  And would

23   you also agree that typically front doors of residences front

24   the main road?

25   A.    Occasionally, yes, ma'am.

ROBERTO RODRIGUEZ – CROSS-EXAMINATION BY MS. COPELAND

91

1   Q.   Occasionally.

2   A.   Yes, ma'am.

3   Q.   Does yours?

4   A.   Uh, yes, ma'am.

5   Q.   Okay.

6   A.   Actually it's the side.

7   Q.   Well, on your residence, for instance, you have door

8   numbers on the front road of your house?

9   A.   No.  My residence is 1486 Dean Forest Road, and there's

10  two houses, two separate houses on the property.

11  Q.   But you have house numbers on your property?

12  A.   No, ma'am.  No, ma'am.

13  Q.   Most of the time when you go to execute warrants do people

14  have house numbers on the property?

15  A.   Occasionally, yes, ma'am.

16  Q.   Okay.  Well, the house numbers that you see, are they on

17  the front of the property as opposed to the backdoor?

18  A.   For the most part, yes, ma'am.

19  Q.   Okay.  So you went into the backdoor of this gray trailer;

20  is that correct?

21  A.   At that time I perceived that to be the actual front of

22  the residence.

23  Q.   But you knew that there was a dirt road that went in front

24  of the residence.

25  A.   Again, I followed to where the defendants were standing in

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

92

1    front of, and that was the nearest access to it.  There was

2    actually also a wallet in that front entrance area, which is

3    why -- another reason why I thought it was going to be the front

4    of the residence.

5    Q.   But you knew there was a dirt road in the front that ran

6    in front of the gray trailer?

7    A.   No, ma'am.  I just -- I followed -- like I said, I went to

8    where the suspects were apprehended and I went into that door.

9    That is the door that I went into.

10   Q.   You testified earlier that there was a well-marked dirt

11   road leading you down through this property?

12   A.   Correct.  To -- yes, ma'am.

13   Q.   All right.  You could take the dirt road from the time you

14   came in to go past the tan --

15   A.   Yes, ma'am.

16   Q.   To go past the camper shed; right?

17   A.   Okay.  Yes, ma'am.

18   Q.   To go past the gray mobile home.

19   A.   Okay.

20   Q.   And to finally go to this little camper with the built-in

21   wooden frame; is that right?

22   A.   Yes, ma'am.  Yes, ma'am.

23   Q.   Okay.

24        THE COURT:  Is there ever a picture of this road itself?

25   Inside the compound?

93

1        MS. COPELAND:  I'm sorry, Judge?

2        THE COURT:  Did you ever take a picture of this road

3   you're describing inside the compound?

4        MS. COPELAND:  Your Honor, if I did, I don't have it

5   with me today, and I may have very well deleted it.  I can go

6   back --

7        THE COURT:  The government has no such picture?

8        MS. GROOVER:  The government does not have a picture.

9        MS. COPELAND:  But I think it is obvious --

10  BY MS. COPELAND:

11  Q.   Well, let me ask you this.  If you would, look at the

12  warrant application that's Government's Exhibit 1 because you

13  have a better photograph of it.

14  A.   Yes, ma'am.

15       THE COURT:  I was just asking.  I'm not making any

16  points here.

17       MS. COPELAND:  Okay.  I got you, Judge.

18  BY MS. COPELAND:

19  Q.   But there really is no dispute today that there was a dirt

20  road -- (simultaneous speaking).

21  A.   Yes, ma'am, led towards the back.

22       THE COURT:  It was more than a lane, was it?

23       MS. COPELAND:  It is clearly marked.

24  BY MS. COPELAND:

25  Q.   I mean, in fact, that is what your officers rode down on

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

94

1   to your knowledge because you remember seeing the cars there,

2   for instance.

3   A.    There was cars all over the place back there.

4   Q.    Sure.

5        MS. COPELAND:  May I approach, Judge?

6   BY MS. COPELAND:

7   Q.    I would like to show you what has been marked as

8   Government's Exhibit Number 7 and Government's Exhibit Number 3.

9        THE COURT:  While you're doing that, let me ask the

10  witness to hand me those color photographs.

11       MS. COPELAND:  Sure.

12  BY MS. COPELAND:

13  Q.    So on 3 can you see the dirt road that goes --

14  A.    Yes, ma'am.

15  Q.    -- on the top side of the trailer?

16  A.    Yes, ma'am.

17  Q.    And you can see where it ends with the K9 unit car parked

18  in front of the little shed that you identified as house number

19  two.

20  A.    He's backed in, yes, ma'am.

21  Q.    Let me ask you this.  The government asked you that no one

22  complained about the execution of the search warrant and you

23  testified that no one had.

24  A.    No.  Correct.  Yes, ma'am.

25  Q.    Did your agents have guns?

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

95

1   A.   Did they?

2   Q.   Yes.

3   A.   Yes, ma'am.

4   Q.   Were they drawn at any point?

5   A.   I'm sure they were.  Yes, ma'am.  I'm sure they were.

6   Q.   And you testified earlier that there may have even been a

7   sniper involved; is that correct?

8   A.   Could have been, yes, ma'am.

9   Q.   How many dogs were there?

10  A.   Just one.

11  Q.   Just one.  Was it a German Shepherd?

12  A.   No.  It is --

13  Q.   A Belgian Malinois?

14  A.   In fact, he is a German Shepherd.  Big.

15  Q.   Big German Shepherd?

16  A.   Oh, yeah.

17  Q.   Okay.  And so this was about 20 agents, and they were all

18  focused on this group of five to six men would you say?

19  A.   Yes, ma'am.

20  Q.   Because the women and children were not --

21  A.   No, no.  Everybody went to their designated area.  So

22  where those four guys were arrested was for that designated area

23  to go arrest them.

24  Q.   Let me ask you this.  Mr. Martinez never tried to leave,

25  did he?

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

96

1    A.    None of the males attempted to flee, no, ma'am.

2    Q.    He was compliant?

3    A.    Yes, ma'am.

4    Q.    In fact, he was so compliant and got heat exhaustion from

5    being outside?

6    A.    Yes, ma'am.

7    Q.    And so after all of this happens, after you drive down,

8    after you secure what you believe to be Pablo's residence

9    without asking, is this order correct -- let me start again.

10   You're out on the property.

11   A.    Yes, ma'am.

12   Q.    You're in car number six.

13   A.    Okay.  Yes, ma'am.

14   Q.    Okay.  You and five -- four or five agents walk into what

15   you think is Mr. Rangel's tan-in-color mobile home; is that

16   correct?

17   A.    Yes, ma'am.

18   Q.    You secure the property.

19   A.    We do.

20   Q.    In the process of that, you find that Mr. Rangel is -- has

21   been apprehended.

22   A.    I got a radio call, yes, ma'am.

23   Q.    You got a radio call.  You never ask if this is his

24   property.

25   A.    No, ma'am.

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

97

1  Q.    Okay.  You go down to where Mr. Rangel is.  Is that

2  correct?

3  A.    Yes, ma'am.

4  Q.    Okay.  You ignore the fact that there's a dirt road

5  running in front of this mobile home.

6  A.    I never saw it.

7  Q.    The gray in color -- but that's the road you drove in on?

8  A.    No.  I did not drive through that road.

9  Q.    So you drove through the back --

10  A.    I drove through the grass directly to where they were at,

11  which is exactly where my vehicle is parked at.

12  Q.    But to get to this property you had to take the winding

13  road --

14  A.    I made a winding road.  My car pulled directly into the

15  front of the residence.  Five officers exited that area.  Got

16  off on foot.  I then drove through the grassy area back onto

17  where Mr. Rangel was parked.

18  Q.    But you could have driven on this dirt road that went into

19  the property?

20  A.    Wasn't until after you brought it up that I say yes,

21  ma'am, I could have.

22  Q.    Okay.  But it was there.  So you then go down to speak to

23  Mr. Rangel.

24  A.    No.

25  Q.    No?

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

98

1   A.    I informed him -- I informed the four males that we had a

2   search warrant for the residence.  That was the end of my

3   communication with them.

4   Q.    And you started searching everyone's home?

5   A.    We started with house number one, yes, ma'am, or I start

6   with house number one.

7   Q.    Which is the gray trailer?

8   A.    Which is the gray-and-white trailer, yes, ma'am.

9   Q.    Which has a separate house number?

10  A.    Yes, ma'am.

11  Q.    Which has a separate mailbox?

12  A.    I guess, yes, ma'am.

13  Q.    And it is only after you search every other place on this

14  dirt road that you then return to the residence that you have

15  always believed was Mr. Rangel's residence; is that correct?

16  A.    Again, the reason that I started with that area, because

17  that's where the suspect was apprehended at.  I went through the

18  area in close proximity, house number one, house number two,

19  house number three.  And then I went to the furthest one, which

20  is house number four which would have been Pablo's residence.

21  Q.    And while I appreciate the explanation, I just want to

22  make sure I have my timing right.

23  A.    Okay.

24  Q.    You searched every other residence on this property before

25  you returned to search the residence that you have always

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

99

1  believed belonged to Pablo Rangel?

2  A.    Yes, ma'am.

3  Q.    That is correct.  The black Chevy Silverado,

4  Mr. Martinez's truck, did he ever try to get away from you?  He

5  didn't, did he?

6  A.    No, ma'am.  As far as I know.  I was not the one that

7  apprehended him.  Again, I was in the residence, the first

8  residence when they were taken into custody.  As far as I was

9  told, everybody was compliant.  Nobody tried to flee, no one

10  tried to fight.

11  Q.    And you certainly didn't see Mr. Martinez trying to drive

12  off in this truck?

13  A.    No, ma'am.

14  Q.    Did you -- did you know that it was Mr. Martinez's truck?

15  A.    I did not, no, ma'am.

16  Q.    But it was not parked by the tan-in-color residence?

17  A.    It was parked by his -- by what was later to be determined

18  as his residence.

19  Q.    By the gray trailer?

20  A.    It was parked near the gray trailer, not directly -- it

21  was underneath a tree where the guys were apprehended at.

22  Q.    And this was a hot day.

23        MS. COPELAND:  Your Honor, if I may just look at my

24  notes to make sure that I've covered all the --

25        THE COURT:  Sure.

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

100

1          MS. COPELAND:  -- that I want to cover?

2          Your Honor, I think that's it for me.

3          THE COURT:  Since you're the photographer of the

4     mailboxes --

5          MS. COPELAND:  Yes.

6          THE COURT:  -- and you've got a closeup of three

7     mailboxes, the white 275 mailbox is shown clearly and then

8     something numbered 20 or maybe 202 and then 135, you didn't take

9     a picture of what was written on the sides of those mailboxes.

10          MS. COPELAND:  Your Honor, I don't think that there was

11     anything written on the sides, in all honesty, but I was also --

12     I grew up in Moultrie in Southwest Georgia, and I know how

13     people fly down the back roads.  I was hesitant to get out of my

14     car and stand on a back road in Effingham County and photograph

15     those mailboxes.

16          THE COURT:  That little lane that you see, the dirt area

17     that is --

18          MS. COPELAND:  That's Milton Rahn Road that goes to the

19     right of those mailboxes.

20          THE COURT:  Well, I'm talking specifically about this

21     area back here.  That's part of that road?

22          MS. COPELAND:  Your Honor, that is.  That is Milton Rahn

23     Road.  This is Rahn Station.  I will note on this first

24     mailbox --

25          THE COURT:  Is that pavement I see down there with the

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

101

1   white striping along the edge of the road?

2          MS. COPELAND:  That is Rahn Station, and this says

3   actually 125 Milton Rahn Road on the far left mailbox, on the

4   first page or next to the right.  And then --

5          THE WITNESS:  Judge, here's a color copy if you want to

6   see them.

7          MS. COPELAND:  Judge, you drive past this mailbox stand,

8   and I think, like you said, there was some trash cans out to the

9   side, and then there's a row of about 10 to 12 mailboxes or

10  however many is shown on here.

11         THE COURT:  Underneath mailbox 280, what does that say?

12         MS. COPELAND:  It looks like it says Katie Street,

13  Judge.

14         THE COURT:  Or court?

15         THE WITNESS:  Katie Court.

16         MS. COPELAND:  Katie Court.

17         THE COURT:  But as far as you know, there's nothing

18  written along the side of Box Number 135?

19         THE WITNESS:  Judge, on the other page you can tell

20  there's something written on that mailbox.

21         MS. COPELAND:  Your Honor, I do not believe that there

22  was.  I believe that my client's affidavit testified to the fact

23  that he got mail at 135 Milton Rahn Road.

24         THE COURT:  No, no.  I don't doubt that.  You know, I

25  know there's been testimony about some other mail being found in

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. COPELAND

102

1    there.  But I was just -- what would anybody have seen by

2    looking at those mailboxes?  So what we have here is, as you so

3    aptly described it, a cluster of mailboxes that are -- some of

4    them are for addresses on Milton Rahn Road that we now say, and

5    apparently that's true that I accepted, and some are for other

6    mailboxes for another road.

7        MS. COPELAND:  I think there's at least one mailbox on

8    this photograph for Katie Court.

9        THE COURT:  And I would assume there's some -- are there

10   any dwellings nearby on Rahn Station Road?

11       MS. COPELAND:  Oh, Judge, it is an adventure to get back

12   to Rahn Station Road.  Rahn Station is two-laned --

13       THE COURT:  But I mean right here nearby these

14   mailboxes, are there any residences, mobile homes or homes?

15   Anything?

16       MS. COPELAND:  It can only be considered

17   rural-Effingham-County close.  You will drive past these

18   mailboxes and then there's a dirt road, and possibly, in

19   eyesight, but not right up on it, you will see a mobile home or

20   you'll see some farmland.  You'll take this dirt road to the

21   back.  You'll see houses with acreage and two, three, four

22   acres, small spreads, just kind of along this dirt road as you

23   head back to this compound.

24       THE COURT:  All right.  I'm familiar with that kind of

25   place.  I don't know how the post office gets people to do that,

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. HESSE

103

1    but they do.  Yeah, I'm familiar with it.  All right.

2           MS. COPELAND:  I have no further questions.

3           MS. GROOVER:  Would you like me to --

4           THE COURT:  Tina, do you have questions for this

5    witness?

6           MS. HESSE:  A couple, Your Honor.  I won't try to cover

7    areas that have already been covered.

8                          CROSS-EXAMINATION

9    BY MS. HESSE:

10   Q.    My name is Tina Hesse, and I represent Jhonatan Rangel.

11   A.    Good morning.

12   Q.    Now, you mentioned the Chevy Tahoe that was searched on

13   the property that you said belonged to my client, Jhonatan

14   Rangel; correct?  So three days later when Mr. Rangel was

15   stopped in that vehicle, what was the reason for that stop?

16   A.     It was more of a need to question.  Not really for me;

17   more the Homeland Security, H.S.I. who was with me, based on the

18   fact that there was firearms located inside of his room, as far

19   as that aspect.  Second aspect I was looking at was he was

20   wanted for questioning in reference to the murder investigation

21   because it was later brought to light that every one of these

22   individuals that were working for the company under Mr. Pablo

23   Rangel all resided in the same close proximity.  They all worked

24   for the same company, and they were all related.  So I needed to

25   question in reference to the murder.

104

1    Q.    So from what you just said, at least one of the reasons,

2    the first one that you stated was because there were guns found

3    in his room?

4    A.    Yes, ma'am.

5    Q.    At 135 Milton Rahn Road.

6    A.    275 Milton Rahn Road.

7    Q.    Well, no, but he lived at 135 Milton Rahn Road.

8         THE COURT:  Let's don't get into semantics.

9         THE WITNESS:  Yeah, I --

10        THE COURT:  That's our issue, isn't it, part of our

11   issue?

12        THE WITNESS:  I don't know.  You guys brought up 135

13   Milton Rahn Road.  I've never seen that address before.

14   BY MS. HESSE:

15   Q.    Right.  Earlier today you testified that Jhonatan Rangel

16   resided, and these things that you found that you're saying in

17   his room were in the white-and-gray --

18   A.    White-and-gray trailer, yes, ma'am.

19   Q.    Which was house number one?

20   A.    House number one, yes, ma'am.

21   Q.    Which we now know is 135 Milton Rahn Road.  Right?

22   A.    Again, I don't know that.  As far as I know, it was 275

23   Milton Rahn Road.

24   Q.    Okay.

25        THE COURT:  Well, you've been questioned by the United

Case 4:17-cr-00219-LGW-GRS   Document 61   Filed 03/02/18   Page 105 of 161
ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. HESSE

105

1    States Attorney and prepared for your testimony today.  And I

2    assume it might have come up in the course of that discussion.

3    Did it not?

4         MS. GROOVER:  I'm sorry?

5         THE COURT:  That there was an issue about the proper

6    address of that residence and perhaps that its actual physical

7    address was 135 Milton Rahn Road?

8         MS. GROOVER:  Did I have -- I'm sorry.  I missed --

9         THE COURT:  When you're talking with your witness.

10        MS. GROOVER:  Oh.  Yes.

11        THE COURT:  This Detective Rodriguez.

12        MS. GROOVER:  Yes.

13        THE COURT:  Did it not come up that, well, there's a

14   contention that that was a different address than 275, that it

15   was 135?

16        MS. GROOVER:  That's correct.

17        THE COURT:  That must have come up.

18        MS. GROOVER:  Yes, Your Honor.  It did.

19        THE COURT:  But does the government stipulate that the

20   actual address of the gray trailer with white trim, gray mobile

21   home, is 135?

22        MS. GROOVER:  The government stipulates that on the

23   front of that trailer there is a sticker that says 135 and that

24   there is a mailbox that says 135 in close -- coupled next to the

25   275.  However, it is the government's contention based on the

Case 4:17-cr-00219-LGW-GRS   Document 61   Filed 03/02/18   Page 106 of 161
ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. HESSE

106

1    property records that were attached to the affidavit that that

2    trailer is located and has the legal residence of 275 Milton

3    Rahn Road.  And indeed, there was mail addressed at 275 Milton

4    Rahn --

5            THE COURT:  Well, I heard that.  I heard that.  Does the

6    government dispute that this mailbox out here that's 135 that --

7    Amy Lee took a picture of that -- that that goes with this

8    mobile home?

9            MS. GROOVER:  The government has no additional

10   information if it does or not.  That was some of my followup

11   questions for the detective.

12           THE COURT:  Nobody's run down the letter carrier asking

13   him --

14           MS. GROOVER:  No, sir.

15           THE COURT:  -- about that.  On the mailboxes, Detective

16   Rodriguez, did you pay any attention to them?  Did you ever get

17   out there to the mailboxes before you went to search?

18           THE WITNESS:  No, sir.  No, sir.  I did see the

19   mailboxes as we turned on to the property.  It was just slightly

20   off the road.

21           THE COURT:  All right.  You saw them.

22           THE WITNESS:  Yes, sir, I did see them.

23           THE COURT:  Did you notice particularly 135?

24           THE WITNESS:  No, sir, I didn't pay close attention to

25   the 135, no, sir.

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. HESSE

107

1    THE COURT:  Did any of the officers -- you talked to a

2  lot of county officers --

3    THE WITNESS:  Yes, sir.

4    THE COURT:  -- deputies about what's this property like.

5    THE WITNESS:  Yes, sir.

6    THE COURT:  You were trying to figure -- you couldn't

7  get in there without tipping your hand.

8    THE WITNESS:  Correct.

9    THE COURT:  And so you're asking them questions about

10  it.  Did it ever come up that there was a structure in there

11  numbered 135?

12    THE WITNESS:  No, sir.  In fact, the verbiage on the

13  search warrant as far as the trailer being gray and white was

14  provided by Effingham County as 275 Milton Rahn Road.

15    THE COURT:  When you asked them what was at 275 Milton

16  Rahn Road.

17    THE WITNESS:  That is their wording on this search

18  warrant as far as the colors of the trailers, the house, that is

19  provided by Effingham County.

20    THE COURT:  All right.  And Amy Lee, there's nothing

21  written along the side of Box 275 either saying Milton Rahn

22  Road?

23    MS. COPELAND:  Your Honor, I'm not certain.  I do not

24  believe so.

25    THE COURT:  All right.  Proceed, Ms. Hesse.  I'm sorry.

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. HESSE

108

1    BY MS. HESSE:

2    Q.    So I'm clear, because you did answer pretty quickly before

3    about the reasons that Jhonatan Rangel was stopped three days

4    later, you said because guns were found in his room?

5    A.    Yes, ma'am.

6    Q.    Because Homeland Security was interested, because he

7    was --

8    A.    The guns found in the room.

9         THE COURT:  Did they know he was illegal?

10        THE WITNESS:  I -- I'm not 100 percent sure, Judge.  I

11   remember after talking to Juan in his interview, it did come up,

12   yes, sir.  So they did know that he was an illegal alien.

13        THE COURT:  All right.

14   BY MS. HESSE:

15   Q.    And where was the Chevy Tahoe on the property on the

16   (indiscernible) property you searched?

17   A.    In front of Juan Rangel's residence.  House number two.

18   Q.    And no firearms were found at that house?

19   A.    Only one round of ammunition.

20   Q.    Oh, the other thing was you said that Mr. Jhonatan Rangel

21   after the vehicle stop was detained and arrested and then

22   interviewed.

23   A.    He was -- I was knocking at a separate residence looking

24   for an individual.  My captain, my sergeant and a special agent

25   from H.S.I. advised me afterwards that they had the vehicle

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MS. HESSE

109

1    stopped.  I approached them.  It was not a traffic stop.  I

2    guess it was more of a, hey, you, pull over.  The driver

3    complied.  And I saw H.S.I. escorting both males out of the

4    vehicle.  It was at that time that I approached them, and we

5    began talking about, this is Jhonatan and it was another male

6    that was with Jhonatan as well.

7    Q.    When you say escorted them out of the vehicle, were they

8    under arrest at that point?

9    A.    They were detained.

10   Q.    Was Jhonatan Rangel arrested prior to his interview?

11   A.    Per me, no, ma'am.  I had no charges on him whatsoever.

12   You'd have to ask H.S.I. that.

13   Q.    You interviewed him; right?

14   A.    Yes, ma'am, I did.

15   Q.    Did you tell him he was free to leave or --

16   A.    I advised him of his constitutional rights.  I don't

17   believe I told him he was free to leave, no, ma'am.  I did

18   advise him of his rights.

19   Q.    But according to you, he was not under arrest at that

20   point, by you?

21   A.    By me, no, ma'am.  No, ma'am.

22        THE COURT:  He was certainly in custody.  I mean

23   Miranda -- if no rights were read to him, you'd have a real

24   grounds for suppression.  But your theory is not a violation of

25   the principles outlined in Miranda, but instead, this

Case 4:17-cr-00219-LGW-GRS    Document 61    Filed 03/02/18    Page 110 of 161
ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MR. BLACKBURN

110

1    questioning never would have occurred but for a violation of his

2    Fourth Amendment rights.  And they found a weapon, and that's

3    what they were interested in, the weapon that they had seized

4    unlawfully, as the defendant would have it, led to his stopping

5    and -- although he was illegal, and I guess Immigration could

6    have stopped him for that reason, what they were interested in

7    is an illegal with a gun.  And the gun came to light as a result

8    of what you contend was an illegal search.

9        MS. HESSE:  Absolutely, Judge.  Thank you, Judge.  I

10    don't have any other questions.

11        MR. BLACKBURN:  I just have a few questions.

12                        CROSS-EXAMINATION

13    BY MR. BLACKBURN:

14    Q.   Now, if I heard you right, you just testified that Juan

15    Rangel was in house number two.

16    A.   He was not inside the residence, no, sir.

17    Q.   But that was his residence, house number two --

18    A.   House number two was his residence, yes, sir.

19    Q.   But you didn't find any guns in his residence?

20    A.   Oh, I found an array of guns inside the residence.

21    Q.   Well, maybe I didn't hear you right, but I thought you

22    just said that in house number two you didn't find any guns; you

23    just found ammunition?

24    A.   Inside the Chevrolet Tahoe there was no guns, only

25    ammunition.  Inside the residence there was a cache of guns in

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MR. BLACKBURN

111

1   there.

2   Q.    Now, earlier you testified that he lived in camper number

3   three.  So which one was he --

4   A.    He lives in camper number two.

5   Q.    Camper number two.

6   A.    This was the second residence searched with the shack in

7   the front.

8   Q.    All right.  Well, let me get something else straight.  Do

9   you still have the warrant there in front of you?

10  A.    Yes, sir, I got numerous copies.

11  Q.    The warrant application?

12  A.    Yes, sir.

13  Q.    There's an Exhibit A to that application.  There's an

14  Exhibit A attached to it, which is --

15  A.    Exhibit 1?  Government's Exhibit 1?

16  Q.    (Indiscernible) -- map of Effingham County.  I think your

17  copy is probably a lot better than the copy that I have --

18  A.    Oh, you talking about the pictures, yes, sir.  Yes, sir.

19  Q.    Two or three copies over.

20  A.    Yes, sir.

21  Q.    I'd like to ask you to mark it, but I really shouldn't do

22  that when that has already been put in evidence.  Which of these

23  parcels outlined on this map is the parcel we're concerned with?

24  A.    It's the one that you can see has been broken down.

25          MR. BLACKBURN:  Your Honor, may I approach?

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MR. BLACKBURN

112

1          THE COURT:  Sure.

2          THE WITNESS:  I don't know if you have the colored --

3     it's --

4     BY MR. BLACKBURN:

5     Q.    Mine's not colored.

6     A.    It's that one right there.

7     Q.    Okay.  This is basically the bottom parcel.

8     A.    Yes, sir.

9     Q.    Okay.  So the trapezoid shaped.

10    A.    Yes, sir.

11    Q.    Okay.  And the road that runs in front of it is Milton

12    Rahn Road?

13    A.    Yes, sir.  I believe.

14    Q.    All right.  And if you look at your Exhibit B, which is

15    the Google Maps --

16    A.    Yes, sir.

17    Q.    -- if we look at the right-hand side of that, that's

18    Milton Rahn Road that runs down there on the right-hand side.

19    And then the one that turns off to the left is the private road.

20    Is that correct?

21    A.    Yes, sir.

22    Q.    Now, as a matter of fact, you say you were vehicle number

23    six.

24    A.    I don't remember.  That's what the defense told me was

25    vehicle -- I don't recall which vehicle exactly I was.  I was

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MR. BLACKBURN

113

1    somewhere in the middle of the pack.

2    Q.   Who was in the first vehicle?

3    A.   Effingham County.

4    Q.   What about the second and third --

5         THE COURT:  Oh, come on.

6         THE WITNESS:  Effingham County.

7         THE COURT:  What's that got to do with anything?

8         MR. BLACKBURN:  You will see in just one second.

9         THE COURT:  Well, go ahead then.

10   BY MR. BLACKBURN:

11   Q.   Juan Rangel was actually on Milton Rahn Road when you

12   arrived, wasn't he?

13   A.   I don't know at what point that becomes a private drive.

14   He was on a dirt road when the traffic stop was initiated.  You

15   can see the residence from where he was pulled over or told to

16   pull over.

17   Q.   So if you're on Milton Rahn -- if you look at your map for

18   Milton Rahn Road, you can see the residence, couldn't you?

19   A.   Correct.  Again, I can't answer that because I don't know

20   at what point or if it was a private drive, is it a public

21   drive.  I don't know.  I know that from where he was stopped, if

22   I looked towards the left, I was behind Pablo's house.  So I

23   can't tell you exactly if that's an actual private drive or if

24   that's 275 Milton Rahn Road.

25   Q.   Who actually stopped him?

ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MR. BLACKBURN

114

1    A.    I believe it was one of the detectives from Effingham

2    County.  It was the first vehicle.

3    Q.    And he was made to return to the property?

4    A.    He was told to turn around and come back to the property.

5    Q.    But he was not on the property when you got there?

6    A.    Again, I can't answer that question because I don't know

7    at what point --

8         THE COURT:  Mr. Blackburn, in your original so-called

9    preliminary motion, you keep saying at the time of the search

10   defendant was outside.  That's undisputed here on this record.

11   You say that he was not in possession of a firearm at the time

12   he was seized.  That's apparently undisputed.  What are you

13   driving at?  I mean you're just belaboring the record with

14   obvious facts that are already in the record.

15        MR. BLACKBURN:  What I was trying to drive at is it's my

16   understanding he was on the public road when he was stopped and

17   told to turn around and go back onto the property.

18        THE COURT:  We're talking about the validity of a search

19   warrant.  What's that got to do with the validity of the search

20   warrant, sir?

21        MR. BLACKBURN:  Well, he shouldn't have even been there,

22   I guess is part of it.  And --

23        THE COURT:  Well, of course, this preliminary motion is

24   a nullity, and I confess that I looked very briefly at your

25   supplemental motion filed way out of time.  The government

Case 4:17-cr-00219-LGW-GRS    Document 61    Filed 03/02/18    Page 115 of 161
ROBERTO RODRIGUEZ - CROSS-EXAMINATION BY MR. BLACKBURN

115

1    hadn't even seen it, and I doubt you've read it yet to this

2    moment.

3          MS. GROOVER:  No, Your Honor.

4          THE COURT:  You've had no opportunity to see it.

5          MS. GROOVER:  No, I have not, Your Honor.

6          THE COURT:  And you're talking in this supplemental

7    motion, you're moving to suppress what?  The search, the things

8    recovered through the search warrant.  You talk about the

9    affidavit not being -- showing probable cause and there not

10   being -- it wasn't with way-misspelled "sufficient

11   particularity."  And where he is stopped, whether he was on the

12   private drive or the public road is just immaterial to the

13   question of the validity of this search warrant.  You're wasting

14   my time.

15         MR. BLACKBURN:  I'm sorry, Your Honor.  I was focusing

16   on the fact that he was personally seized from a public road and

17   returned to the property.

18         THE COURT:  Did the government know that that was the

19   issue he was raising here today?

20         MS. GROOVER:  The government could generally get on the

21   fact that he wasn't on the property when he was -- when the

22   search was executed, but the government doesn't see that to be

23   material to this issue.

24         THE COURT:  Anything else, Mr. Blackburn?

25         MR. BLACKBURN:  That's all, Your Honor.

Case 4:17-cr-00219-LGW-GRS   Document 61   Filed 03/02/18   Page 116 of 161
ROBERTO RODRIGUEZ - REDIRECT EXAMINATION BY MS. GROOVER

116

1         THE COURT:  All right.  Was the murder weapon recovered?

2         THE WITNESS:  It's unknown at this time, Judge.  The

3    guns were sent out to the GBI for analyzation to be compared

4    with the bullets recovered from the body.

5         THE COURT:  Was any bullet intact that would show

6    markings that might be useful?

7         THE WITNESS:  A lot of fragments.  A lot of fragments.

8         THE COURT:  All right.  Thank you, Detective.  You may

9    go down.

10         MS. GROOVER:  Your Honor --

11         THE COURT:  Oh, you have some more.  I don't want to cut

12    you off.  I'm sorry.

13         MS. GROOVER:  Just very briefly.

14         THE COURT:  Yeah, sure.

15                    REDIRECT EXAMINATION

16    BY MS. GROOVER:

17    Q.   Ms. Copeland asked you earlier about when it was

18    determined that a possible small-caliber, .22-caliber bullet may

19    have been used and referred to days later.  I want to direct you

20    to Page 3, the first paragraph of your affidavit, which is

21    Government's Exhibit 1.  Would you agree that it says at the end

22    of that paragraph, "it was apparent from evidence on scene that

23    Eliud was shot with a small-caliber bullet, possibly a .22-

24    caliber bullet?"

25    A.   Yes, ma'am.

ROBERTO RODRIGUEZ - REDIRECT EXAMINATION BY MS. GROOVER

117

1   Q.   But did you determine prior to getting your search warrant

2   that that was the possible firearm used in this murder?

3   A.   Preliminary investigation with the hole that we saw in the

4   body, on the scalp as well as the I guess the indentation on his

5   shoulder, showed that it was possibly going to be a

6   small-caliber weapon.

7   Q.   You determined that on scene before speaking --

8   A.   Preliminary, yes, ma'am.  Preliminary investigation.

9   Q.   And with respect to the mailboxes, how far away would you

10  say they were from the residences that you were searching?

11  A.   Not close, not far.  Kind of in between.  It was

12  definitely within the walk, I mean I guess the drive in.  But

13  you're talking about 1,000 -- maybe 1,000 yards or 1,000 -- 100

14  acres away from where the actual search was conducted.

15  Q.   And Exhibit B of Government's Exhibit 1, your affidavit,

16  search warrant and affidavit, that is a Google Maps aerial view?

17  A.   Yes, ma'am.

18  Q.   Am I correct in that?

19  A.   Yes, ma'am.

20  Q.   And you can see there's a road on the right and there's a

21  structure that's white that's highlighted that you can see.

22  A.   Yes, ma'am.

23  Q.   And then above that there's a cluster of buildings, it

24  appears, as something to the top.  Do you see that?

25  A.   Yes, ma'am.

ROBERTO RODRIGUEZ  -   RECROSS-EXAMINATION BY MS. COPELAND

1    Q.    And are those two items -- did you highlight those for the

2    magistrate?

3    A.    Yes, ma'am, we did.

4    Q.    And why did you highlight them?

5    A.    To show, I guess, some of the array of properties on the

6    actual property itself.

7    Q.    And so it's your understanding there were multiple

8    locations where people could live on this 26 acres that your

9    determination was owned by Pablo Rangel that you were going to

10   be searching?

11   A.    Yes, ma'am.

12         MS. GROOVER:  Thank you.  No further questions.

13         MS. COPELAND:  Just a few followup.

14                          RECROSS-EXAMINATION

15   BY MS. COPELAND:

16   Q.    But the person you were really interested in, of course,

17   was Pablo Rangel?

18   A.    He was the one that, like I said, we felt he was going to

19   be associated to this homicide, yes, ma'am.

20   Q.    In fact, when you pulled up to the property, there was a

21   Wolf Tree work truck right by the tan-in-color residence; is

22   that right?

23   A.    Right next to the main house, yes, ma'am.

24   Q.    And the Wolf Tree was an important part of your

25   investigation, was it not?

ROBERTO RODRIGUEZ -   RECROSS-EXAMINATION BY MS. COPELAND

119

1    A.    Subsequently, yes, ma'am.

2    Q.    But that was what Eliud Montoya's family had told you that

3    this was all involved about prior to the execution of --

4    A.    Correct, yes, ma'am.

5    Q.    It was about an employment issue.

6    A.    Correct.

7    Q.    And there was the Wolf Tree truck parked next to the tan

8    mobile home; is that right?

9    A.    Yes, ma'am.

10         MS. COPELAND:  May I approach, Judge?

11         THE COURT:  Yes.

12   BY MS. COPELAND:

13   Q.    I'm going to show you, once again, Government's Exhibit 6.

14   This was a piece of mail that you identified as being found in

15   the gray trailer.

16   A.    Uh-huh.

17   Q.    Now, the name on that piece of mail is Maria D. Gonzalez

18   Juárez; correct?

19   A.    Gonzalez, yes, ma'am.

20   Q.    And the address shown is 275 Milton Rahn Road; right?

21   A.    Yes, ma'am.

22   Q.    Okay.  Page 7 of my Exhibit Number 3, your investigative

23   report, do you recall finding in the child's play room and

24   office of the tan mobile home that was Pablo Rangel's a copy of

25   Ms. Gonzalez Juárez's residence card, Georgia driver's license

Case 4:17-cr-00219-LGW-GRS    Document 61    Filed 03/02/18    Page 120 of 161
ROBERTO RODRIGUEZ  -  RECROSS-EXAMINATION BY MS. COPELAND

120

1    and Social Security card?  It is on the fourth full paragraph on

2    Page 7 of Martinez Exhibit 3.

3    A.    Yes, ma'am.

4    Q.    And so the name at least appears to be the same name as

5    the mail --

6    A.    Correct, yes, ma'am.  Similar.

7            MS. COPELAND:  Okay.  I have no further questions.

8            THE COURT:  All right.  If there are no further

9    questions for this witness, you're excused.

10           MS. GROOVER:  Nothing for the government, Your Honor.

11   The government calls Special Agent Tony Miranda to the stand.

12           THE COURT:  You may go down and stay in the courtroom.

13           THE WITNESS:  Do you want me to leave the paperwork

14   here?

15           THE COURT:  That's up to the government.

16           MS. GROOVER:  The government does not need to use the

17   exhibits for the next witness, Your Honor.

18           THE COURT:  All right.  Just hand those to the clerk.

19   All those have been marked and admitted?

20           MS. GROOVER:  That's the government's understanding,

21   Your Honor.

22           MS. COPELAND:  I marked Mr. Martinez's exhibits with the

23   designation M because I was not certain if other defendants

24   would be marking any exhibits.

25           MS. GROOVER:  All right.  May this witness be excused,

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

121

1    Your Honor?

2         THE COURT:  Be excused or remain in the courtroom.

3    Whatever he wishes to do.

4         THE CLERK:  Sir, you have previously been sworn.  If you

5    would, just be seated; state your name and your occupation for

6    the record, please.

7         THE WITNESS:  Anthony Miranda.  I'm a special agent with

8    Homeland Security Investigations.

9              ANTHONY MIRANDA, having been previously

10   sworn, testified as follows:

11                      DIRECT EXAMINATION

12   BY MS. GROOVER:

13   Q.   And before you were employed as a special agent with

14   H.S.I., where did you work, sir?

15   A.   I worked for the U. S. Border Patrol in (indiscernible)

16   New Mexico.

17   Q.   And what were your duties as border patrol?

18   A.   I had various duties.  I patrolled the border, apprehend

19   people entering the country undocumented.

20   Q.   And do you speak Spanish, sir?

21   A.   Yes, I do.

22   Q.   Fluent Spanish?

23   A.   Yes, I do.

24   Q.   And what are your duties now with Homeland Security?

25   A.   Now I investigate various crimes that fall under federal

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

122

1    statutes, to include alien smuggling, undocumented aliens.  I

2    also do Customs law, Immigration.

3    Q.    On August the 19th of 2017, a homicide that occurred in

4    connection with this case, were you called to assist local law

5    enforcement with the execution of a search warrant?

6    A.    Yes, I was.

7    Q.    What was your understanding of why you were assisting?

8    A.    They believed there was possible human trafficking.  They

9    were trafficking victims that were of possible Mexican descent

10   is what was suspected.

11   Q.    It was your understanding that there was possible

12   individuals who were illegally in this country that may be

13   present?

14   A.    Yes.

15   Q.    Were you present for the debriefing in this case by

16   Detective Rodriguez before the execution of the search warrant?

17   A.    Yes, I was.

18   Q.    And what was your understanding of what law enforcement

19   was going to be doing that day?

20   A.    They were going to be executing a search warrant and

21   search for a murder weapon of a murder that had occurred.

22   There's a possible weapon belonging either to the suspect of the

23   murder or his nephew.

24   Q.    Was it your understanding that there was multiple

25   dwellings, trailers or campers on the property that were to be

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

123

1  searched?

2  A.   Yes.

3  Q.   And were you present at the actual execution of the

4  warrant on August the 20th, 2017?

5  A.   Yes, I was.

6  Q.   Can you describe for the Court what you did when you first

7  got on scene?

8  A.   When I got on scene, I -- I didn't participate in the

9  search warrant.  What I did was just looked for people that I

10  could talk to or approach and tried to get -- assess the

11  situation, see if there was possible trafficking conditions.

12  And so I just exited my vehicle and walked the property pretty

13  much.

14  Q.   Tell the Court what you were wearing that day.

15  A.   I was wearing my body armor, which has indicators of

16  my agency, has H.S.I. -- an H.S.I. badge.  It has indicators on

17  the back, both the front and the back.  I was also wearing a

18  ball cap that has a badge on it.

19  Q.   Did you have anything that said ICE?

20  A.   Yes.

21  Q.   Or Immigration?

22  A.   Yes.  Yes.  I had Homeland Security.

23  Q.   So people were able to recognize that you were there from

24  Immigration as well?

25  A.   Yes.  They should have, yes.

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

124

1    Q.    And did you encounter a Mr. Juan Rangel?

2    A.    Yes, I did.

3    Q.    Tell the Court how that occurred.

4    A.    I was walking -- walking around, and I saw him, so I

5    approached him.  I identified myself as an immigration officer.

6    I asked him where he was from.  He told me.

7    Q.    What did he tell you?

8    A.    He told me he was from Hidalgo, Mexico.

9    Q.    And what did you do after he told you he was from Mexico?

10   A.    I asked him how he came to be in the United States.  He

11   said he crossed the border.  I asked him if he entered here with

12   documents. He said no.  I read him his rights --

13   Q.    Let me stop for a moment.  Those initial questions, were

14   those standard immigration questions?

15   A.    Yes.  Yes.

16   Q.    Can you describe that for the Court?

17   A.    Through my training I've been trained to always identify

18   myself first as an immigration officer.  In this particular

19   instance I identified myself as an Immigration and Customs

20   Enforcement agent.  Then you do a standard questions of where

21   the person -- establish where the person was born and their

22   nationality, citizenship and nationality, and then you establish

23   how they entered the United States and how long they've been

24   here.

25   Q.    And was this conversation with Mr. Juan Rangel conducted

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

125

1    in Spanish?

2    A.    Yes, it was.

3    Q.    And did he understand your questions and have any

4    difficulty communicating with you?

5    A.    He appeared to understand my questions, had no difficulty

6    communicating with me.

7    Q.    And so when you encountered Mr. Juan Rangel on the

8    property, did you advise him of these standard immigration

9    questions?

10   A.    Yes, I did.

11   Q.    And after he then acknowledged to you that he was in this

12   country illegally, did you advise him of his Miranda rights?

13   A.    Yes, I did.

14   Q.    And how did you advise him of his rights?

15   A.    We have a standard form.  I showed him the form.  I read

16   him the rights and then had him read the rights off the form

17   also.

18   Q.    And you did this right there on the property?

19   A.    Yes, right there on the property.

20   Q.    Did there come a time later on the day of August 20th that

21   you spoke again with Mr. Juan Rangel?

22   A.    Yes.  I spoke to him multiple times throughout the --

23   throughout the day.

24   Q.    And the initial time when you encountered him after you

25   advised him of the immigration questions, was this encounter

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

126

1   recorded at all?

2   A.   No, it was not.

3   Q.   Did you later interview him down in Garden City again?

4   A.   Yes, I did.

5   Q.   Was that recorded?

6   A.   Yes, it was.

7   Q.   Okay.  Backing up to the first time when you encountered

8   him, after you advised him of his Miranda rights, did he appear

9   to understand his rights?

10  A.   Yes, he did.

11  Q.   And did he -- having understanding those rights, did he

12  waive them and agree to speak with you?

13  A.   Yes, he did.

14  Q.   And what did you guys talk about?

15  A.   We spoke about various things.  It was a hot day, so we

16  walked under some shade, a shaded area that they had there.  And

17  I knew that they were executing a search warrant, so for the

18  safety of the other officer, I asked him if there was anything

19  that could harm the officers if they were looking in the homes.

20  He said yes, that there was a weapon that he was holding for a

21  friend.  Firearms.

22  Q.   And you said "anything in the home."  Did you identify in

23  particular what home you were referring to or did you just make

24  a general statement?

25  A.    I made a general statement, and then he looked back

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

127

1  towards where his home was, his residence.

2  Q.    And again, was his residence the light-colored pull-behind

3  camper located at the rear of the gray mobile home?

4  A.    Yes.

5  Q.    That seemed to be a small shed built on top of a camper?

6  A.    Yes.

7  Q.    Is that the location where law enforcement found various

8  weapons including a firearm in the oven?

9  A.    Yes, that's correct.

10 Q.    Okay.  Did he indicate to you if he had a son?

11 A.    Yes, he did.

12 Q.    And did he tell you the son's name?

13 A.    Yes.  Yes, he did.

14 Q.    Did he explain if the son was in this country illegally?

15 A.    Yes.

16 Q.    What did he say about that?

17 A.    I asked him if -- knowing that -- after I found out that

18 he was the suspect's brother, knowing that he had -- that there

19 was also a possible nephew that might have had the murder

20 weapon, I asked him if he had any -- any sons that would be the

21 nephew of the suspect, and he said he did.  And then I asked him

22 how old the son was.  I can't remember the exact date he gave

23 me.  And then I asked him if he was here illegally, and he said

24 yes, that he was here illegally also.

25       THE COURT:  Approximate age of the son?

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

128

1          THE WITNESS:  20 -- in his 20s.  I can't remember

2     exactly, Your Honor.

3          THE COURT:  Okay.

4     BY MS. GROOVER:

5     Q.   You identified per Mr. Juan Rangel that he was the brother

6     of the murder suspect at the time, Pablo Rangel?

7     A.   Yes, I did.

8     Q.   And that -- did you have an understanding before entering

9     and executing the -- assisting with the search warrant that

10    there was a possible nephew of Mr. Pablo Rangel that may possess

11    the murder weapon?

12    A.   Yes, I did.

13    Q.   And Mr. Juan Rangel explained that he had a son who would

14    be the nephew of Mr. Pablo Rangel; is that correct?

15    A.   That is correct.

16    Q.   And so did you ask where he was?

17    A.   Yes.  I asked where he was.

18    Q.   Was he on the scene of the property?

19    A.   He was not.  He was not on the scene.

20    Q.   What did you do after that initial encounter with Mr. Juan

21    Rangel?

22    A.   I sat him down in that shaded area.  And then just let the

23    local officers handle the search warrant.

24    Q.   Did you speak with any of the other males that were

25    there -- I assume were there other males?

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

129

1    A.    Yes.  There were other males.

2    Q.    Was this under like a carport type area?

3    A.    Yes, it was.

4    Q.    And how many men were there?

5    A.    There was Mr. Rangel; his brother, Pablo; Mr. Martinez;

6    another gentleman, I can't remember his name right off the top

7    of my head.  And --

8    Q.    Approximately four people or so?

9    A.    Yes.

10   Q.    Okay.  And did you advise them all of your standard

11   immigration questions before speaking with them about anything

12   else?

13   A.    Yes, I did.

14   Q.    And again, the same process did you go through with each

15   one of those individuals as you did with Mr. Juan Rangel?

16   A.    Yes, I did.

17   Q.    And did they have any questions for you?

18   A.    No, they did not.  They all --

19   Q.    And what about Mr. Hipolito Martinez-Martinez?  Did he

20   appear -- did he answer the immigration questions?

21   A.    Yes, he did.

22   Q.    And what did he advise you?

23   A.    He advised that he was also from Mexico, that he was not a

24   citizen of the United States, that he was here without the

25   proper documents to be remaining in the United States.

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

130

1  Q.    And after he advised you of that, did you then advise him

2  of his Miranda rights?

3  A.    Yes, I did.

4  Q.    And how did you advise him of his Miranda rights?

5  A.    The same way, Spanish.

6       MS. COPELAND:  Objection, Your Honor.  We're kind of

7  getting far afield of what Mr. Martinez's claims are in this

8  motion.

9       THE COURT:  It seems that we are.

10       MS. GROOVER:  I was just going through the general

11  nature of how the search and the treatment of individuals or

12  whether -- to the issue of whether or not it was executed in a

13  legal manner.

14       THE COURT:  All right.

15       MS. GROOVER:  But if Your Honor has heard enough on this

16  subject, I can move on.

17       THE COURT:  Well, I -- yeah, I wondered where this was

18  going, but yeah, issues have been raised about it being hot and

19  how people were treated, and so I think it's a fair line of

20  questioning that, yeah, how it proceeded from his point of view,

21  in light of some of the suggestions there may be some

22  impropriety.  I mean hot days are hot days.  They would have

23  preferred it cooler I'm sure.

24  BY MS. GROOVER:

25  Q.    In general, did you remain at or near these gentlemen?

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

131

1   A.   Yes.

2   Q.   And did you speak with them in Spanish?

3   A.   Yes, I did.

4   Q.   And did they appear to have any confusion or questions

5   that they were asking you about what was going on and what was

6   taking place?

7   A.   No, they did not.

8   Q.   Were they cooperative?

9   A.   They were very cooperative.

10  Q.   And were you cooperative with them?

11  A.   Yes, I was.

12  Q.   And did they complain at all about how they were treated

13  at all?

14  A.   No, not to me they didn't.

15  Q.   Okay.  And were they offered opportunities to use the

16  restroom and have water?

17  A.   Yes, they were.

18  Q.   Did you personally observe anyone suffering from heat

19  exhaustion or anything of that nature?

20  A.   Personally I did not.

21  Q.   Mr. Juan --

22       THE COURT:  Is this -- where you're talking about this

23  interview or series of questions posed to these gentlemen, is

24  this under the fan or before they got to the area where the fan

25  was?

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

132

1          MS. GROOVER:  This initial questioning was just under

2    the carport.

3          THE WITNESS:  My initial questioning was under the

4    carport.

5    BY MS. GROOVER:

6    Q.   And did your --

7          THE COURT:  And that is before they were carried to

8    where the fan was?  I'm confused about where the fan is.

9          MS. GROOVER:  Yes, Your Honor.  I'll clarify.  After

10   they were initially in the carport, because of getting hot, they

11   then moved the men to --

12         THE COURT:  And the carport of which dwelling?

13         MS. GROOVER:  -- the carport -- it was not a dwelling.

14   I think it's identified in the photographs of Defendant

15   Martinez.

16         THE COURT:  The big long structure with the camper

17   parked under it?

18         MS. COPELAND:  Yes.

19         THE COURT:  Okay.  All right.

20         MS. COPELAND:  The fourth and fifth photograph in my

21   Composite Exhibit 1.

22         THE COURT:  All right.  That's where the interview

23   started.

24         MS. GROOVER:  Initially, yes.

25         THE COURT:  And I think Detective Rodriguez said they

Case 4:17-cr-00219-LGW-GRS   Document 61   Filed 03/02/18   Page 133 of 161
ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

133

1  were there for about an hour, hour and a half --

2        MS. GROOVER:  Before they were moved by law enforcement

3  because it was so hot.

4        THE COURT:  You just testified you never saw one in any

5  physical distress.

6        THE WITNESS:  No, I did not.  Not personally, Your

7  Honor.

8        THE COURT:  Well, specifically Defendant Martinez here,

9  did you notice anything unusual about his behavior?  Was he

10  acting in an odd manner or did he seem to be, you know, overtly

11  having problems because of the heat?

12        THE WITNESS:  Not that I noticed, Your Honor.  The only

13  thing I do remember -- recall him later on as I -- because I

14  didn't stay with them the whole time.  I walked around the

15  property.  I do remember towards the -- when they were getting

16  ready to transport him to Garden City, I remember he asked about

17  his shoes.  But I really wasn't part of that, so I didn't pay

18  too much attention.  I just remember he asked something about --

19  he said something about his shoes, wanting to change his shoes,

20  I believe.

21        THE COURT:  All right.  Well, there's no dispute that he

22  had some heat-related issues, but this witness never saw that.

23        MS. GROOVER:  That's my understanding, Your Honor.

24        THE COURT:  Okay.  All right.

25  BY MS. GROOVER:

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

134

1    Q.    You testified that you walked around throughout the

2    search.

3    A.    Yes.

4    Q.    Did you participate in the seizure and photographing of

5    anything at the property?

6    A.    No, I did not.

7    Q.    At some point -- so why were you walking around?

8    A.    Maybe to see if there was anybody else talking about just

9    pretty much be around, try to see what I noticed, see what I

10   see, see if I notice anything that I can bring to their

11   attention, anything that might be of interest in any possible

12   investigations we might have.  And that was pretty much it.  I

13   also walked around with Mr. Rangel around the property, because

14   I like to try to document as much as I can, so I walked around

15   and asked him which -- who lived in which dwelling, which

16   vehicle belonged to who and tried to get a better sense of who

17   owned what on the property.

18   Q.    And did Mr. Rangel voluntarily go with you?

19   A.    Yes.  Yes, he did.

20   Q.    And did he identify where he lived, where his son lived,

21   where Mr. Hipolito Martinez lived?

22   A.    Yes, he did.

23   Q.    Where Pablo Rangel lived?

24   A.    Yes, he did.

25   Q.    And whose cars they drove?

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

135

1    A.    Yes.

2    Q.    He was cooperative with you?

3    A.    He was cooperative.

4    Q.    And approximately how many search warrants have you been

5    involved with throughout your career in law enforcement?

6    A.    I wouldn't know exactly.  Multiple, several search

7    warrants throughout my career.

8    Q.    Hundreds?

9    A.    Probably not hundreds, but close to hundreds.

10   Q.    And based on your training and experience, did you notice

11   anything unusual about the execution of this particular search

12   warrant over the compound, if you will?

13   A.    No, I did not.

14   Q.    Several days later after the execution of the search

15   warrant, did you encounter Jhonatan -- well, let me back up.

16   While you were walking around the property, did anyone hand you

17   a passport?

18   A.    Yes.  One of the Effingham County officers handed me a

19   passport.

20   Q.    And whose passport did they give you?

21   A.    That was Jonathan's.

22   Q.    The passport that was seized during the execution of the

23   search warrant?

24   A.    Yes, it was.

25   Q.    And prior to receiving that passport, had you already

1  learned from speaking with Mr. Juan Rangel, the father, that he

2  was in this country illegally?

3  A.    Yes.

4  Q.    And so did you take that passport?

5  A.    Yes, I took it.

6  Q.    But Mr. Jhonatan Rangel was not on the scene that day?

7  A.    He was not.

8  Q.    Several days later, I believe on August 23rd, 2017, did you

9  locate Jhonatan Rangel?

10  A.    Yes, we did.

11  Q.    And how did you find him?

12  A.    We were assisting again with the investigation in

13  Savannah, I believe on Ferguson, if I'm -- I believe it was

14  Ferguson, in the trailer park.  And we had no success.  As we

15  were leaving, I noticed the same SUV driving into the parking

16  lot, had to turn around.  I noticed it had Texas plates.  I knew

17  that one of the SUVs on the property had Texas plates.

18  Q.    The gold Tahoe?

19  A.    The gold Tahoe.  And I remember Mr. Rangel had told me

20  that his son last drove that the day before we executed the

21  search warrant.  So I went ahead and called out -- the driver

22  had his window down.  I called him out, and I approached him;

23  and same as I always do, I identified myself as an immigration

24  officer.

25  Q.    And how were you dressed that day?

ANTHONY MIRANDA - DIRECT EXAMINATION BY MS. GROOVER

137

1   A.    I was dressed with the same gear that I had on the day of

2   the search warrant.

3   Q.    Clearly identifying yourself as an immigration officer?

4   A.    Yes.  Clearly.

5   Q.    And what did you tell the driver of the Tahoe?

6   A.    I asked him about -- I identified them, asked them about

7   their immigration status and determined that they were both in

8   the country illegally.

9   Q.    Did you advise them of the standard immigration questions

10  that you were trained to do?

11  A.    Yes, I did.

12  Q.    And did you determine that Jhonatan Rangel was the

13  passenger of this vehicle?

14  A.    No.  Jhonatan Rangel was not the passenger.

15  Q.    He was the driver?

16  A.    He was the driver.

17  Q.    Thank you for -- thank you.  And did he answer your

18  questions?

19  A.    Yes, he did.

20  Q.    And did he admit to being in this country illegally?

21  A.    Yes, he did.

22  Q.    And then what did you do?

23  A.    And then after we determined he was here illegally, we

24  took him into custody and took him back to Garden City for

25  further questioning.

ANTHONY MIRANDA - CROSS-EXAMINATION BY MS. COPELAND

138

1   Q.   And then he was -- that interview then took place?

2   A.   Yes.

3   Q.   And was that initial encounter at the -- on Ferguson, in

4   the Tahoe, was that recorded?

5   A.   No, it was not.

6   Q.   But was the subsequent interview formally recorded?

7   A.   Yes, it was.

8   Q.   And did you advise him of his rights?

9   A.   Yes.

10  Q.   And he agreed to speak with you?

11  A.   Yes, he did.

12       MS. GROOVER:  Your Honor, may I have just a moment,

13  please?

14       THE COURT:  Yes.

15       MS. GROOVER:  I believe those are all the questions I

16  have.

17       THE COURT:  Proceed.

18                       CROSS-EXAMINATION

19  BY MS. COPELAND:

20  Q.   Good afternoon, Agent Miranda.

21  A.   Good afternoon.

22  Q.   My name is Amy Lee Copeland.  I represent Hipolito

23  Martinez-Martinez.  Did you have any part in the drafting of

24  this search warrant?

25  A.   No, I did not.

ANTHONY MIRANDA - CROSS-EXAMINATION BY MS. COPELAND

139

1   Q.   Did you ever read the search warrant?

2   A.   I did not.

3   Q.   You just relied on what Detective Rodriguez told you at

4   the operational briefing; is that correct?

5   A.   Yes, ma'am.

6   Q.   You testified earlier that you were wearing body armor

7   that was clearly marked as an H.S.I. agent and a ball cap; is

8   that right?

9   A.   Yes, that's correct.

10  Q.   Were you armed?

11  A.   Yes, I was.

12  Q.   What did you have?

13  A.   I had my Glock 19 on a thigh holster.

14  Q.   So it was clearly visible --

15  A.   It was clearly visible, yes.

16  Q.   You have to be able to reach it; correct?

17  A.   Yes.

18  Q.   How many other officers and agents were there that day?

19  A.   There were several officers.

20  Q.   Give me a number.  How many are several?

21  A.   Uh...

22  Q.   More than 5?

23  A.   More than 5 for sure.

24  Q.   More than 10?

25  A.   More than 10.

ANTHONY MIRANDA - CROSS-EXAMINATION BY MS. COPELAND

140

1   Q.   More than 15?

2   A.   More than 15 probably.

3   Q.   More than 20?

4   A.   Probably 20, close to 20.

5   Q.   Close to 20.  How many cars?  Do you remember?

6   A.   I don't remember exactly how many cars.

7   Q.   But there were at least six?

8   A.   There was at least -- yes, at least six.

9   Q.   And there was a K9 unit there?

10  A.   Yes.  There was a K9 unit.

11  Q.   And there were other officers who also had firearms with

12  them; is that correct?

13  A.   Yes, correct.

14  Q.   And you were -- testified earlier you were not really

15  there to execute the warrant.  You were just there to talk to --

16  A.   Well, one of my fields of expertise is human trafficking,

17  so I was there to try to determine whether there was human

18  trafficking victims onsite.  That was the main reason I was

19  there really, and also to help with any immigration-related

20  issues that might arise.

21  Q.   Right.  But is it fair to say you were there more to talk

22  to the various people as opposed to actually going to the door

23  with the gun drawn?

24  A.   Yes.

25  Q.   And so one of the people that you talked to was Juan

ANTHONY MIRANDA - CROSS-EXAMINATION BY MS. COPELAND

141

1   Rangel; is that correct?

2   A.    That is correct.

3   Q.    And I got a little confused about the testimony earlier.

4   I'm a visual person.  I want to show you pictures.

5   A.    Okay.

6         MS. COPELAND:  May I approach, Judge?

7         THE COURT:  You may.

8   BY MS. COPELAND:

9   Q.    I'm going to show you what's been marked as Government's

10  Exhibit 8 and Government's Exhibit 12.

11  A.    Okay.

12  Q.    If I understand your testimony correctly, Juan Rangel

13  walked around and showed you who lived where.  Which of those

14  two places, if either, did Mr. Rangel live?

15  A.    A.

16  Q.    He lived in A.

17  A.    Yes.

18  Q.    So that is not the camper behind the gray mobile home, is

19  it?

20  A.    It's back here behind the gray mobile home as far as --

21  the gray mobile home is this one here.  This is back here.  So

22  that's -- depends on where -- if you're coming in from the road,

23  it would be behind it because the gray mobile home, as you see,

24  is right here.  The road comes in this way and that's it right

25  here.

ANTHONY MIRANDA - CROSS-EXAMINATION BY MS. COPELAND

142

1   Q.   But it's not immediately behind it?

2   A.   No, it's not immediately behind it, but like I say, if

3   you're coming in the road, it would be in front.  Like if you're

4   driving in with the road, it would be in front of Mr. Rangel's

5   trailer.

6   Q.   Okay.  And so you do recall the dirt road and going to the

7   property kind of winding its way in front of the various --

8   A.   Yes, I do.

9   Q.   And Mr. Rangel -- Mr. Juan Rangel identified to you who

10  lived where you said.

11  A.   Yes, he did.

12  Q.   And which vehicle belonged to whom.

13  A.   Yes.

14  Q.   Did he tell you where Pablo Rangel lived?

15  A.   I can't remember.

16  Q.   Okay.  Would you recall if it were a tan trailer?

17  A.   I mean I knew where Pablo Rangel lived because of the

18  search warrant, but -- and speaking to the officers, but I can't

19  remember if he told me or not.

20  Q.   And that was in the tan trailer?

21  A.   The bigger dwelling as you drive into the property.

22  Q.   The nicer --

23  A.   The nicer house, yes.

24  Q.   It had a Wolf Tree truck behind it.  Is that correct?

25  A.   It was a Wolf Tree truck.  I don't know if it was behind

ANTHONY MIRANDA - CROSS-EXAMINATION BY MS. COPELAND

143

1  it or beside it, but there was a Wolf Tree truck there.

2  Q.   And were you in communication with the other officers

3  during the execution of the warrant?

4  A.   Throughout, yes, on and off.

5  Q.   Radio abilities?

6  A.   No, I did not have auto abilities.

7  Q.   But you did see the other officers?

8  A.   Yes, I did.

9  Q.   And you were never informed that Mr. Martinez was ever a

10  suspect or person of interest in this Montoya murder?

11  A.   Not specifically, no.

12  Q.   You were never informed that he was the nephew of

13  Mr. Rangel that you were wanting to speak with?

14  A.   Mr. Martinez?

15  Q.   Yes.

16  A.   No, I was not.

17  Q.   And you testified earlier that everyone was very

18  cooperative and did not complain about treatment.

19  A.   Yes.  They did not.

20  Q.   Okay.  But would you acknowledge that this is a situation

21  that would be very, very upsetting?

22  A.   Yes, I would.

23  Q.   With the number of agents and the number of guns?

24  A.   Yes.

25  Q.   And it might be difficult to express some dissatisfaction

ANTHONY MIRANDA - CROSS-EXAMINATION BY MS. COPELAND

144

1    with that.  You can see where that might be an issue?

2    A.    I can see that.

3    Q.    And you didn't stay with Mr. Martinez the entire time, and

4    you testified earlier you didn't know about his heat issues; is

5    that right?

6    A.    That is correct.

7    Q.    Did you see an ambulance arrive?

8    A.    Yes, I did.

9         MS. COPELAND:  Thank you.  I have no further questions.

10        THE COURT:  All right.

11        MS. HESSE:  I don't have any other questions for this

12   witness.

13        MR. BLACKBURN:  Anything I could ask would be

14   cumulative.  So I'll ask no more questions.

15        THE COURT:  All right.  Thank you.  You may step down.

16        MS. GROOVER:  Government has no additional witnesses,

17   Your Honor.  Only argument.

18        MS. COPELAND:  Your Honor, we'll rely on our written

19   submissions, including Mr. Martinez's affidavit stating that he

20   lived at 135 Milton Rahn Road.

21        THE COURT:  All right.

22        MS. HESSE:  Same here.  We'll rely on what's been

23   submitted and presented in court.  I'm confident the Court

24   understands our argument.

25        MR. BLACKBURN:  We'll rely on what's submitted, plus

1    Mr. Juan Rangel-Rubio's affidavit which will be submitted today.

2         THE COURT:  All right.  Well, I've read the briefs.

3    Anything that -- new developments that causes you to need

4    additional time for argument?

5         MS. GROOVER:  No, Your Honor.

6         THE COURT:  But if you want to sum up what you think the

7    evidence shows, I just ask you to be as brief as you can.

8         MS. GROOVER:  Your Honor, there's several reasons why --

9    and Your Honor identified those at the beginning.  Several

10   issues.  But I think this warrant stands at the end of the day.

11        What we have is the execution of this warrant is not a

12   general warrant, and it does have property description.  Yes, it

13   is not the most specific and detailed warrant with respect to

14   every single structure that is to be searched, but it was clear

15   to the detective and clear to the magistrate that the warrant

16   was going to be searching for all of the homes, dwellings,

17   campers, trailers, whatever different words that were called on

18   this -- on the property owned by Pablo Rangel.

19        And there -- and while there are at one point it says

20   Springfield, at one point it says Rincon; sometimes it called it

21   a trailer, sometimes it called it a camper, it is obvious when

22   you read the entire affidavit together that the intent of this

23   warrant was to search all the different dwelling locations on

24   Pablo Rangel's property.

25        THE COURT:  Whether it was 275 or 135 or any other

1    number?

2         MS. GROOVER:  That is correct.  And admittedly, the

3    detective came in -- he never saw the 135.  And I think even had

4    he saw 135 and began to search at the front of that trailer

5    instead of the back, it would not have changed the government's

6    analysis in this case at all, because what is in the warrant is

7    probable cause to establish that someone was murdered and we

8    develop a suspect, and the suspect lives on a property with

9    family members and multiple dwellings.

10        THE COURT:  Well, there were multiple suspects here.

11        MS. GROOVER:  Multiple suspects, and all honing in to

12   this property that was identified as 275 Milton Rahn Road.  And

13   the attachments to the search warrant identify 275 Milton Rahn

14   Road as this 26-acre property that had multiple buildings on it,

15   using very different terms, but multiple buildings where people

16   lived.  And there's facts in the affidavit that indicate that

17   family members of Pablo Rangel, the owner of this entire piece

18   of land, was possibly in possession of the possible murder

19   weapon.  So there is probable cause to search these different

20   trailers for these -- for the weapons.  And so agents had that

21   information.  The detective had that information and provided

22   that to the magistrate.

23        THE COURT:  Well, the affidavit itself, the face of the

24   warrant, and the detective says he told the judge that there are

25   multiple dwellings.  That's not necessarily stated in the

1    affidavit.  It's stated in the -- on the face of the warrant,

2    multiple dwellings.  It's stated on the face of the affidavit,

3    too, that it's not discussed at very -- at great length about

4    how many dwellings we think there are.

5            MS. GROOVER:  That is correct.

6            THE COURT:  Then they're named in the warrant, with

7    specificity.

8            MS. GROOVER:  Several of them are, not all of them.

9            THE COURT:  And those are legitimate questions the

10   defense counsel have raised about, well, yeah, you say 275; and

11   of course, Ms. Copeland has questioned the detective, and she

12   pointed out in her briefs, and you say I believe I have probable

13   cause to search 275.  Well, one possible interpretation of that

14   is the house that actually has 275, that physical address.  And

15   the argument would be, well, that's only one place.  That's the

16   tan-colored residence.  And if the officer didn't know that,

17   then maybe he should have known that.  And you would say the

18   evidence doesn't support that argument.

19           On that issue -- it's not like some of the cases that

20   have been cited, you know, *Maryland V. Garrison* 1(b)(1), where

21   the officers go believing there's one place to be searched, but

22   when they get there, they discover there's two apartments on the

23   third floor of that Park Avenue or Park Street apartment

24   complex.  So here it's not where the officers show up and find

25   dwellings they weren't expecting or residences or apartments

148

 1    they weren't expecting.  They were expecting multiple.

 2            MS. GROOVER:  Absolutely.

 3            THE COURT:  Now, you say that -- we move on eventually,

 4    of course, we'll have to -- setting aside the issue about the

 5    particularity of the warrant for a moment, you get into the

 6    probable cause basis for the issuance of the warrant.  And of

 7    course, my standard is not *de novo* review of this warrant.  It's

 8    the great deference standard to see if there is a substantial

 9    basis; and of course, then we have the *Leon* doctrine beyond

10    that.  But the theory of the government is we're looking for a

11    .22-caliber something, pistol, rifle.  And we know there are

12    multiple dwellings and vehicles, and we're asking the judge to

13    give us authority to search all of those places.

14            MS. GROOVER:  That is correct.  Government --

15            THE COURT:  What if the compound had been bigger and

16    instead of four separate dwellings there had been 40?

17            MS. GROOVER:  Then you limit it to the description in

18    the warrant.  And the description --

19            THE COURT:  No, no, no.  No.  I'm talking about probable

20    cause.  I'm talking about probable cause.  There had been 40

21    dwelling places inside that 20 acres.  Easy to imagine.

22            MS. GROOVER:  Easy.

23            THE COURT:  Would there have been probable cause to

24    search all 40 for that .22-caliber weapon?

25            MS. GROOVER:  It's the government's position that, yes.

149

1    There's not -- this is not overwhelming probable cause.  This

2    is -- this is enough to meet the Fourth Amendment requirement.

3    The government acknowledges that it's not over --

4            THE COURT:  I can just be right up front.  I wouldn't

5    have issued that warrant, not on this showing.

6            MS. GROOVER:  I understand.

7            THE COURT:  Not on the words of that affidavit.  Not

8    saying that it could not have been framed in a better way that

9    would have established.  I'm just saying there are a lot of

10   inferences to be made.

11           MS. GROOVER:  There are.

12           THE COURT:  It's not where all that was known by the

13   officers -- and that's the job sometimes of a good attorney.  Is

14   let's get on paper what's in your head.  You're being too

15   abbreviated in your description.  Let's put down everything we

16   know to try to bolster this to show that there really is

17   probable cause.  But if you start increasing the number of

18   dwelling places on the property, you start stretching the

19   probable cause concept beyond all recognition.

20           MS. GROOVER:  The government does say that there is

21   definitely probable cause in this to search the two trailers

22   where the firearms in question --

23           THE COURT:  You just won't go with my hypothetical, will

24   you?  What if there had been more, though?

25           MS. GROOVER:  There weren't in this particular case.

150

1    And we had probable cause to search the two, but the government

2    acknowledges it is not the strongest --

3            THE COURT:  Let's just say eventually your argument

4    would stumble.

5            MS. GROOVER:  It probably would, Your Honor, which is

6    why the government also acknowledges that this was executed in a

7    reasonable manner and the officers acted in good faith, because

8    the testimony that Your Honor heard --

9            THE COURT:  In good faith.  In what way do you say good

10   faith?  In good faith in reliance upon that magistrate's

11   judgment about the existence of probable cause?

12           MS. GROOVER:  And their good-faith understanding that

13   they have the authority to search all of the dwellings on that

14   property, because as Detective Rodriguez testified, it was his

15   intention and his understanding to search all of the dwellings,

16   the campers, the trailers, the homes, whatever you call it --

17           THE COURT:  If you had been drafting this warrant, would

18   you have brought this to me?

19           MS. GROOVER:  No, Your Honor.  We would certainly have

20   edited it and make it more specific.  But at the end of the day

21   an officer --

22           THE COURT:  Wouldn't you have referenced the vehicles in

23   each of these places in the affidavit itself?

24           MS. GROOVER:  Yes.  Yes.

25           THE COURT:  And said why we think there's probable

151

1   cause?

2          MS. GROOVER:  Yes.

3          THE COURT:  That the gun could be anywhere?

4          MS. GROOVER:  Certainly, Your Honor.

5          THE COURT:  That Pablo is the henchman?  He's in

6   control?  These people are under his thumb?  He's the

7   mastermind?  They do his bidding?  They live there at his

8   indulgence?  That he's the powerful figure?  And the likelihood

9   of him having the weapon in his home is pretty remote, he could

10  get someone else to do his bidding?

11         MS. GROOVER:  Yes, Your Honor.

12         THE COURT:  I mean if that had been true and truthful,

13  you would have said those things.

14         MS. GROOVER:  We would have spelled it out.  Absolutely.

15         THE COURT:  Building a case that that weapon is not

16  necessarily or even likely to be in his personal residence but

17  somewhere else.

18         MS. GROOVER:  Absolutely.

19         THE COURT:  This affidavit lacks all of that.

20         MS. GROOVER:  It does.

21         THE COURT:  In fairness -- I know the detective is here.

22  Even -- and I know Amy Lee says in her brief, in her original

23  brief, the officers apparently believed -- I'm not looking at

24  exact wording here, but I've read it.  Apparently believed that

25  they have a license to search all of these structures.  And

1    you're saying that was a reasonable belief because it was indeed

2    what the judge gave them a license to do.

3         It further shows that the detective was -- he was in a

4    rush.  Well, ferreting out crime is often a hasty and -- you

5    don't have the luxury of time.  This is a murder case.  It's

6    likely the evidence will disappear if given time.  They're

7    moving as fast as they can.  They get this warrant typed up.  I

8    can see this agent has labored to prepare the affidavit and the

9    warrant.  He's labored to do a good job.  We're picking at it

10   now.  And Lord knows, there's grounds for that.

11        But it seems to me that the concession that was made --

12   it's not a concession.  The statement that was made in the --

13   Amy Lee, by you in your initial brief, that they believed they

14   had a warrant.  She's just saying it was the wrong belief, that

15   you read the warrant, you can't come to that conclusion.  And

16   there's no probable cause to support it.

17        MS. GROOVER:  Your Honor, I think the --

18        THE COURT:  But it is not the tightest case.  I've left

19   particularity behind.  I'm talking probable cause.

20        MS. GROOVER:  And the government acknowledges that.

21        THE COURT:  It's not an airtight case you would like to

22   have.

23        MS. GROOVER:  No, it's not.  And we acknowledge that,

24   but the government does maintain that above everything else this

25   case does get to the heart of *Leon,* because what we have, we

153

1    have officers who were diligent in their investigation to

2    quickly locate evidence before it is destroyed.  We have

3    officers whose investigation led them to a suspect and did his

4    research on the location of the property where it's owned, the

5    description of the property, spoke with other officers who had

6    been out there, got descriptions from those other officers about

7    what types of dwellings are going to be on there, had

8    information that the guns could be at any other of these 12

9    trailers that family members owned, and he got -- he was

10   diligent in his investigation, and he put that together as

11   quickly as he could in a --

12          THE COURT:  It is rather an amazing turn of events that

13   the murder victim has a manilla envelope with the complaining

14   aliens who have been abused by allegedly by Pablo Rangel and

15   that they have come forward confessing to the EEOC that we're in

16   this country unlawfully, in this modern -- this happened back --

17   this year.

18          MS. GROOVER:  Yes, sir.

19          THE COURT:  After the new administration change.

20          MS. GROOVER:  That's correct.

21          THE COURT:  And they're confessing that they're illegal

22   and they're being abused by this man.

23          MS. GROOVER:  Yes.

24          THE COURT:  That he is charging them $1,500 for their

25   I.D.s and he's withholding pay from them, and if they complain,

154

1   then there's hell to pay.  It's rather amazing that you have

2   these affidavits, these declarations from these illegal aliens.

3   I was surprised and, frankly, encouraged by it, that people had

4   the courage to come forward and do that.

5          MS. GROOVER:  And that is why the officers were working

6   so quickly --

7          THE COURT:  So the evidence is not just a mother and a

8   wife saying we know the boss did it, but hard evidence to

9   suggest as a motive here, as a grievance.

10          MS. GROOVER:  Yes.

11          THE COURT:  I mean the evidence is building -- nobody's

12   questioning here -- I mean Pablo is not before the Court.  He's

13   not represented by a lawyer here.  They would be making an

14   argument for him, I'm sure.  But nobody here is asserting that

15   there was a lack of probable cause to search his house.  It's

16   the broadening of whether the judge -- whether the agents even

17   sought to broaden it beyond the house, whether they had a

18   license to do so in the face of the warrant that was particular

19   enough to meet the Fourth Amendment and whether there was

20   probable cause to support that broadening out beyond.  I

21   understand what the issues are.  And --

22          Well, Amy Lee, you want to respond; I know you do.

23          MS. COPELAND:  I do, Judge.  There's no Fourth Amendment

24   doctrine that says that the ends justify the means.  And that is

25   what I'm hearing is the justification for this search, Judge.

1    We talk about was there probable cause to search these other

2    dwellings on the property, and I keep hearing about the

3    reference to the family in the search warrant affidavit.  So I'm

4    going to read you the single reference to the family that I hear

5    in the search warrant affidavit.  This is from Joel Reyes.  He

6    stated he told Eliud to leave Pablo alone since he was going to

7    have him killed.  Joel advised he didn't think Pablo could kill

8    Eliud but he has family who could kill him.

9          THE COURT:  Yeah.

10          MS. COPELAND:  That's it.  That's the big basis for

11   family.  It goes on in the next paragraph about this nephew,

12   Refugio Ramirez.  And they're relying on an arrest from 2014

13   that is two-and-a-half years prior to the search warrant

14   affidavit under this -- under the incident number, it looks like

15   the arrest was on December 23rd, 2014.  This was an August 20th,

16   2017 affidavit.

17          So this is stale information.  This is two-and-a-half

18   years old.  This is seeking a gun that they now say, well, they

19   really don't know that it was a .22.  They thought it was a

20   small-caliber handgun, but they really don't know it was a .22.

21   And they're looking for a very, very common gun.

22          The search warrant affidavit states that your affiant

23   firmly believes enough probable cause has arisen to show Pablo

24   is involved in the murder of Eliud Montoya.  And then goes on to

25   say that fruits exist inside the residence located at 275 Milton

1    Rahn Road.

2           The affidavit mentions nothing about Mr. Martinez.  All

3    of the testimony today, as I understood it, was that everybody

4    believed that Pablo lived in the tan mobile home that had the

5    Wolf truck parked outside of it.  That's the first thing you saw

6    when you come down the dirt road.

7           THE COURT:  Well, I mean in fairness, it also suggests

8    the nephew lived in a trailer on Pablo's property.

9           MS. COPELAND:  But that's not what the affidavit ends

10   with.  They don't say that the affiant believes probable cause

11   has arisen to show Pablo is involved and that the nephew --

12          THE COURT:  Well, is that statement even needed to get a

13   warrant?

14          MS. COPELAND:  Probably not, Judge, but it certainly

15   shows what the police officers believed is the probable cause

16   showing that they are being called upon to make.

17          THE COURT:  It somewhat begs the question, though,

18   doesn't it, about, well, what is 275?

19          MS. COPELAND:  What is 275 indeed, Judge.  And you know,

20   as I read the description of the property, it would be like

21   saying that Amy Lee Copeland lives in a brick house at 1234 Oak

22   Street.  It is next door to a cream-colored house and a yellow

23   house.  To me this sounds like the description of a

24   neighborhood.  It identifies what you're looking for, where it

25   is in space and time.  It does not say that, by the way, since

157

1  you're checking out my house, you can go search my neighbors'

2  houses, too.

3          THE COURT:  That would be an interesting concept.

4          MS. COPELAND:  That would be an interesting concept

5  because I don't think the Fourth Amendment lets officers --

6          THE COURT:  No.  The draft has clearly frowned upon --

7          MS. COPELAND:  I don't even think we have to take that

8  into the future.  I think that that's what they were thinking --

9          THE COURT:  It's the very thing that prompted the

10 drafting of the Fourth Amendment.

11         MS. COPELAND:  Right.

12         THE COURT:  They were tired of the British soldiers

13 coming into their houses --

14         MS. COPELAND:  Right.

15         THE COURT:  -- without any warrant; just a general go

16 look for evidence.  They got tired of it.  They had a revolution

17 because of it.

18         MS. COPELAND:  Yes.  And that's what bothers me.  I've

19 got a client who lives at a separately marked trailer with the

20 address that faces the little road that comes down to -- you

21 know, comes down through this 26-acre tract that is never

22 mentioned in this affidavit.  I've heard no testimony that

23 anyone thinks that he is Mr. Rangel's nephew or any family

24 member even who is there, and all of a sudden has perhaps a

25 sniper, a K9 unit, 20 armed officers and a whole cavalcade of

158

1  police officers driving down this dirt road in Effingham County

2  on one of the hottest days of the year, you know --

3          THE COURT:  Well, they didn't choose the weather.

4          MS. COPELAND:  They didn't choose the weather.  But it

5  is a terrifying situation.  So you go in to whether the officers

6  acted reasonably in a manner when they executed the warrant.

7  Everybody says that they were looking for Pablo Rangel.  The

8  first house they go to is the house that they believe belongs to

9  Pablo.  They talked to his wife.  I understand they're securing

10 the premises.

11         THE COURT:  Of course, that argument is bleeding back

12 into the particularity argument.

13         MS. COPELAND:  And I'm good, Judge.

14         THE COURT:  If they didn't have the reasonable belief

15 that there was evidence outside of his home, then the whole

16 thing was dead in the water from the get-go.

17         MS. COPELAND:  It is, and it doesn't say why they would

18 have thought that.  There isn't even any boilerplate recitation

19 about this is a small, easily concealed handgun that could be,

20 you know, found in all sorts of different places.  They are

21 clearly in this affidavit looking for Pablo, and they want to

22 look through Pablo's things.

23         THE COURT:  A gun's, whether it be rifle or handgun, I

24 mean in the scheme of things, relatively easy to see.

25         MS. COPELAND:  It is.  Yeah.

1          THE COURT:  Well --

2          MS. COPELAND:  So, Judge, I just -- I think it's an

3    invalid warrant.

4          THE COURT:  I keep having these Fourth Amendment issues,

5    and every time I look up above the bench, there you stand.  It's

6    not because of you.  You're just getting the luck of the draw in

7    those warrants.

8          MS. COPELAND:  That's all right, Judge.  I feel --

9    anyway.  Thank you.

10          THE COURT:  It's been commented that there's nothing

11    left to be said about the Fourth Amendment, that we -- you know,

12    we've exhausted all the endless variety of the factual

13    situations.  But cases like this prove those people wrong.

14    Anything else?

15          MS. HESSE:  Nothing further, Your Honor.

16          MR. BLACKBURN:  I would just reiterate and adopt what

17    Ms. Copeland said.  And I think it's very telling that nowhere

18    in this affidavit and application does the officer say that

19    there are numerous dwellings on the property that should be

20    searched because the weapon could be in those other dwellings or

21    in some other building on the property.  He only mentions that

22    he firmly believes the fruits of the crime do exist inside the

23    residence located at 275.

24          THE COURT:  Yeah.  Even the words "the residence."

25          MR. BLACKBURN:  The residence.  I mean not the residence

160

1    and the surrounding sheds and buildings and campers and

2    trailers, but just the residence.

3         THE COURT:  Yeah.  Well, of course, we're -- we have in

4    addition -- you may be seated.

5         In addition to the affidavit, we've got his testimony

6    today about what he meant, but more importantly what he told the

7    state judge.  So the affidavit is supplemented, Georgia Law

8    permits that, and we're interpreting a Georgia-issued warrant.

9    And so the fact that there was additional factual statements

10   presented to the magistrate judge, the Court can take into

11   account whatever they're worth.

12        All right.  We'll take a -- the parties are excused.

13   However, I'm going to ask government counsel, Mr. Blackburn and

14   his client to remain.  Everyone else is excused.

15             (Proceedings concluded at 1:20 p.m.)

16                        - - -

17

18

19

20

21

22

23

24

25

161

CERTIFICATE OF OFFICIAL REPORTER

1

2

3         I, Kelly McKee Dorsey, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the Southern District of Georgia, do hereby

6    certify that pursuant to Section 753, Title 28, United States

7    Code, that the foregoing is a true and correct transcript of

8    the electronically recorded proceedings held in the

9    above-entitled matter and that the transcript subsequently

10   transcribed by me is true and accurate to the best of my

11   ability to hear and understand the recording, and the page

12   format is in conformance with the regulations of the Judicial

13   Conference of the United States.


15         Dated this 2nd day of March, 2018.


20         _/s/ Kelly McKee Dorsey_____

21         KELLY McKEE DORSEY, CCR, RMR, CCP

22         #2731